UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------ x
DONNESIA BROWN,

                    Plaintiff,

                                   Civil Action No.
                                   9:17-CV-01036

        -against-
THE STATE OF NEW YORK, THE NEW
YORK STATE DEPARTMENT OF
CORRECTIONS, ET AL,

                    Defendants.
------------------------------------------------ x
UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK
------------------------------------------------ x
THOMAS OZZBORN,

                    Plaintiff,

                                   9:17-CV-1039
        -against-                  (MAD/ATB)

THE STATE OF NEW YORK, THE NEW
YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, NEW YORK STATE
CORRECTIONS OFFICER MATTHEW
CORNELL, INDIVIDUALLY AND IN
HIS OFFICIAL CAPACITY,

                    Defendants.
------------------------------------------------x
DATE:  7/16/2020
DEPONENT:  BRIAN LEEDS

1
2
3          EXAMINATION BEFORE TRIAL of a non-party
4     witness, BRIAN LEEDS, taken by the respective
5     parties, pursuant to Subpoena, held on VC
6     LEXITAS-LegalView, LEXITAS-LEGALVIEW VC One-Click
7     Link Entry Provided REMOTE VIDEOCONFERENCE VC, on
8     July 16, 2020, at 10:12 a.m., before a Notary Public
9     of the State of New York.
10    ***********************************************
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1
 2    A P P E A R A N C E S: (VIA VIDEOCONFERENCE)
 3               RUBENSTEIN & RYNECKI, ESQS
                      Attorneys for Plaintiffs
 4                    DONNESIA BROWN AND THOMAS
                      OZZBORN
 5                    16 Court Street, Suite 1717
                      Brooklyn, New York  112541
 6
               BY:   RICHARD LEVY, ESQ.
 7
 8
               ATTORNEY GENERAL OF THE STATE OF NEW YORK
 9                    Attorneys for Defendants
                      THE STATE OF NEW YORK
10                    615 Erie Boulevard West, Suite 102
                      Syracuse, New York  13204
11
               BY:   AIMEE COWAN, ESQ.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2           F E D E R A L    S T I P U L A T I O N S
 3
 4           IT IS HEREBY STIPULATED AND AGREED by and
       between (among) counsel for the respective
 5     parties herein, that filing and sealing be and the
       same are hereby waived.
 6
 7           IT IS FURTHER STIPULATED AND AGREED that all
       objections, except as to the form of the question,
 8     shall be reserved to the time of the trial.
 9           IT IS FURTHER STIPULATED AND AGREED that the
       within deposition may be sworn to and signed
10     before any officer authorized to administer an
       oath, with the same force and effect as if signed
11     and sworn to before the Court.
12                         xxxx
13
             IT IS HEREBY STIPULATED AND AGREED by and
14     between counsel for all parties present that
       pursuant to CPLR section 3113(d) this deposition is
15     to be conducted by video conference, that the court
       reporter, all counsel, and the witness are all in
16     separate remote locations and participating via
       videoconference (LegalView/Zoom) meeting under the
17     control of Lexitas Court Reporting Service, that the
       officer administering the oath to the
18     witness need not be in the place of the deposition
       and the witness shall be sworn in remotely by the
19     court reporter after confirming the witness's
       identity, that this videoconference will not be
20     recorded in any manner and that any recording
       without the express written consent of all parties
21     shall be considered unauthorized, in violation of
       law, and shall not be used for any purpose in this
22     litigation or otherwise.
23           IT IS FURTHER STIPULATED that exhibits may be
       marked by the attorney presenting the exhibit to the
24     witness, and that a copy of any exhibit presented to
       a witness shall be Emailed to or otherwise in
25     possession of all counsel prior to any questioning
```

1

2   parties shall bear their own costs in the conduct of

    this deposition by video conference, not

3   withstanding the obligation by CPLR to supply a copy

    of the transcript to the deposed party by the taking

4   party in civil litigation matters.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    Brian Leeds
 2    B R I A N   L E E D S, Having been first duly sworn
 3    before a Notary Public of the State of New York, was
 4    examined and testified as follows.
 5    EXAMINATION BY
 6    MR. LEVY:
 7    Q     What is your name?
 8    A     Brian Leeds.
 9    Q     What is your address?
10    A     191 Elder Drive, Farmington, New York,
11    14425.
12                    (Whereupon, NOTES are received
13              and marked as PLAINTIFF'S Exhibit 1
14              for Identification.)
15    Q.    Good morning, Mr. Leeds.
16    A.    Good morning.
17    Q.    I guess some ground rules before I get
18    going and it goes without saying, we are
19    conducting this deposition via a Zoom
20    platform and we all acknowledge that we are
21    in different rooms and different parts of New
22    York State and this is not being recorded
23    other than by our official court
24    stenographer, the court reporter that's here
25    with us today, Ms. Mulligan.
```

1                     Brian Leeds

2           That's understood, right?

3      A.     Yes.

4      Q.     Again, my name is Richard Levy, I work

5      for a law firm called Rubenstein & Rynecki.

6      You're here today to provide testimony

7      relevant to two lawsuits that are presently

8      pending in the Northern District of New York

9      and they are Thomas Ozzborn against

10     Correction Officer Matthew Cornell and

11     Donnesia Brown against Correction Officer

12     Matthew Cornell.

13          Before we begin, I'll just go over a

14     few basic ground rules.  Please let me know

15     if you'd like me to rephrase a question that

16     I'm asking, if you would like me to state it

17     another way, I will be happy to do so.  If

18     you've answered the question, I'm going to

19     assume you understood it so please let me

20     know if you would like me to restate my

21     question.

22          If you have difficulty hearing it

23     because of the method in which we are

24     conducting the deposition, please let me know

25     and we'll try to adjust our settings so that

```
 1                    Brian Leeds
 2   you can hear better.
 3          Please wait until I'm done asking a
 4   full question before you provide your answer,
 5   I'll wait until you're done providing your
 6   answer before I go on to my next question.
 7   It goes without saying it's very important
 8   that two people can't talk at the same time
 9   as the court reporter can only take down one
10   person talking at a time.
11          Do you understand all those
12   instructions?
13   A.    Yes.
14   Q.    Great.
15          Mr. Leeds, are you currently employed?
16   A.    Yes, I am.
17   Q.    Who are you employed by?
18   A.    The Ontario County Public Defender's
19   Office.
20   Q.    What is your job with the Ontario
21   County Public Defender's Office?
22   A.    I am an assistant public defender.
23   Q.    How long have you held that position?
24   A.    Approximately now about two-and-a-half
25   years.
```

```
 1                     Brian Leeds
 2    Q.     Do you know approximately when it was
 3   that you started with them?
 4    A.     It would have been February of 2017,
 5   I'm not sure of the exact date, it might have
 6   been the 28th, if I'm not mistaken.
 7    Q.     You're currently an attorney?
 8    A.     Yes, I am.
 9    Q.     What year did you receive your Juris
10   Doctorate?
11    A.     I graduated law school 2007, was sworn
12   in 2008.
13    Q.     Where did you go to law school?
14    A.     Vermont Law School.
15    Q.     Where were you sworn in?
16    A.     Albany, 3rd Department.
17    Q.     Where are you admitted to practice?
18    A.     New York State.
19    Q.     What courts in New York State are you
20   admitted to practice?
21    A.     I am currently practicing in the 4th
22   Department and I believe I'm still eligible
23   to practice in the 3rd.
24    Q.     Do you have any Federal Court
25   admissions?
```

```
 1                    Brian Leeds
 2  A.     No, I don't.
 3  Q.     What was your first job as an attorney
 4  out of law school?
 5  A.     My first job was as an assistant
 6  district attorney in Broome County, New York.
 7  Q.     When did you leave that job?
 8  A.     I want to say it was 2014, February or
 9  March of 2014.
10  Q.     Where did you go to work at that time?
11  A.     After I left Broome I went to the
12  Cayuga County District Attorney's Office.
13              MR. LEVY:  I just want to make
14         sure our court reporter got that, you
15         got what he said?
16              (Whereupon, the requested
17         portion of the transcript was read
18         back by the reporter.)
19  Q.     Both Broome County and Cayuga County
20  are located in Upstate New York, correct?
21  A.     That is correct.
22  Q.     Is there any specific reason why you
23  went to the Cayuga County District Attorney's
24  Office?
25  A.     The easiest specific reason I can give
```

```
 1              Brian Leeds
 2   you is that my wife grew up in Auburn, which
 3   is located in Cayuga County and we were kind
 4   of looking to get closer to her family, I
 5   guess is the easiest way to put it.  Most
 6   specific reason, but that was a real
 7   motivating factor.
 8   Q.    I should have began with this, but
 9   you're here today pursuant to two subpoenas
10   that I served upon you for your testimony
11   today, correct?
12   A.    That is correct.
13   Q.    Other than the coordination of your
14   appearance here today, have we discussed
15   these matters at all?
16   A.    The factual matters, no the only
17   discussions we had was setting up this
18   deposition.
19   Q.    The logistics of actually setting it
20   up, correct, not any substance of your
21   testimony, correct?
22   A.    That is correct.
23   Q.    Prior to making your appearance here
24   today, did you have any discussions with any
25   members of the Cayuga County District
```

1                    Brian Leeds

2   Attorney's Office regarding your testimony?

3   A.      Today, no, I haven't.

4   Q.      When specifically did you begin

5   working at the Cayuga County District

6   Attorney's Office?

7   A.      I want to say, let's see, so if I left

8   Broome County around February 2014, I would

9   have started about a week later so February

10  2014.  I would have to really look and think

11  about it, but that's my rough remembrance, I

12  might be getting my dates wrong, it might

13  have been 2015.

14  Q.      When you began working at the Cayuga

15  County District Attorney's Office, who was

16  the district attorney.

17  A.      Jon Budelmann, B-U-D-E-L-M-A-N-N.

18  Q.      Did Mr. Budelmann himself hire you?

19  A.      Yes, he did.

20  Q.      How large is the Cayuga County

21  District Attorney's Office in terms of

22  numbers of attorneys working there?

23  A.      When I had started or --

24  Q.      When you began working there.

25  A.      Maybe seven attorneys, maybe eight.

```
 1                    Brian Leeds
 2   Q.    Was there a deputy district attorney?
 3   A.    There was, I don't know if his title
 4   is chief assistant or first assistant.  The
 5   deputy essentially was Christopher Valdina,
 6   V-A-L-D-I-N-A.
 7   Q.    Was the Cayuga District Attorney's
 8   Office broken up into divisions or different
 9   groups?
10   A.    No.
11               MR. LEVY:  Off the record.
12               (Whereupon, a discussion was
13          held off the record.)
14   Q.    Would it be fair to say that any of
15   the approximately seven to eight assistant
16   district attorneys in Cayuga County could
17   handle any type of a case?
18   A.    They could, the way it worked is we
19   generally had specific cases that, types of
20   cases that some of us would be assigned to,
21   but we didn't actually have specific
22   divisions in that sense, for example, I was
23   primarily when I started I became or took
24   over doing like the prison prosecutions.
25   Anybody in the office could have done them,
```

```
 1                    Brian Leeds
 2   but that was essentially my job or part of my
 3   job when I was there.
 4   Q.      Can you expand on what you mean by
 5   that, the prison prosecutions?
 6   A.      So we would, we would get cases
 7   recommended to us from the, from the prison,
 8   they would go first to the New York State
 9   Police and, you know, once every maybe two or
10   three months I would sit down and meet with
11   one of the investigators from the State
12   Police and he would have a stack of incident
13   reports from Auburn Prison and from the other
14   prison in the county, Cayuga County
15   Correctional Facility and we would kind of,
16   he would give them to me and he would say
17   take a look and decide if there is any that
18   your office is interested in prosecuting and
19   from there I would look through them and
20   decide which cases we wanted to select for
21   prosecution.
22   Q.      Which prisons would they be coming
23   from?
24   A.      Auburn Correctional Facility and
25   Cayuga County Correctional Facility.
```

```
 1                     Brian Leeds
 2   Q.     Who at the Cayuga County District
 3   Attorney's Office would review the potential
 4   prison cases to determine whether or not
 5   charges should be brought?
 6   A.     Me.
 7   Q.     Would you have to get the approval
 8   from either Christopher Valdina or Jon
 9   Budelmann?
10   A.     No.
11   Q.     During the period of time that you
12   were working at the Cayuga District
13   Attorney's Office, did your job
14   responsibilities change at all?
15   A.     Change in what sense?  Maybe if you
16   can rephrase it.
17   Q.     Well, did you change position from
18   handling the prison cases, were you handling
19   other types of cases, however you would
20   describe it?
21   A.     It never changed.  One of my
22   responsibilities was the prison cases.  I
23   would also have several local courts that
24   were assigned to me as the prosecutor, I
25   assisted in DWI prosecutions when needed, we
```

```
 1                 Brian Leeds
 2   had another prosecutor there who is the
 3   primary DWI prosecutor, that was kind of the
 4   backup.  I would have other types of cases,
 5   felony cases that might have been assigned to
 6   me and would help out more or less as needed
 7   and that was up until when I left, I guess if
 8   the specific question is did anybody else do
 9   prison prosecutions while I was there the
10   answer to that is no.
11   Q.     When you left the Cayuga County
12   District Attorney's Office, is that when you
13   began working for the Ontario County Public
14   Defender's Office?
15   A.     That's correct.
16   Q.     Who would have been your direct
17   supervisor in the time that you worked at
18   Cayuga?
19   A.     Jon Budelmann would have been, the
20   district attorney would have been my direct
21   supervisor, I did work pretty closely with
22   Mr. Valdina as well, but the boss was
23   Mr. Budelmann.
24   Q.     Did Mr. Budelmann remain the Cayuga
25   County district attorney through the time
```

```
 1                      Brian Leeds
 2    that you worked in Cayuga?
 3    A.    Yes, he did.
 4    Q.    Did Mr. Valdina continue to work for
 5    Cayuga during the entire time you were there?
 6    A.    He was there when I left, yes.
 7    Q.    Are you aware where either one of them
 8    work now?
 9    A.    I have no idea, I believe
10    Mr. Budelmann is still the district attorney
11    there and I'm not sure if Mr. Valdina is
12    still there or not.
13    Q.    When you were prosecuting cases out of
14    Auburn Correctional Facility, was there a
15    particular person that you would consider a
16    liaison at Auburn Correctional Facility that
17    you dealt with?
18    A.    Several people, yes.
19    Q.    Who are they?
20    A.    When I first started, one of the
21    people who was very helpful was Captain Brian
22    Chutey, he was the captain over at Auburn
23    Correctional Facility.  At some point he then
24    left, I believe, to go into Five Points
25    Prison and then afterward, kind of my go-to
```

1              Brian Leeds

2    person if I ever needed anything coming out

3    of the prison was Lieutenant Joe Vasile and

4    that's V-A-S-I-L-E, Chutey is C-H-U-T-E-Y, I

5    believe.

6    Q.     What sorts of prosecutions were you

7    doing from the prisons?

8    A.     The bulk of them were inmates accused

9    of having contraband items on them

10   specifically weapons, sometimes drugs.  I did

11   several assault cases, inmate on inmate

12   assaults, sometimes inmate on corrections

13   officers assaults.  I believe I handled a

14   couple of noxious substance cases out of

15   there, inmates throwing like urine at the

16   corrections officers.  I think that would

17   have been really it.

18   Q.     What you were doing would be

19   considered outside charges from the prison,

20   correct?

21   A.     Maybe if you can phrase that, I'm not

22   sure what you mean by that.

23   Q.     Sure.

24          For any number of misbehavior or

25   infractions of inmates, they could have a

```
 1                    Brian Leeds
 2    hearing within the prison, correct?
 3    A.      As far as I knew, yes.
 4    Q.      And you were reviewing them to
 5    determine whether or not they would be
 6    charged outside of the prison in the Criminal
 7    Courts of New York?
 8    A.      That's correct, yes.
 9    Q.      Would one of the documents that you
10    had reviewed from the prison to determine
11    whether or not you would bring charges
12    against an inmate be a misbehavior report
13    from a corrections officer?
14    A.      The documents that I would review, to
15    the best of my recollection, would be unusual
16    incident reports and I don't know if they are
17    the same thing or the misbehavior report
18    would have been incorporated into that, but
19    that would be the packet of documents, packet
20    of information essentially that I would
21    review.
22    Q.      You're here today specifically to give
23    testimony relative to some incidents that
24    occurred in late 2016 involving Correction
25    Officer Matthew Cornell; do you recall
```

1             Brian Leeds

2    dealing with Mr. Cornell?

3    A.    Yes, I do.

4    Q.    When do you recall first encountering

5    Mr. Cornell?

6    A.    I could not tell you specifically, he

7    was subpoenaed for a case involving an

8    inmate, I believe it was an inmate out of the

9    Auburn Correctional Facility that we were

10   presenting to the grand jury and he was

11   subpoenaed again as one of the witnesses, I

12   believe his role in that case was there was

13   some contraband drugs recovered off an inmate

14   and he was responsible for the testing of

15   those drugs so that was the first time that I

16   met Mr. Cornell was when he was subpoenaed

17   for grand jury.

18   Q.    Do you recall approximately when that

19   was?

20   A.    So let's see, if I had started with

21   them 2015, it might have been maybe three or

22   four months into me starting there.

23   Q.    I believe you testified earlier that

24   you had started there in about February of

25   2014?

```
 1                    Brian Leeds
 2   A.      Then I think I clarified that I'm not
 3   quite sure, I was there for a little bit
 4   under two years so if, if I had left -- if
 5   you give me a moment I can actually think
 6   about it specifically.  So let's see, I had
 7   started with them February 2015 so I would
 8   have first met Mr. Cornell sometime within
 9   the spring or summer I'm going to guess, I
10   don't have my notes in front of me, of 2015.
11   Q.      During your time at the Cayuga County
12   District Attorney's Office, can you
13   approximate the number of cases that you had
14   that involved Matthew Cornell?
15   A.      Had him in what regard?
16   Q.      That he was a witness in a case.
17   A.      I want to say, again this is me
18   guessing, I can more accurately look it up if
19   I had access to my notes, about eight or
20   nine, maybe.
21   Q.      You will be provided with a copy of
22   this transcript and you will be allowed to
23   make corrections as you wish upon your review
24   so today is to the best of your recollection,
25   if you need to make changes there is always
```

```
 1                    Brian Leeds
 2   going to be an errata sheet that you can make
 3   corrections on.
 4   A.     Okay.
 5   Q.     Do you recall prosecuting an
 6   individual named Thomas Ozzborn?
 7   A.     Yes, I do.
 8   Q.     What do you recall about that case?
 9   A.     That I was the prosecutor on Thomas
10   Ozzborn's case.  I recall that I must have
11   been the prosecutor responsible for
12   presenting his case to the grand jury, other
13   than that I recall nothing about Mr. Ozzborn
14   specifically.
15   Q.     Do you recall prosecuting an
16   individual named Donnesia Brown?
17   A.     My answer would be the same.  I recall
18   the name, but as far as any specifics about
19   Mr. Brown, I don't recall any specific
20   details about his case while I was a
21   prosecutor there.
22   Q.     Would it be fair to say that one of
23   the overriding principals of working in a
24   District Attorney's Office and prosecuting
25   cases is that you're dealing with which would
```

1                    Brian Leeds

2    be facts and evidence, correct?

3    A.      That's correct.

4    Q.      And one of those bits of evidence

5    would be a corroborating witness, correct?

6    A.      Not all the time.

7    Q.      If you were prosecuting an individual

8    for Possession of Prison Contraband or

9    Promoting Prison Contraband, what sorts of

10   evidence would you be looking for?

11   A.      Usually you would have witnesses, you

12   would hope that you would have the actual

13   contraband recovered so that you could look

14   it over, make sure it's going to meet the

15   statutory definition, any other witnesses

16   involved is always helpful, but for the most

17   part with the prison contraband cases, it was

18   really who was present as your witness and

19   what was recovered as your item.

20   Q.      If I told that you Thomas Ozzborn was

21   accused of possessing an altered tweezers,

22   does that refresh your recollection as any of

23   the details to his charges?

24   A.      It does not.  There were many altered

25   things and tweezers was a common item that

```
 1                   Brian Leeds
 2    was altered to be used as contraband or
 3    weapons.
 4    Q.     If I told that you Donnesia Brown was
 5    found to be in possession of an altered tooth
 6    brush, does that refresh your recollection at
 7    all?
 8    A.     No, it does not.  Again same answer,
 9    that was pretty common.
10    Q.     If you were presenting a case of
11    Promoting Prison Contraband to the grand
12    jury, ideally what would you represent to the
13    grand jury?
14    A.     Generally speaking we would subpoena
15    the officers that essentially helped us make
16    our elements there so we would subpoena the
17    officers that conducted, if it was a search,
18    whether it was their cell or their person,
19    that officer we would definitely want to have
20    the officer that recovered the item.  If
21    there was something specific about the item
22    itself, if it was drugs, we would probably
23    want an officer who was involved in the
24    handling and testing of those things.  Really
25    if it was an assault case, you know, who was
```

 1            Brian Leeds
 2  assaulted and who witnessed the assault.  So
 3  that's really with the contraband cases, who
 4  was there, who did a search, who recovered
 5  the item and then who was responsible for
 6  handling the item afterwards would be our
 7  witnesses.
 8  Q.     Prior to your appearance here today
 9  and part of your subpoena was for you to
10  bring any notes that you might have relevant
11  to your testimony here today, correct?
12  A.     That's correct.
13  Q.     Did you have any notes that you
14  reviewed?
15  A.     I didn't get a chance to review them.
16  In response to the subpoena I was actually
17  looking through to see if I had any notes
18  from my time at Cayuga and I did so I haven't
19  even read them, but they are present here.
20  Q.     We have here a document that's eight
21  pages long that we've marked as Plaintiff's
22  Exhibit 1 with today's date for
23  identification and do you recognize that to
24  be a copy of the notes that you've brought
25  here today?

```
 1                    Brian Leeds
 2    A.    Yes, I do.
 3    Q.    Generally speaking what are these,
 4    what are these notes that we're looking at,
 5    what are they in a general sense?
 6    A.    These were notes that I prepared on my
 7    own knowing that after the specific incident
 8    referenced in the notes I might be required
 9    to testify to talk to other people and I
10    wanted to make sure that essentially I had my
11    facts straight so these were my own notes
12    that I took in regard to the occurrence
13    listed in the notes involving Mr. Cornell.
14    Q.    All right.
15          And more specifically, do your notes
16    involve an incident that occurred when you
17    interviewed Mr. Cornell relevant to a case
18    that you were about to take to trial in which
19    you were prosecuting?
20    A.    That's correct.
21    Q.    Approximately what date did that take
22    place?
23    A.    Well, I can tell you if I can look at
24    my notes I can just ballpark it.
25    Q.    Sure.
```

```
 1                    Brian Leeds
 2    A.       If you don't want me to --
 3    Q.       You can refer to your notes.
 4    A.       Okay, so the date that I met with Matt
 5    Cornell I believe would have been December
 6    9th, 2016.
 7    Q.       To be clear, that meeting was not
 8    relevant to the prosecution of either Thomas
 9    Ozzborn or Donnesia Brown, correct?
10    A.       Correct.
11    Q.       Do you know approximately when Thomas
12    Ozzborn was sentenced?
13    A.       I do not.
14    Q.       If I told you that he was sentenced
15    approximately August 11, 2016 would that
16    sound right to you or no?
17    A.       I really, I don't know, I don't
18    believe I was even present for his
19    sentencing.
20    Q.       Do you know when Donnesia Brown was
21    sentenced?
22    A.       I do not.
23    Q.       If I told that you that Donnesia Brown
24    was sentenced October 11th, 2016, does that
25    sound right to you?
```

1          Brian Leeds
2    A.    I wouldn't know, again, I apologize, I
3    don't think I was present when he was
4    sentenced.
5    Q.    Well, let me ask you this way, do you
6    know if both Thomas Ozzborn and Donnesia
7    Brown had already been sentenced prior to
8    your December 9th, 2016 meeting with Matthew
9    Cornell?
10   A.    I am going to assume so and if I can
11   explain why I would assume that way, I know
12   after the incident with Mr. Cornell on
13   December 9th we ended up dismissing a number
14   of indictments including Mr. Ozzborn's and
15   Mr. Brown's, I don't know if they were
16   waiting sentencing or had been sentenced at
17   that point or even if they were going to
18   trial, they had -- I don't recall
19   specifically what the status of their
20   indictments were at the time we moved to
21   dismiss them.
22   Q.    In meeting with Matthew Cornell on
23   December 9th, 2016, what was the purpose of
24   that meeting?
25   A.    I was preparing for a jury trial, this

1          Brian Leeds
2    was a Friday when I met with Mr. Cornell, I
3    was preparing for a jury trial to begin on
4    Monday morning, the trial was People versus
5    Sean Gaines who was at the time was an inmate
6    at Auburn Correctional Facility.  The charge
7    was Possession of Criminal Contraband, First
8    Degree, essentially Mr. Gaines having a
9    weapon on him that was recovered.  Matt
10   Cornell was the primary officer involved in
11   that case, I believe he was the one that
12   conducted both the search and the recovery of
13   the item.  My recollection is it was actually
14   found in Inmate Gaines's mouth so I was
15   meeting with Matt before trial essentially to
16   go through his testimony and, you know,
17   essentially do preparation work with him in
18   anticipation of his trial testimony the week
19   following.
20   Q.    Do you recall what Thomas Ozzborn had
21   been charged with?
22   A.    Well, given that you've told me
23   earlier that he had tweezers on him, I'm
24   going to guess Criminal Possession of
25   Contraband Item, First Degree.

```
 1                    Brian Leeds
 2    Q.    Do you know what Donnesia Brown had
 3   been charged with?
 4    A.    I would assume the same charge, Felony
 5   Possession of Contraband, First.
 6    Q.    To your recollection, was Matthew
 7   Cornell the correction officer that recovered
 8   the contraband from both Thomas Ozzborn and
 9   Donnesia Brown?
10    A.    I would assume he was.
11    Q.    Why would you assume that?
12    A.    After the disclosure that Mr. Cornell
13   made to me on December 9th, we in the weeks
14   following went through essentially every
15   single one of the prison cases that we could
16   that potentially Mr. Cornell might have been
17   involved with and any case where we had
18   realized he was going to give what we
19   considered to be material evidence, meaning
20   he was directly involved in search of an
21   inmate or recovery of an inmate as far as
22   contraband items are concerned we then moved
23   to dismiss those items.  So Mr. Brown and
24   Mr. Ozzborn's indictment were both dismissed,
25   that triggers to me that Mr. Cornell was
```

```
 1                    Brian Leeds
 2   involved in a material way most likely as the
 3   person who recovered the items from them.
 4   Q.      So let's go back to your meeting with
 5   Officer Cornell on December 9th, 2016.   In
 6   your meeting with him, what was it that he
 7   revealed to you?
 8   A.      Maybe be a little bit more specific
 9   because he said a lot of things to me.
10   Q.      All right.
11           Did you ask Officer Cornell if he had
12   recovered a contraband from the inmate that
13   you were about to prosecute?
14   A.      Yes, yes.  We had 20 or 30-minute
15   conversations specific to that incident about
16   the steps that he took in recovering that
17   item with Mr. Gaines.
18   Q.      How did Mr. Cornell respond to your
19   question of how he found the contraband?
20   A.      To the best of my recollection, what
21   Mr. Cornell was explaining to me when I was
22   asking him how he did essentially come to
23   believe that this particular inmate had a
24   weapon on him because it was concealed, it
25   was in his mouth, you know, Matt had
```

1                   Brian Leeds

2 explained to me that he had information from

3 a source in the prison, essentially another

4 inmate, that Mr. Gaines was known to have a

5 weapon on his person, that he would hide it

6 in his mouth and I believe in exchange for

7 some kind of favor to this inmate, I think

8 Matt was going to allow him to set up a hot

9 plate in his jail cell, that the inmate

10 essentially told Matt that Mr. Gaines had a

11 weapon on him.  And from there Matt

12 approached the inmate, I want to say in the

13 rec yard and essentially, you know, asked

14 him, you know, I believe what he just said

15 was I know you have a weapon on you, you want

16 to just give it up right now or do I have to

17 search you and I think Mr. Gaines at that

18 point just reached into his mouth and pulled

19 out what I believe was some kind of razor.

20 Q.    Did Officer Cornell indicate that he

21 had put a weapon on an inmate to break up a

22 gang?

23 A.    So again, I would have to refer

24 specifically to my notes about how that

25 transpired, how he kind of transitions from

```
 1                    Brian Leeds
 2   speaking about Mr. Gaines to speaking
 3   generally about gang activity in the Auburn
 4   Correctional Facility to answer your
 5   question, yes, yes, he did say that to me.
 6   Q.      Do you recall what specifically he did
 7   say?
 8   A.      He had been mentioning trouble with
 9   the gangs in the prison, I want to say,
10   again, I don't, I don't know, this is just to
11   the best of my recollection, there was part
12   of my case with Mr. Gaines involved an
13   alligation that we received through
14   Mr. Gains's defense attorney that this may
15   have been a retaliatory action by the prison
16   because I believe Mr. Gaines filed some form
17   of complaint with the prison system about his
18   role in, the easiest way to put it is a riot
19   that happened months before that, I guess,
20   there was like a riot type incident in Auburn
21   Prison, Mr. Gaines may have had a role in
22   that and then filed a complaint, I believe, I
23   don't know if it was to Auburn Prison
24   facility or to the Inspector General's Office
25   fearing that he was going to be retaliated
```

1           Brian Leeds
2   against and, you know, essentially trying to
3   set up the idea that this charge was in
4   response to that by the prison.  So I believe
5   I was asking Mr. Cornell if he knew anything
6   about that, you know, whether or not he even
7   had any understanding that Mr. Gaines had
8   filed some kind of complaint about the staff
9   at Auburn and at that point Mr. Cornell then
10  began to talk about the incident which was a
11  gang related incident involving the Bloods.
12  I don't know if he knew for sure or not what
13  Mr. Gaines' role in that might have been, but
14  then he was, you know, mentioning some of the
15  problems that they were having with the
16  Bloods in the prison around that same time
17  too and I think at that point kind of
18  casually he had mentioned he ended up putting
19  some weapons on them and I asked him to
20  clarify what he meant by putting weapons on
21  them and he would, he said, you know, we put
22  weapons on them.  I took that to be -- and I
23  was a little startled by it, I took that to
24  be that they had placed weapons on inmates
25  essentially to create disciplinary problems

1          Brian Leeds

2     and that they were planting contraband

3     weapons on people.  I asked him, you know,

4     who did you do this to and, again, look -- I

5     did look at my notes really quickly this

6     morning, I believe he gave me a name of Eddie

7     Johnson or Charles Johnson and, you know,

8     then I started to ask him a few more

9     questions about what he's talking about and

10    then he really kind of got evasive about it

11    and, you know, kind of I believe was saying

12    things like, you know, let's forget about it,

13    let's kind of move on.  I would have to again

14    look specifically at my notes about what my

15    recollection is about how that conversation

16    actually transpired.

17    Q.      Did he use a phrase that they boated a

18    bunch of gang members?

19    A.      That's -- if I can look at my notes

20    that might have been what I wrote in my

21    notes, that he said boated, which again I

22    took to mean that they would, you know, put

23    weapons on people as a way to float them out

24    of the Auburn Correctional Facility.

25    Q.      Is that a phrase that you had heard

```
 1                       Brian Leeds
 2    before?
 3    A.      No, I think I asked him to explain
 4    what he meant by it.
 5    Q.      What did he say?
 6    A.      He said just what I said I believe --
 7    again, this is to my recollection, I believe
 8    that that was just kind of a colloquial term
 9    they used for how to get people out of Auburn
10    Prison or break up the gangs was floating
11    them out of there.
12    Q.      Did you take what he said to mean that
13    more than one officer had placed weapons on
14    inmates at Auburn Correctional Facility?
15    A.      He used, to the best of my
16    recollection, he used the word "we".  I don't
17    know if he was using that in the general
18    sense, I don't know if he was referring to
19    other officers there, that I don't know.
20    Q.      Did you ask Officer Cornell if he
21    specifically had ever placed weapons on
22    prisoners?
23    A.      Yes, I did.
24    Q.      And what was the response?
25    A.      He had mentioned the one person's name
```

```
 1                      Brian Leeds
 2   that he had done that.  Well, he said we put
 3   a weapon -- the way the conversation went
 4   down, again, is we put a weapon on him and
 5   then I asked him well, who did you do this to
 6   and that's when he gave me the name.
 7   Q.    The eight-page document that we have
 8   marked as your notes that you have regarding
 9   all this, is that the entirety of the notes
10   you have regarding this?
11   A.    Can I refer to them and look at them
12   really quickly?
13   Q.    Please do.
14   A.    So, yes, those are the entirety of the
15   notes that I have in regard to this incident.
16   Q.    So the notes that you have and that
17   we've marked here today would appear to be a
18   timeline of events; is that fair to say?
19   A.    Yes.
20   Q.    So following this conversation that
21   you had with Officer Cornell, what was the
22   next action that you took relevant to that
23   conversation?
24   A.    So we continued to talk about, you
25   know, again, my trial and things like that
```

| 1 | Brian Leeds |
| 2 | and, you know, what I needed him for, when he |
| 3 | can expect to have to testify. We concluded |
| 4 | that conversation, he left. This all |
| 5 | occurred in the conference room, the front |
| 6 | conference room in the Cayuga County District |
| 7 | Attorney's Office. After he left, honestly, |
| 8 | I was a little taken aback by what he had |
| 9 | just told me so I didn't mention that |
| 10 | conversation to any of my other co-workers or |
| 11 | discuss it with anybody else. I wasn't kind |
| 12 | of sure how to process it at that point. |
| 13 | The -- continued to essentially prepare my |
| 14 | case. The, I want to say next day, Saturday, |
| 15 | I went back into work and I believe what I |
| 16 | did was contact Lieutenant Vasile at the |
| 17 | prison, I think he was working that day and I |
| 18 | asked him to see if he could pull the unusual |
| 19 | incident report for the inmate that |
| 20 | Mr. Cornell had mentioned they might have |
| 21 | placed a weapon on and my reason for doing |
| 22 | that was I wanted to see if there was |
| 23 | anything kind of backing this up at that |
| 24 | point, you know, to, did this happen or not, |
| 25 | is there any way that I can document, verify |

1          Brian Leeds
2  that there may be some information to this.
3  I didn't explain to the lieutenant why I was
4  asking for this, I just, you know, asked for
5  things and he would especially if they were
6  reports and things he would have no problem
7  giving them to me so I later that day got a
8  copy of that unusual incident report, looked
9  through it and, you know, essentially what I
10  was reading was that in a single witness
11  situation, a situation where Matt Cornell was
12  both the person that did the search and did
13  the recovery, this particular inmate had a
14  weapon found on him.  So that to me was
15  enough corroboration of, you know, making
16  sure I did hear all this right, that I did
17  get the name right from Matt Cornell, that he
18  wasn't just making up an incident, it
19  actually was documented there.  I then
20  continued to kind of think about what my next
21  step was going to be.  Again, because at that
22  point was not quite sure what to do, you
23  know, I never had somebody essentially
24  confess in a manner like this to me before,
25  it was not something that I was prepared for,

```
 1                    Brian Leeds
 2   this was not going to be part of our trial
 3   preparation is hearing this information.  I
 4   waited into Monday morning, still unsure what
 5   to do and amiss of all this I'm also
 6   preparing for a jury trial and Monday morning
 7   I walked in thinking about what my level of
 8   obligations are for disclosure at this point
 9   because this is definitely something that
10   would, would need to be disclosed to the
11   defense attorney as part of my ethical
12   obligations.  The defense attorney explained
13   to me that Mr. Gaines was going to plead
14   guilty that day so we allowed him to plead
15   guilty, I did not, I was not comfortable the
16   entire time doing it, I knew something was
17   wrong, that this is, we should not let this
18   gentleman plead guilty with the information
19   that I now had, I was confident enough that
20   the information that I had, that I had heard
21   it correctly, nonetheless Mr. Gaines did, in
22   fact, plead guilty.  Immediately after his
23   guilty plea, I walked back to my office and I
24   told Mr. Budelmann that Mr. Cornell had
25   admitted to me the Friday before that he had
```

```
 1                    Brian Leeds
 2   planted a weapon on a different inmate, that
 3   we had a problem essentially.
 4   Q.     Did you report it to anyone else at
 5   that time?
 6   A.     I told Mr. Budelmann about it
 7   face-to-face first and then after that we had
 8   a discussion about it in the, I want to say
 9   the office of our district attorney
10   investigator who is James Bender so he was
11   present, Mr. Bender was present,
12   Mr. Budelmann was present, I don't recall if
13   Mr. Valdina was present or not and I believe
14   the first step that we made was I want to say
15   we called the Inspector General's Office and
16   talked to Tom King maybe is his name and --
17   Q.     Would it be Tom Knight?
18   A.     Tom Knight, I'm sorry, Tom Knight and,
19   you know, essentially I kind of let
20   Mr. Budelmann explain what I had disclosed to
21   him and, you know, pretty much this is, this
22   is what we have now learned trying to kind of
23   game plan what do we do next.
24   Q.     Before Officer Cornell left your
25   meeting on December 9th, 2016, did you
```

```
 1                    Brian Leeds
 2   indicate to him that this was a problem?
 3   A.    No.   Indicate to him directly that
 4   this is a problem, no, I did not.
 5   Q.    In addition to the one case now that
 6   you were about to go to trial on that you
 7   felt posed an issue, did you begin to think
 8   of any other cases that may have been
 9   problematic that involved Officer Cornell?
10   A.    I -- we had used Officer Cornell in a
11   number of cases.  He had been a witness for
12   me at trial a number of times so it was
13   common for us to be having cases with
14   Mr. Cornell so instantly I knew that this was
15   not a situation where this is the first time
16   I remember dealing with Matt Cornell so
17   whether there were specific cases that we
18   needed to do something about, I don't think
19   so, I just think we knew that or I knew that
20   there were a number of cases that Matt
21   Cornell was involved with that we're now
22   going to have to look into reviewing.
23   Q.    Would you say that Matt Cornell was
24   the witness in more cases than say other
25   correction officers?
```

```
 1                      Brian Leeds
 2                MS. COWAN:  Objection, you can
 3         answer.
 4                THE WITNESS:  Okay, sorry.
 5                MS. COWAN:  I'm just objecting
 6         to the form.
 7                THE WITNESS:  I don't know,
 8         there was something else happening.
 9   A.    What I would say to that question is
10   we, when I was reviewing prison cases, we
11   would get hundreds of unusual incident
12   reports that we would end up handling and
13   there is no formula, there is no algorithm to
14   why we would choose specific cases, why I
15   would choose specific cases.  A number of
16   them were, in fact, contraband cases
17   essentially because they weren't very
18   complicated and we did find that Matt Cornell
19   was involved in a number of, a significant
20   maybe unusual number of contraband cases that
21   I was selecting, now whether he was involved
22   in a number, a percentage of contraband cases
23   coming out of the prison, that I couldn't
24   tell you, but I would tell you that we found
25   that he was coming to grand jury with a
```

```
 1                    Brian Leeds
 2   little more frequency than some of the other
 3   prison guards might be.
 4   Q.    Now, Matt Cornell has testified in
 5   this case that the reason for that is he said
 6   he was good at his job, did you feel that
 7   there was another reason for that?
 8             MS. COWAN:  Objection, go
 9        ahead.
10   A.    About -- I guess you would have to
11   rephrase it.  Did I bring him in because I
12   thought Matt Cornell was good at his job, is
13   that the question?
14   Q.    No, I'm asking you whether or not you
15   believe that there was another reason why
16   Matt Cornell would appear more frequently
17   than other officers at the grand jury.
18             MS. COWAN:  Same objection.
19   A.    No, no, I don't, I don't think so
20   because I, you know, I wasn't particularly
21   choosing him because, it was a, let's say a
22   Matt Cornell case, it was just he ended up
23   randomly being the officer involved on a
24   number of cases that we looked at like this
25   one seems one of the ones that we might want
```

```
 1                    Brian Leeds
 2   to consider doing and it just always would
 3   turn out that -- not always, but frequently
 4   would turn out that Matt was involved there.
 5   In fact, at some point probably towards the
 6   end of my time at Cayuga County, I had
 7   actually decided I wasn't going to use Matt
 8   Cornell or I was going to try to avoid his
 9   cases for a while.
10   Q.     Am I correct in saying you left Cayuga
11   County about two-months after this occurred,
12   correct?
13   A.     Approximately, yes.
14   Q.     After you had this December 2016
15   meeting with Officer Cornell, did you then
16   review other cases that Officer Cornell was
17   the main corroborating witness?
18   A.     Yes, I did.
19   Q.     How many of those cases were there?
20   A.     That he was involved with?
21   Q.     Yes.
22   A.     Again, my best guess recollection was
23   about seven or eight, maybe a little bit
24   more.  We reviewed dozens, dozens of cases.
25   We essentially went back, I think we tried to
```

1               Brian Leeds
2  backtrack when Matt Cornell started at Auburn
3  Prison and essentially reviewed every single
4  prison case we had to see which ones he was
5  involved with.
6  Q.    Your notes indicate on that same
7  Monday, December 12, 2016 when you revealed
8  to Mr. Budelmann what Officer Cornell had
9  told you, that you were already looking at
10 another case that day, correct?
11 A.    Can I refer to my notes, can I look at
12 them?
13 Q.    Sure.
14 A.    Okay, are you referring to the Naythen
15 Aubain case?
16 Q.    Yes.
17 A.    Okay.  So I guess yes, that was one of
18 the cases that instantly it stood out to me
19 because that was before Mr. Gaines's case,
20 that was the last case that I was, contraband
21 case out of Auburn Prison that I was
22 preparing for trial so that one was still
23 fresh in my mind and I recall rather
24 instantly that Matt was involved in that one
25 as well.

| | |
|---|---|
| 1 | Brian Leeds |
| 2 | Q.   According to your notes, you continued |
| 3 | to compile a list of cases involving Matt |
| 4 | Cornell, correct? |
| 5 | A.   After December 12, yes. |
| 6 | Q.   Were the cases of Thomas Ozzborn and |
| 7 | Donnesia Brown cases that appeared on that |
| 8 | list? |
| 9 | A.   Yes, they did. |
| 10 | Q.   Why would they have appeared on that |
| 11 | list? |
| 12 | A.   The list of cases involving -- I guess |
| 13 | I'm not sure if you're referring to just list |
| 14 | of all the Auburn Prison cases the District |
| 15 | Attorney's Office handled or just the one |
| 16 | that we were flagging so to speak. |
| 17 | Q.   I'm referring to the ones that you |
| 18 | were flagging as cases that Matt Cornell was |
| 19 | the main witness. |
| 20 | A.   So yes, Mr. Ozzborn and Mr. Brown were |
| 21 | among the cases that were flagged because |
| 22 | Matt Cornell was what we were considering to |
| 23 | be a material witness in those cases. |
| 24 | Q.   After returning to your office on |
| 25 | Monday, December 12, 2016, did you have any |

1              Brian Leeds
2  further discussion with Matt Cornell about
3  what he had told you?
4  A.    No, I never talked to Matt again after
5  December 9th.
6  Q.    Did you ever speak to him again in any
7  setting?
8  A.    I don't believe so.  I don't -- no,
9  no.
10  Q.    Do you have any specific ax to grind
11  with Officer Cornell?
12              MS. COWAN:  Objection.
13  A.    No, no, up until December 9th I
14  actually liked Matt.
15  Q.    With regard to what you had told
16  Mr. Budelmann and after you began flagging
17  cases, what was the next course of action
18  that the Cayuga County District Attorney's
19  Office took with regards to these events?
20  A.    To the best of my recollection in the
21  coming days, our office began some form of
22  investigations involving Mr. Cornell trying
23  to coordinate with the IG's office.  I had
24  specifically requested to Mr. Budelmann that
25  I kind of not be involved in that because

| 1  | Brian Leeds |
| 2  | essentially if there was going to be an |
| 3  | investigation and I was going to be a witness |
| 4  | I didn't want to make it seem that I had any |
| 5  | kind of agenda or that, you know, I was |
| 6  | anything other than like any other witness, |
| 7  | somebody that, you know, the disclosure was |
| 8  | made to and I'm not involved in the actual |
| 9  | investigation process itself. That said, |
| 10 | it's a small office so, you know, I wasn't |
| 11 | involved in the actual decision making in the |
| 12 | investigation itself. I did become aware of |
| 13 | some of the other things that other people's |
| 14 | investigations were revealing about |
| 15 | Mr. Cornell. I do know that our |
| 16 | investigators at the District Attorney's |
| 17 | Office had interviewed him. They conducted |
| 18 | that interview at the District Attorney's |
| 19 | Office. I don't, I don't know if my |
| 20 | understanding was that there was no |
| 21 | admissions made, but I don't know what |
| 22 | transpired, it was a closed-door meeting with |
| 23 | the investigators. I recall I had several |
| 24 | phone conversations with people from the IG's |
| 25 | office as they were trying to clarify, you |

```
 1                    Brian Leeds
 2   know, what I recalled and get some specifics
 3   from me.  I did kind of get briefed, it
 4   sounded like there was, they called it a
 5   raid, a search over at Auburn Prison of both
 6   vehicles and some lockers at the prison and
 7   they had recovered some items from
 8   Mr. Cornell's car and his locker, but that
 9   was just people relaying information through
10   to me, you know, I don't think I was ever, I
11   was ever intimately involved in the
12   investigation and certainly not in any of the
13   decisions that were made about how to kind of
14   proceed at that point.  Sometime after I
15   started at the Public Defender's Office here
16   I was interviewed again.  I don't know if I
17   gave a written statement or not, by I want to
18   say it was Tom Knight and an agent from the
19   FBI and then that was really my last
20   interaction with anybody as far as this
21   particular incident is concerned.
22   Q.     The records we have would indicate
23   that that interview that you had with an FBI
24   special agent, Melissa Lewis, took place on
25   March 29th, 2017; does that sound right to
```

```
 1                    Brian Leeds
 2  you?
 3  A.     That sounds right to me.
 4  Q.     Where did that interview take place?
 5  A.     The conference room here at the
 6  Ontario County District Attorney's Office --
 7  Public Defender's Office, I'm sorry.
 8  Q.     To be clear, you were not present when
 9  Matt Cornell was interviewed by the
10  investigators from the Cayuga County District
11  Attorney's Office?
12  A.     No.
13  Q.     Do you know who did conduct the
14  interview of Matt Cornell from the DA's
15  office?
16  A.     I want to say it was our two
17  investigators, James Bender and I'm
18  embarrassed that I'm blanking on his name
19  right now, we call him Bud, but the other
20  investigator that worked in our office.
21  Q.     Would that be Bud Whitsett?
22  A.     Yes, Bud Whitsett, thank you.
23              MR. LEVY:  That's, for the
24         reporter that's W-H-I-T-S-E-T-T.
25  Q.     Did you speak with either Mr. Whitsett
```

```
 1                    Brian Leeds
 2    or Mr. Bender about what Cornell had told
 3    them?
 4    A.     Yes, I did.
 5    Q.     What was relaid to you?
 6    A.     The conversation was with Investigator
 7    Whitsett that occurred in my office and to
 8    the best of my recollection Investigator
 9    Whitsett, you know, essentially told me that
10    he didn't admit it, but they thought he was
11    coming very, very close to it, that they kind
12    of confronted him with it and he got hesitant
13    for a moment and at some point then said he
14    didn't want to talk to them anymore and, you
15    know, had asked for an attorney.
16    Q.     Did you believe what Officer Cornell
17    had told you amounted to either Brady or
18    Rosario material?
19                    MS. COWAN:  Objection.
20    A.     Yes, I did.
21    Q.     In that case that you had met with him
22    that you were preparing for, was that
23    provided to defense counsel?
24    A.     On Mr. Gaines's case?
25    Q.     Yes.
```

| 1 | Brian Leeds |
| 2 | A.     No, it was not. |
| 3 | Q.     Why not? |
| 4 | A.     Honestly, I had never been put in that |
| 5 | position before and I did not know what to |
| 6 | do.  From my perspective what I was dealing |
| 7 | with at that point was essentially I had an |
| 8 | admission from a young corrections officer |
| 9 | who admitted to wrongdoing to me, possibly |
| 10 | criminality to me and I knew that disclosure |
| 11 | would not only cost him his job, his career, |
| 12 | but it may trigger a lot of problems and a |
| 13 | big investigation and be a big deal for the |
| 14 | Auburn Prison system.  Members of my wife's |
| 15 | family are in the Auburn Prison system.  They |
| 16 | were all my friends, they had come to my |
| 17 | wedding, my father-in-law was a corrections |
| 18 | guard at Auburn Prison.  And essentially for |
| 19 | three days knowing full well that me and -- |
| 20 | we were in a locked room together so there |
| 21 | was -- not locked, but closed door that I was |
| 22 | the person that could have started all this |
| 23 | from happening, I honestly did not know what |
| 24 | to do for about three days.  And we allowed |
| 25 | Mr. Gaines to plead guilty without me making |

```
 1                    Brian Leeds
 2   that disclosure, that's on me.  Instantly I
 3   regretted it and instantly I then made the
 4   disclosure to Mr. Budelmann because it wasn't
 5   right.  So I was racked with what to do, I
 6   wasn't sure what to do.  It didn't seem very,
 7   very easy to me.  I wanted to be clear about
 8   what I had heard in that room, knowing full
 9   well that me opening my mouth would have at
10   the very least cost Mr. Cornell his career so
11   it was something that I wasn't sure, you
12   know, what to do here and I didn't share that
13   with anybody, I didn't discuss what my
14   decisions were going to be with anybody and
15   that's kind of how it transpired.
16   Q.     Just circling back, legally speaking,
17   why did you believe what he told you amounted
18   to either Brady or Rosario material?
19   A.     It wasn't Rosario, it arguably would
20   have been Brady information, Brady
21   information being information that, roughly
22   speaking, in the criminal context information
23   that should be disclosed that is material to
24   the case that can possibly serve as
25   impeachment purposes for a witness.   The
```

| 1 | Brian Leeds |
| 2 | disclosure that a guard plants weapons on |
| 3 | inmates is going to have strong impeachment |
| 4 | purposes relevant to the present case where |
| 5 | that same guard is being asked to testify to |
| 6 | finding a weapon on a different inmate.  So |
| 7 | for that reason because it would have served |
| 8 | as impeachment, that's why we felt it needed |
| 9 | to be disclosed or it should have been |
| 10 | disclosed.  Whether or not timing-wise that's |
| 11 | something that has, it should be disclosed |
| 12 | immediately so, you know, the timing of it |
| 13 | again, that's on me, I probably should not |
| 14 | have let Mr. Gaines plea without disclosing |
| 15 | that information to his attorney, but I did. |
| 16 | That was probably something I really regret |
| 17 | in the moment and I just, that's, you know, |
| 18 | that's something that we instantly after it |
| 19 | happened I regretted it and instantly took it |
| 20 | back and did make the disclosure. |
| 21 | Q.    So I'm going to refer you back to your |
| 22 | notes and I'm looking at December 16th, 2016 |
| 23 | now.  What was the next course of action that |
| 24 | was taken with regard to these revelations? |
| 25 | A.    That I did or that -- |

1              Brian Leeds

2  Q.    Yes.

3  A.    Referring specifically to December

4  16th?

5  Q.    Correct.

6  A.    Okay, according to my notes, I had a

7  conversation with John O'Mara at the New York

8  State Prosecutors Training Institute about

9  how best to handle this and again, according

10 to his notes, you know, he recommended again

11 that we look at our cases and, you know,

12 essentially any cases that were going to be

13 affected by this we should probably do what

14 we think would serve justice best.  I think

15 prior to even talking to Mr. O'Mara we were

16 discussing whether or not we had to or should

17 or were going to dismiss indictments or if we

18 were going to allow inmates to make, we were

19 going to make the Brady disclosure to any

20 inmate affected and let them essentially do

21 their own what is called a 440 Motion which

22 means that they can get their plea back based

23 on new information and then, you know, see

24 where their indictment goes from there.  So

25 we had a number of different options that we

1            Brian Leeds
2   could do and, again, according to my notes I
3   guess Mr. O'Mara was just advising us of, you
4   know, from his perspective what we might want
5   to consider doing.  I would say I do not
6   recall independently the conversation with
7   Mr. O'Mara at all or Mr. O'Mara.
8   Q.      Regarding the next steps, do you
9   recall what you did involving Mr. Budelmann
10  and Mr. Valdina?
11  A.      I mean, to the best of my
12  recollection, it was my job to go through the
13  prison cases and find the ones that we felt
14  were affected by this, by Officer Cornell.  I
15  compiled a list, kept the case files in my
16  office and I don't recall if we -- I want to
17  say I spoke mostly with Mr. Valdina about
18  what to do, I don't remember how it came
19  about.  My position from the outset was we
20  shouldn't even be messing around with the
21  idea of having inmates file or having
22  defendants file 440 Motions and things, that
23  we should just dismiss.  So I don't recall,
24  Mr. Budelmann ultimately as the district
25  attorney would have made that decision, I

1                     Brian Leeds
2    don't recall the specifics, I don't even
3    think it was much of a discussion, I think
4    Mr. Budelmann just did, in fact, agree that
5    that was the best thing to do.  I had
6    drafted -- so I pulled the files, I decided
7    which ones we thought were going to be
8    affected.  I gave kind of summaries, I think
9    they were just discussion summaries to either
10   Mr. Valdina or Mr. Budelmann about this is
11   what Matt Cornell's role was in each of these
12   cases and I think it was just thumbs up,
13   thumbs down about whether or not we were
14   going to submit letters to the defense
15   counsel and to the court essentially, you
16   know, bypassing the 440 process and saying
17   this is subject to a 440, we would like to
18   reopen it and once reopened we are moving to
19   dismiss the indictments.  We erred on the
20   side of caution so I don't recall us, I can't
21   think of any case that Investigator Cornell
22   wasn't involved with in any capacity that we
23   did not move to dismiss an indictment on.
24   There may have been one, but I don't recall.
25   I don't know what we did with the one where

```
 1                      Brian Leeds
 2   he served as tester of drugs and was not
 3   involved in any way with the recovery of the
 4   contraband items, that one may have stood.
 5   Q.      The Cayuga County District Attorney's
 6   Office did not actually move to dismiss those
 7   indictments though, correct?
 8   A.      No, I believe they did.
 9   Q.      Well, wouldn't it be true that the
10   Cayuga County District Attorney, Jon
11   Budelmann sent a letter to the affected
12   defendants that had been prosecuted where
13   Matt Cornell was the complaining witness?
14   A.      I would have to -- I drafted the
15   letter so Mr. Budelmann signed it, I would
16   have to be able to look at the letter to see
17   exactly what transpired so maybe I can't
18   answer your question specifically because I'm
19   not sure, I don't recall.
20   Q.      Before it was decided what would be
21   done, was there a meeting between the
22   District Attorney Jon Budelmann or
23   Christopher Valdina and judges in Cayuga
24   County?
25   A.      I wouldn't know, I was not part of any
```

```
 1                    Brian Leeds
 2   discussions with the judges, to the best of
 3   my recollection.
 4   Q.     Was a letter that you drafted and
 5   Mr. Budelmann signed sent to the defense
 6   attorneys for the inmates that had been
 7   prosecuted by the Cayuga County District
 8   Attorney's Office where Matt Cornell was the
 9   main material witness?
10   A.     As far as I know, yes.
11   Q.     What was the purpose of that letter?
12   A.     Again, I would have to be able to see
13   the letter specifically.  The purpose -- and
14   again, I don't recall specifically whether we
15   notified defense attorneys or we contacted
16   the courts with the letter, but the purpose
17   of it was essentially to notify everybody
18   that there was a significant issue with the
19   cases in which they were involved involving
20   the people that they represented and involved
21   an issue with Matt Cornell, one of the
22   officers involved and again I don't remember
23   the specific language of the letter, but
24   essentially either that we wouldn't oppose a
25   440 Motion and a motion to dismiss or we were
```

```
 1                      Brian Leeds
 2   doing it ourselves, that I don't recall
 3   specifically about logistically how we
 4   handled that.
 5   Q.     I would like to you take a look at
 6   your notes for the date December 20th, 2016.
 7   A.     Okay.
 8   Q.     Can you take a look and read that
 9   note?
10   A.     Let me read it in its entirety.  Okay.
11   Q.     So after taking a look at that, do you
12   recall meeting with two county judges
13   regarding these matters?
14   A.     I don't recall the meeting, but I
15   would acknowledge that my notes are an
16   accurate representation of what actually
17   transpired and that the notes do reflect that
18   I did meet, in fact, with two judges from
19   Cayuga County.
20   Q.     Now referring to your note of December
21   22nd, 2016, it states, prepared drafts of
22   disclosure letters for affected inmates.
23          Can you state what that specifically
24   means?
25   A.     There were letters prepared, again I
```

```
1                    Brian Leeds
2   don't, I would have to look at the letters
3   themselves and what the letter essentially
4   says, but what I was doing was essentially
5   drafting letters more or less explaining what
6   had transpired.  They were brief, they were
7   brief letters and again I don't, I don't
8   remember specifically what the course of
9   action was going to be whether, again we were
10  going to not oppose their motions or we were
11  going to move to dismiss the indictments on
12  our own.  I would have to look at the
13  letters.
14  Q.     I would like --
15                    MR. LEVY:  Let's go off the
16           record a second.
17                    (Whereupon, a discussion was
18           held off the record.)
19                    (Whereupon, LETTERS are
20           received and marked as PLAINTIFF'S
21           Exhibits 2 AND 3 for Identification.)
22  Q.     We are back on.
23         Mr. Leeds, I would like you to take a
24  look what we've marked with today's date for
25  identification as Exhibit 2.  It's a December
```

1               Brian Leeds
2    23rd, 2016 letter that is signed by Jon
3    Budelmann regarding the People versus Thomas
4    Ozzborn; do you have that?
5    A.    Yes, I do.
6    Q.    Have you had a chance to take a look
7    at it and review it?
8    A.    Yes, I have.
9    Q.    Do you recognize it?
10   A.    Yes, I do.
11   Q.    Did you, in fact, write this letter?
12   A.    Yes, I did.
13   Q.    And it was signed by Jon Budelmann in
14   his capacity as the District Attorney of
15   Cayuga County?
16   A.    Yes.
17   Q.    After reviewing it, does it refresh
18   your recollection as to what course of action
19   the Cayuga County District Attorney's Office
20   was going to take with regard to the case of
21   People versus Thomas Ozzborn?
22   A.    Yes, it does.
23   Q.    What was that course of action?
24   A.    What we had said was we would not
25   oppose any motion to reopen the case under

```
 1                    Brian Leeds
 2   Criminal Procedure Law 440 and then once
 3   submitted, we would also not oppose any
 4   motion to dismiss the indictment.
 5   Q.    Do you know if that, in fact, was done
 6   in this case?
 7   A.    I don't know.
 8   Q.    So what reason was the Cayuga County
 9   District Attorney's Office not going to
10   oppose the 440 Motion?
11   A.    We after learning about the issue with
12   Investigator Cornell, we decided that any
13   case where he was involved as a material
14   witness would, would essentially be tainted
15   by the disclosure that he made to me, you
16   know, as a result that number one, that was
17   our, not just our ethical obligation to
18   reveal this as Brady information, but also
19   statutory that we had to do that.  We knew
20   that once that disclosure was, in fact, made
21   that the 440 Motion would have been granted
22   or should have been granted, we would have
23   consented to that and then from there,
24   knowing full well that the only way to
25   continue to sustain the case whether it
```

```
 1                      Brian Leeds
 2   required a trial would be having to overcome
 3   that disclosure, that Brady disclosure that
 4   Matt Cornell had creditability issues with
 5   us, we probably where not going to be
 6   successful with any re-prosecution.
 7   Q.      How many of these types of letters
 8   were sent out?
 9   A.      Guessing I believe it was about seven
10   or eight.
11   Q.      But were there cases where a letter
12   was sent out, however, the District
13   Attorney's Office did oppose a motion to
14   vacate the conviction?
15   A.      I don't know.
16   Q.      Do you recall the case of the People
17   verse Jaencric Agee, that's J-A-E-N-D-R-I-C,
18   A-G-E-E?
19   A.      I recall the name, I don't recall
20   anything independently off the top of my
21   head.  I want to say that that was a jury
22   trial that I conducted, but I'm guessing.
23   Q.      Do you recall in that case Mr. Agee
24   seeking to have his conviction overturned
25   after these revelations about Mr. Cornell?
```

1        Brian Leeds

2 A.  I don't recall.

3 Q.  Do you recall being quoted in a

4 newspaper that it would be speculation that

5 Mr. Cornell planted a weapon on Mr. Agee?

6 A.  I don't recall that either.

7 Q.  Do you recall there being any cases

8 where the Cayuga County District Attorney's

9 Office did not consent to the 440 Motion in a

10 case that Mr. Cornell was involved with?

11 A.  I do not know the answer to that.

12 Q.  Is it your belief that in all of the

13 cases that a letter was sent out that the

14 Cayuga County District Attorney's Office

15 consented to the dismissal of the indictment?

16 A.  My belief would be that any letter

17 similar in nature, similar in language to the

18 ones involving Mr. Ozzborn as you showed in

19 the Exhibit 2 that that course of action

20 would be the one that the District Attorney's

21 Office was taking.

22 Q.  There is a phrase used in your letter

23 that says, we would join any motion to

24 dismiss the indictment in the interest of

25 justice.

1           Brian Leeds
2           Why would that phrase be used?
3    A.     The reason for it is because the
4    criminal procedure law actually has that
5    language written right into it.  That's,
6    there is a separate statute for dismissing
7    matters in the interest of justice and I also
8    believe that somewhere in the 440 Statue that
9    same phrase may apply so I believe we just
10   wanted to mirror or I wanted to mirror the
11   statutory language as far as the reason, we
12   have to give a basis for why we're moving to
13   dismiss something, we can't just essentially
14   say because we feel like it today so I think
15   we just kind of used the language in the
16   statute to allow the District Attorney's
17   Office to consent to motions to dismiss in
18   the interest of justice.
19   Q.     I want to refer back to the letter
20   that's marked as Exhibit 2, the letter
21   regarding the People versus Thomas Ozzborn.
22   According to this letter that references
23   indictment 2015-191, correct?
24   A.     Yes, that's correct.
25   Q.     Who is this letter being sent to?

```
 1                    Brian Leeds
 2   A.      This letter is being sent to Thomas
 3   Leone.
 4   Q.      Who is he?
 5   A.      He would have been the Cayuga County
 6   Supreme and County Court judge.
 7   Q.      Why is this letter being sent to Judge
 8   Leone?
 9   A.      I believe because Judge Leone
10   procedurally in order to accomplish what we
11   were seeking to do, which was to essentially
12   vacate what had already been done, the court
13   of jurisdiction would have been the judge
14   assigned to the case originally.  If someone
15   were to do what is called a 440 Motion, that
16   would go to a specific judge so the reason
17   why we corresponded with the judge was
18   because it was his case to control.
19   Q.      Were there other parties that were
20   copied on the letter?
21   A.      Yes.
22   Q.      Who are they?
23   A.      According to the letter, Rome Canzano
24   who would have been the attorney of record at
25   the time that we handled the case and
```

```
 1                     Brian Leeds
 2   Mr. Ozzborn would have been sentenced in
 3   addition to Mr. Ozzborn.
 4   Q.    Referring to the letter you agree that
 5   it indicates that Mr. Ozzborn was sentenced
 6   on August 11th, 2016 to 2 to 4 years in state
 7   prison?
 8   A.    According to the letter, yes.
 9   Q.    If you could take a look at the other
10   letter that we've marked as Plaintiff's
11   Exhibit 3 with today's date.
12   A.    Okay.
13   Q.    This letter is regarding what case?
14   A.    Donnesia Brown.
15   Q.    Is this the People versus Donnesia
16   Brown and it's indictment 2016-095, correct?
17   A.    That's correct.
18   Q.    Incidentally, this case states as well
19   as the other letter regarding Thomas Ozzborn
20   that the charges were Promoting Prison
21   Contraband in the First Degree, correct?
22   A.    Correct.
23   Q.    And this letter also that we're
24   looking at, is this the letter that you
25   composed?
```

```
 1                        Brian Leeds
 2   A.     Yes, it is.
 3   Q.     And Jon Budelmann in his capacity as
 4   the District Attorney of Cayuga County signed
 5   it?
 6   A.     Yes, he did.
 7   Q.     This letter also indicates that, it's
 8   the same context as the previous letter
 9   regarding Mr. Ozzborn, correct?
10   A.     Correct.
11   Q.     The Cayuga County District Attorney's
12   Office would not oppose a motion to vacate on
13   CPL440 in the interest of justice, correct?
14   A.     Correct.
15   Q.     Who is this letter being sent to?
16   A.     Judge Mark Fandrich of Cayuga County.
17   Q.     Who else is copied on it?
18   A.     The defense attorney of record for
19   Mr. Brown who would have been Rome Canzano as
20   well as Donnesia Brown.
21   Q.     According to this record, the letter,
22   it indicates that Mr. Brown was sentenced on
23   October 18th, 2016 to 2 to 4 years in state
24   prison, correct?
25   A.     Correct.
```

```
1                    Brian Leeds
2    Q.    I just want to refer you to the
3    letterhead of these two letters on the
4    left-hand side it indicates that Jon
5    Budelmann was the district attorney and on
6    the right-hand side is that the total number
7    of assistant district attorneys that worked
8    at the Cayuga County District Attorney's
9    Office on or about December 23rd, 2016?
10   A.    I believe it's accurate.  I don't see
11   anybody missing.
12   Q.    During the course of these proceedings
13   after the letter was sent in December of
14   2016, do you recall having any specific
15   conversations with this defense attorney,
16   Rome Canzano about these matters?
17   A.    Most likely, yes.
18   Q.    Do you recall anything specific that
19   was said between the two of you?
20   A.    I couldn't recall anything specific,
21   Rome Canzano and I talked about many things
22   and he is a still practicing defense
23   attorney, we still talk frequently.
24   Q.    Have you ever discussed these cases
25   with Mr. Canzano?
```

```
 1                      Brian Leeds
 2   A.      Probably.
 3   Q.      Specifically I should say, did you
 4   ever discuss the cases of Thomas Ozzborn or
 5   Donnesia Brown with Rome Canzano?
 6   A.      After this incident?
 7   Q.      Yes.
 8   A.      I don't recall if we did or not.
 9   Q.      Do you know if Rome Canzano made the
10   440 Motions in either the Ozzborn case or the
11   Brown case?
12   A.      I do not know.
13   Q.      At some point were you, for lack of a
14   better word, shielded from dealing with these
15   matters by the Cayuga County District
16   Attorney's Office?
17   A.      I wouldn't say I was shielded from
18   them, I think I tried to keep myself away
19   from the investigation component of it as
20   best as I could.  Again, at that point I
21   didn't know where this matter was going to be
22   going whether there might be criminal charges
23   filed against Mr. Cornell and if there were
24   going to be, I'd certainly was going to be
25   probably the key witness in the case and I
```

```
 1                    Brian Leeds
 2   didn't want to make it seem like, you know, I
 3   was both witness and part of the
 4   investigation.  So I was briefed on a lot of
 5   the things, you know, I found out a lot of
 6   things just through it being a small office,
 7   but, you know, I really just kind of tried to
 8   do my best not to pry and to get involved in
 9   the real nuts and bolts of the investigation
10   itself.
11   Q.    Were criminal charges ever brought
12   against Matt Cornell by the Cayuga County
13   District Attorney's Office?
14   A.    I have no idea.
15   Q.    You don't know if he was charged
16   criminally regarding any of this or not?
17   A.    I have no idea.
18   Q.    Other than your appearance here today
19   and the interviews that you had with the FBI
20   and the investigators at the District
21   Attorney's Office, have you ever provided
22   testimony regarding these matters?
23   A.    I have not.
24   Q.    Do you know if Matt Cornell is still
25   employed as a correction officer?
```

```
1                          Brian Leeds
2    A.    I don't know.
3    Q.    Do you know if Matt Cornell was
4    suspended for a period of time from his job
5    as a correction officer?
6    A.    I believe after the disclosure was
7    made and we spoke to the IG's office on the
8    12th, I think at some point shortly after
9    that he was, in fact, suspended.
10   Q.    Do you know if Matt Cornell ever
11   returned to his job as a correction officer
12   after being suspended?
13   A.    I do not know.
14   Q.    Do you recall ever seeing any of the
15   contraband that Officer Cornell claimed to
16   have recovered from either Thomas Ozzborn or
17   Donnesia Brown?
18   A.    I don't recall it, but if they were
19   indicted by me, it's safe to say then the
20   answer to that is yes, I did see them.
21   Q.    You're basing that on just the fact
22   that they were indicted, correct?
23   A.    I am basing that on the fact that if
24   they were indicted and I was the one who
25   actually did the presentation, I would have
```

```
 1                     Brian Leeds
 2   had that weapon in my hand in a bag at some
 3   point to present to witnesses at a grand
 4   jury.
 5   Q.    Earlier when I asked you if you
 6   recalled what the weapons were and I
 7   described them to you in each case you said
 8   you didn't recall it?
 9   A.    I said I didn't recall it specifically
10   and I still don't recall it, I don't know
11   what weapons specifically Mr. Brown or
12   Mr. Ozzborn might have had on them at the
13   time.
14                 MR. LEVY:  Aimee, do you have
15         any questions?
16                 MS. COWAN:  I do.  Thank you
17         and I'm going to try to be quick.
18                 MR. LEVY:  Okay, so I'm going
19         to stop.
20                 MS. COWAN:  Okay.
21                 MR. LEVY:  I'll just, I'm going
22         to reserve to follow up after
23         Ms. Cowan asks a few questions.
24                 MS. COWAN:  Okay.  Does anybody
25         need to take a break, we're good?
```

```
 1                     Brian Leeds
 2          Okay.
 3     BY MS. COWAN:
 4     Q.    Mr. Leeds, my name is Aimee Cowan, I
 5     represent Matthew Cornell in both the
 6     Donnesia Brown and Thomas Ozzborn case so I'm
 7     just going to ask you a couple of questions.
 8     I apologize, I might be jumping around a
 9     little bit so stop me if something doesn't
10     make sense or you want me to rephrase, okay?
11     A.    Okay.
12     Q.    Other than the subpoena that you
13     received from Mr. Levy, did you receive any
14     other correspondence from him or anyone at
15     his office?
16     A.    So I believe, I don't remember exactly
17     what came first, Mr. Levy was reaching out to
18     me either through email first or then phone
19     that he represents Mr. Ozzborn or Mr. Brown I
20     don't remember if he mentioned them
21     specifically in regard to an incident
22     involving Matt Cornell and he asked if I
23     would be willing to talk to him about it.  I
24     specifically recall that I think the thing
25     that jumped out at me was the voicemail I got
```

```
 1                    Brian Leeds
 2   on my, I don't know if it was my personal
 3   number or not, if he tracked me down through
 4   work because we were forwarding our work
 5   phones through our personal phones and I
 6   can't tell what's coming in as what, but it
 7   was on my cell phone.  It was a short
 8   message, I did call him back a few days later
 9   and, you know, he had introduced himself,
10   mentioned that he was pursuing something
11   civilly, he works out of New York City and
12   asked me if I recalled the incident with
13   Mr. Cornell and I said I did.  And then he
14   had mentioned that, you know, through
15   discovery my name was involved in a lot of
16   the reports and asked me if I would be
17   willing to do the deposition or provide a
18   deposition and I said sure and we came up
19   with a time and place, or at least a time to
20   do it virtually and that was really it.  I
21   was waiting on subpoenas from -- I told him,
22   you know, I do want a subpoena, I was waiting
23   on subpoenas, I think I waited a few days and
24   I might have reached out to him through email
25   just to let him know number one I hadn't
```

1                    Brian Leeds
2   gotten the subpoena yet and, in fact, I got
3   it later that day and I also I think I made a
4   request that if he's going to be
5   corresponding with me anymore do it through
6   my personal email account and not my work
7   related account.
8   Q.    Did he ever email you on your personal
9   email?
10  A.    I -- this morning he did.  I don't
11  know specifically and I imagine I could look,
12  I don't remember if the initial email or -- I
13  recall that I got an email from him, but I
14  don't know which account it came from.  I
15  want to say it was my personal account.
16  Q.    What was the contents of that email?
17  A.    Just, you know, introducing himself,
18  saying he represents Thomas Ozzborn and
19  Donnesia Brown involving an incident with
20  Corrections Officer Matt Cornell.  I don't
21  know if he identified him as a corrections
22  officer or just Matt Cornell, you know, and
23  essentially asking if I would be willing to
24  speak to him about it.
25  Q.    Okay.

1               Brian Leeds

2          Did he tell you anything about the

3     nature of the lawsuits that he filed for

4     Mr. Brown and Mr. Ozzborn?

5     A.     Just that he was filing lawsuits, I

6     don't know what the basis of what wrong is

7     being alleged by either of these gentleman.

8     Q.     Did you speak to anybody else from

9     Mr. Levy's office about this deposition?

10    A.     I did not.

11    Q.     Did you speak to any anybody else in

12    general about your deposition?

13    A.     I did not.

14    Q.     We've already talked about Exhibit 1

15    which is your eight pages of notes and I

16    think there is a couple of emails in there as

17    well.  Anything else that you would have

18    reviewed for this deposition?

19    A.     No, no.  And I was just reviewing

20    those notes this morning as we were talking.

21    Q.     Okay.

22          The notes that are Exhibit 1, I think

23    you said that you created them knowing that

24    you might be required to testify or something

25    to that effect about the incident that you

1              Brian Leeds

2   talked about in your notes, is that what you

3   testified to?

4   A.    Correct.

5   Q.    So my question is so there is dates on

6   these notes, did you write the notes on the

7   date that it says or did you go back at a

8   later date and say okay, this happened on

9   this date, this happened on this date?  Were

10  you doing it contemporaneously or how do you

11  do that?

12  A.    To the best of my recollection, I

13  think I probably started somewhere in the

14  middle that if the incident occurred, I

15  definitely did not take notes on December

16  9th.  I might have started December 12th or

17  immediately after that with recording my

18  notes.

19  Q.    Your notes are based off of your own

20  memory of the conversation with Matt Cornell

21  on December 9th?

22  A.    That's correct.

23  Q.    Was your conversation with Matt

24  Cornell, was it recorded in anyway either

25  videotape or audio?

1                    Brian Leeds

2   A.    It was not.

3   Q.    So you think that it could be possible

4   that you waited three or more days to write

5   down your recollection of the December 9th

6   meeting?

7   A.    Not it could be, it is.  That's what I

8   did.  I didn't write it down on December 9th.

9   Q.    So it was at least three days, if not

10  more, before you wrote down the notes from

11  that meeting?

12  A.    Correct.

13  Q.    Then with respect to, let's see we

14  have December 10th, December 11th and then

15  December 12th, when did you write the notes

16  for December 10th and December 11th, would

17  that have been at the same time you wrote the

18  December 9th notes?

19  A.    Again, I don't -- I wouldn't -- I

20  don't specifically recall the exact date when

21  I would have started.  Most likely somewhere,

22  it could have been starting on the 12th and

23  then, you know, referring to things that

24  happened days before.  At some point I want

25  to say the notes became contemporaneous, but

1                          Brian Leeds
2    at what point I don't know.
3    Q.     Did you keep that on your work
4    computer or personal computer?
5    A.     I don't recall.  I want to say it
6    would have been my work computer.
7    Q.     Now when you left the Cayuga County
8    District Attorney's Office you obviously took
9    these notes with you, right?
10   A.     I had a copy of them, I don't know if
11   they were still stored or left behind on the
12   computer.
13   Q.     Where did you access them for purposes
14   of this deposition?
15   A.     I have an actual file of some things
16   that I kept with me in regard to some of the
17   cases, some of the business I conducted at
18   Cayuga County so I have a file of some old
19   cases and the notes were just printed out and
20   left in that file.
21   Q.     Anything else in that file pertaining
22   to Matt Cornell or the two plaintiff's in
23   this case?
24   A.     I would have to look.  I have the file
25   here, I can look.

```
 1                     Brian Leeds
 2    Q.     Okay.
 3    A.     Do you want me to do that?
 4    Q.     You don't have to do it now, if you
 5    want to take a look at some point.  I was
 6    assuming that you looked through your records
 7    to look for anything relevant here so I would
 8    hope that everything is here in front of us,
 9    but if you think there might be something
10    else then that would be great if you can take
11    a look.
12                     MR. LEVY:  Can I jump in and
13              say while we're all together, could he
14              check it out just to make sure?
15                     MS. COWAN:  Sure.  Is it right
16              there with you?
17                     THE WITNESS:  It's right here.
18                     MS. COWAN:  How big is it?
19              Okay that's not too bad.
20                     MR. LEVY:  That seems
21              reasonable.
22    A.     Okay.  So I actually do have some
23    other information, not personal notes, but
24    other information relevant to this.
25    Q.     What is it?
```

| 1  | Brian Leeds |
|----|-------------|
| 2  | A.     So I have copies of the letters that |
| 3  | we had sent to the inmates that were affected |
| 4  | including the ones that were referenced in |
| 5  | the exhibits, one of which has actually what |
| 6  | looks like a copy of a post-it note that I |
| 7  | wrote on one, probably this is what I gave to |
| 8  | Mr. Budelmann.  I have an email from |
| 9  | Mr. Budelmann about cases that we believed |
| 10 | were going to be among the ones affected.  I |
| 11 | think I referenced this, I actually have my |
| 12 | notes in summary about the cases that I was |
| 13 | recommending to Mr. Budelmann that we had a |
| 14 | problem with real quick summaries of what the |
| 15 | case was about and essentially what my |
| 16 | recommendations were going to be with those |
| 17 | cases.  I have copy of disciplinary records |
| 18 | involving -- I don't know if we requested, I |
| 19 | don't recall specifically if we requested |
| 20 | from the Department of Corrections any |
| 21 | unusual incident report that had Investigator |
| 22 | Cornell's name on it, but it looks like we |
| 23 | did, I was able to actually go through this |
| 24 | 23-page document and more or less flag what |
| 25 | cases Investigator -- Officer Cornell would |

| 1 | Brian Leeds |
| 2 | have been involved in and whether or not |
| 3 | there were cases that we accepted as |
| 4 | prosecutions so that must have been the |
| 5 | reference that we used for what cases Matt |
| 6 | Cornell was involved in.  And then I have |
| 7 | memorandum forms from the State Police |
| 8 | whenever I would meet with investigators from |
| 9 | the State Police, they would prepare for me a |
| 10 | list of cases that we were looking at and |
| 11 | then, you know, what was the basis, what |
| 12 | would happen as a result of our discussions |
| 13 | whether we would accept the case for |
| 14 | prosecution or decline so I have those |
| 15 | memorandums from the State Police essentially |
| 16 | to go through and see which cases were we |
| 17 | accepting, which case weren't we accepting. |
| 18 | Q.    Okay, so I just want to kind of boil |
| 19 | this down a little bit to make sure I |
| 20 | understand.  What you did specifically was |
| 21 | you looked at all of the cases in which Matt |
| 22 | Cornell was involved in specifically finding |
| 23 | a weapon on an inmate? |
| 24 | A.    No.  We -- usually it was going to be |
| 25 | the weapons cases anyway, but we looked at |

1              Brian Leeds
2    every prison case that Matt Cornell was
3    involved with in any capacity and we boiled
4    it down to these are the cases where, that we
5    prosecuted where Matt Cornell was a witness
6    in some way, whether we called him at grand
7    jury or not, I think we looked at everything
8    and eventually tried to determine what was
9    his role in each one of these cases and
10   whether or not knowing that we now had the
11   credibility information to call it whether or
12   not we were going to continue to go forward
13   with prosecuting these cases if 440s were
14   granted and things like that.  I don't think
15   there was any case that essential had Matt
16   Cornell's name on it in any way that we
17   didn't ultimately just decide that we weren't
18   going to oppose dismissal because usually he
19   was kind of a material witness in those
20   things and we erred on the side of caution.
21   Q.      So you boil it down to the cases in
22   which Officer Cornell was going to be
23   material witness essentially?
24   A.      One of the material witnesses, you
25   know, whether it was he was involved in

1        Brian Leeds
2    recovery of the weapon or even -- essentially
3    if there was going to be testimony taken from
4    Matt Cornell, we wouldn't have used him as --
5    you can't really use him as anything other
6    than having information to share to a jury so
7    any case where he was involved materially was
8    a case that we flagged and took action on,
9    you know, for example, if there was an
10   assault case at Auburn Prison that involved a
11   weapon and Matt was one of, let's say 20
12   guards that responded to it, but wasn't
13   involved in recovering weapons, seeing how
14   the assault took place, it was just really
15   part of the cleanup afterward or part of
16   securing the inmates, to us he didn't take
17   any role whatsoever in the case, we would
18   never have called him as a witness, those
19   would have been cases that we might not have,
20   we might not have written letters on so to
21   speak.  I don't recall there being any cases
22   like that, but that was kind of what we were
23   using as the standard, how involved was he.
24   Q.      After you boiled it down, I think you
25   said you came up with about seven or eight

```
 1                      Brian Leeds
 2   cases that you flagged?
 3   A.      That's correct.
 4   Q.      Are those the cases that you sent the
 5   letters out to the judge and the
 6   corresponding defense counsel?
 7   A.      That's correct, yes.  I don't know,
 8   again, looking at it now, it looks like
 9   there -- I might have some further notes to
10   clarify, I don't think there was any case
11   though that we had flagged and not sent out a
12   similar letter.
13   Q.      We did look at two of the letters that
14   you sent out, they were the Thomas Ozzborn
15   and Donnesia Brown letters and they are
16   marked as Exhibits 2 and 3, right?
17   A.      Correct.
18   Q.      Are those contained within the letters
19   that you have in your hand right now from
20   your file?
21   A.      Yes, they are.
22   Q.      Now, I think you said that you don't
23   specifically recall whether or not you
24   prosecuted the Donnesia Brown case; is that
25   right?
```

1          Brian Leeds
2   A.    I don't specifically recall, again, I
3   was the prison prosecutor for the DA's
4   office, there were times when maybe like I
5   was away, unavailable and somebody else from
6   the office might have actually put the case
7   in to grand jury for me, but I don't think, I
8   can't independently recall whether or not
9   that happened and I'm just going to assume
10  that I was the prosecutor involved in this
11  case.
12  Q.    Do you have any recollection of any
13  grand jury proceeding for Donnesia Brown?
14  A.    Independently, no I do not.
15  Q.    Any independent recollection of any
16  documents about this particular charge
17  against him?
18  A.    No.
19  Q.    Do you remember any conversations you
20  had with Matt Cornell about this charge?
21  A.    No.
22  Q.    Do you know whether Donnesia Brown was
23  a gang member?
24  A.    I don't know.
25  Q.    Do you recall Officer Cornell ever

1       Brian Leeds
2   telling you that he was trying to get rid of
3   Donnesia Brown from Auburn Prison?
4   A.    Do I recall, that never happened, that
5   I can say never happened, only one person did
6   Matt Cornell mention to me as far as weapons
7   are concerned placing them on people.
8   Q.    So he never told you that he placed a
9   weapon on Donnesia Brown?
10  A.    Never.
11  Q.    Do you know however -- well, you must
12  know given the letter that Donnesia Brown
13  plead guilty to that contraband charge?
14  A.    Yes.
15  Q.    I think you said you do remember
16  handling the prosecution for Thomas Ozzborn?
17  A.    I don't know if I did his grand jury
18  presentation or not. That would have been my
19  file to handle.
20  Q.    Do you recall any conversations that
21  you had with Ozzborn or his attorney about
22  this charge?
23  A.    No.   There probably weren't any
24  conversations about that either. I don't, I
25  won't say that, I just don't recall.

```
1                        Brian Leeds
2    Q.    Do you recall any documents about this
3    particular incident with Thomas Ozzborn?
4    A.    No, I don't.
5    Q.    Do you recall reviewing any jail phone
6    call records from Mr. Ozzborn?
7    A.    I don't recall.
8    Q.    What about emails from Mr. Ozzborn
9    from the Cayuga County Jail, do you recall
10   reviewing any of those records?
11   A.    I don't recall.
12   Q.    At any point do you recall Mr. Cornell
13   saying that he placed a weapon on
14   Mr. Ozzborn?
15   A.    No, he never said that.
16   Q.    Do you know whether Mr. Ozzborn was a
17   gang member?
18   A.    I don't know.
19   Q.    Is there something that you typically
20   look into just as a matter of course when you
21   are prosecuting an inmate?
22   A.    Whether they are gang members or not?
23   Q.    Right.
24   A.    When I was a prosecutor, no, I really
25   didn't care what -- no.
```

```
 1                    Brian Leeds
 2    Q.    Did you ever develop any evidence that
 3    Mr. Cornell planted a weapon on either
 4    Ozzborn or Donnesia Brown?
 5    A.    Did I develop evidence about that?
 6    Q.    Yes?
 7    A.    No.
 8    Q.    Do you know if the District Attorney's
 9    Office ever developed any evidence that a
10    weapon was placed on either of those two
11    inmates?
12    A.    No, I don't know.
13    Q.    I want to direct you to Exhibits 2 and
14    3 which are the letters that were sent out
15    about both of these inmates and I think you
16    said that you drafted these letters, right?
17    A.    That's correct.
18    Q.    If you look at the second paragraph
19    and I think it's the second paragraph of both
20    letters because they seem to be carbon copies
21    of each other, do you see the second
22    paragraph?
23    A.    Yes.
24    Q.    It says, we have no direct evidence
25    that this particular defendant was subjected
```

```
 1                       Brian Leeds
 2    to the same conduct.
 3            Do you see where it says that?
 4    A.    I do.
 5    Q.    And that's referring to Officer
 6    Cornell planting a weapon, correct?
 7    A.    Correct.
 8    Q.    The flagged cases that you listed, did
 9    anybody else collaborate with you to figure
10    out which cases should be filed and which
11    shouldn't be filed?
12    A.    Nobody collaborated with me on them, I
13    was tasked with more or less doing the work
14    and then I summarized them and I was going to
15    leave it the district attorney to ultimately
16    decide what to do with these things.
17    Q.    I think you said you went to Vermont
18    Law?
19    A.    That's correct.
20    Q.    When did you graduate?
21    A.    Where did I graduate or when?
22    Q.    When.
23    A.    2007.
24    Q.    That was from Vermont Law?
25    A.    That's correct.
```

```
 1                      Brian Leeds
 2    Q.    Where did you go to undergrad?
 3    A.    It would have been SUNY Binghamton at
 4    the time, Binghamton University.
 5    Q.    When did you graduate from Binghamton?
 6    A.    Undergraduate was 1995, graduate was
 7    '97, '98.
 8    Q.    Okay, what is your graduate degree?
 9    A.    English.
10    Q.    So were you an English teacher at some
11    point?
12    A.    No, no.  After getting my Master's
13    Degree my next job would have been I was a
14    copy editor for about five years.
15    Q.    Where was that?
16    A.    It was a journal called the Quarterly
17    Review of Biology.  The office was located
18    Stony Brook University on Long Island.
19    Q.    The Quarterly Review of Biology?
20    A.    Correct.
21    Q.    How long were you there or you said
22    five years?
23    A.    About five years.
24    Q.    After five years, what happened next?
25    A.    I went to law school.
```

```
 1                   Brian Leeds
 2   Q.    Then you graduated from law school in
 3   2007 from Vermont Law?
 4   A.    Correct.
 5   Q.    Any other degrees or anything like
 6   that?
 7   A.    No.
 8   Q.    Have you ever had any grievances filed
 9   against you as an attorney?
10   A.    Not that I know of.
11   Q.    Ever been disciplined in any way as an
12   attorney?
13   A.    No, I have not.
14   Q.    After you graduated from Vermont Law I
15   think you said you went to Broome County
16   District Attorney?
17   A.    Correct.
18   Q.    Was there any particular division or
19   department that you worked in while you were
20   there?
21   A.    I started as a local court assistant
22   district attorney doing the justice courts in
23   the county, did that for maybe two years,
24   maybe less.  Then I became the prosecutor for
25   the City of Binghamton in their court
```

1                    Brian Leeds
2   handling misdemeanor cases and below.  I did
3   that for maybe another couple of years.  Then
4   I went and started doing felony prosecutions
5   and about a year into felony prosecutions I
6   was doing almost exclusively DWI offenses,
7   vehicular crimes.
8   Q.    At any point in your time at Broome
9   County did you prosecute prisoner cases?
10  A.    I probably did handle -- I did, yes, I
11  did.  We did do a number of misdemeanor and
12  felony cases out of the Broome County Jail
13  and I did handle several of those.
14  Q.    What about prison contraband cases,
15  did you handle any of those?
16  A.    Yes, I did.
17  Q.    How many would you estimate, if you
18  can?
19  A.    Maybe a dozen.
20  Q.    Then I think you said you went to
21  Cayuga County DA's office, correct?
22  A.    Correct.
23  Q.    How long were you at Broome County
24  for?
25  A.    About eight years, maybe a little

```
 1                    Brian Leeds
 2   under eight years.
 3   Q.    I believe you said that there really
 4   wasn't any particular division or bureau you
 5   were assigned to at Cayuga County?
 6   A.    No, we didn't have bureaus, no.
 7   Q.    Because the office is small I guess?
 8   A.    Right.
 9   Q.    Then I think you said that you became
10   kind of the prison prosecutor while you were
11   at Cayuga County?
12   A.    Correct, yes.
13   Q.    How many prison contraband cases would
14   you say you prosecuted while you were there?
15   A.    Forty or fifty, maybe.
16   Q.    Then after Cayuga County you went to
17   Ontario County Public Defender, correct?
18   A.    Correct.
19   Q.    Why did you leave Cayuga County?
20   A.    You want the short version or the long
21   version?
22   Q.    The short version if fine.
23   A.    The short version is that it was a
24   better move for my family.  It was
25   significant increase pay-wise.  I had a
```

1                      Brian Leeds
2    really good friend who had already been
3    working here at Ontario County.  I had gotten
4    a little bit kind of, let's say bored --
5    maybe bored is not the right word, but I just
6    maybe a little bit tired of doing
7    prosecutions.  And, you know, it was kind of
8    an opportunity to just try something new and,
9    you know, do it in an office where I was
10   already familiar with one of the people I
11   would be working with.
12   Q.      Did you have any falling out with the
13   district attorney or any of his senior staff?
14   A.      Falling out, no.
15   Q.      Did you have any conflicts with the
16   senior staff or the district attorney that
17   made part of the decision for you to leave?
18   A.      Face-to-face conflicts, no.  I had as
19   you normally do in offices you might have
20   disagreements with the people you work with
21   and maybe not, maybe not really agree with
22   some of the decisions that they make, but
23   that was really just part of the job, you
24   know, I think my relationship with everybody
25   I worked with over there was pretty good.

1                      Brian Leeds
2    Q.      Did you have disagreements with
3    decisions made with respect to Matt Cornell
4    or any of these cases that we talked about?
5    A.      At the time, no, no.
6    Q.      You said at the time, is there a time
7    that things changed?
8    A.      Well, again I'm just assuming this, I
9    wouldn't know one way or the other, it's
10   personally disappointing to me and I don't
11   know if this is true that not, that nothing
12   was ever criminally brought about involving
13   Mr. Cornell, but that wasn't my decision and
14   again, I, I was never subpoenaed, I was never
15   asked anything further about it, that is a
16   little disappointing to me, but I was not
17   involved in any of the decisions one way or
18   the other about what they decided to do
19   ultimately.
20   Q.      After you left did you keep in touch
21   with any of the staff from Cayuga County?
22   A.      Yes.
23   Q.      Did you keep in touch with the staff
24   about anything having to do with Matt Cornell
25   or these cases that we've talked about?

1                    Brian Leeds
2    A.      No, I did not talk about anything
3    regarding Matt Cornell that these
4    investigations.  The only conversations I had
5    were the ones with the investigator and the
6    FBI and I don't even think I spoke to anybody
7    from Cayuga County about that either.
8    Q.      That was while you were still employed
9    by Cayuga County, right?
10   A.      No, it was not.  I was employed at
11   Ontario County Public Defender.
12   Q.      I think I'm a little confused on my
13   timeline.  When did you leave Cayuga County?
14   I want to nail that down.
15   A.      I want to say I formally left, my last
16   day might have been like -- I'd have to look
17   at a calendar, like February 17th and I maybe
18   took a week off and then started the
19   following Monday after that at the end of
20   February in the Ontario County Public
21   Defender's Office and I recall because it was
22   a little bit strange because I had maybe in
23   my first week explain to my boss that the FBI
24   was coming to interview me.
25   Q.      That was February of what year, 2017?

1                      Brian Leeds
2    A.     2017.
3    Q.     I think you mentioned that you were
4    interviewed by the IG's Office about Matt
5    Cornell, correct?
6    A.     There was a face-to-face interview
7    with again I think it was Tom Knight, that
8    would have been the one that occurred at the
9    Ontario County Public Defender's Office.
10   Q.     When was that?
11   A.     That again would have been right after
12   I started, March of I think I said 2017.
13   Q.     When we say IG, what we're referring
14   to is Office of Special Investigations,
15   right?
16   A.     Correct.
17   Q.     I think they changed names at some
18   point, but I'm going to refer to them as OSI;
19   does that make sense?
20   A.     Yes.
21   Q.     So you face-to-face met with Tom
22   Knight from OSI in March of 2017, any other
23   face-to-face interactions with OSI?
24   A.     Face-to-face, I don't recall that I
25   did, no.

1                    Brian Leeds
2     Q.     What about on the phone --
3     A.     Let me correct, I may have had
4     face-to-face discussions and I don't know
5     specifically or not with a couple of
6     investigators with the IG's office, it's very
7     tough to say because often with the prison
8     cases I was meeting with investigators there
9     rather frequently so I don't know, you know,
10    it almost was like a biweekly occurrence so I
11    don't know if I met with them face-to-face or
12    not, the investigators.
13    Q.     So you're saying you met with them on
14    a biweekly occurrence to talk about any cases
15    in general or specifically Matt Cornell?
16    A.     I don't recall.  For example, if I, if
17    I needed something from the prison system for
18    a case that I was prosecuting, let's say I
19    was looking for phone calls which I didn't
20    often do, but sometimes we wanted them I
21    would reach out to the IG's office or OSI and
22    speak with them about that.  I want to say
23    the one investigator I frequently dealt with
24    was Aldo, Aldo Larossi (phonetic spelling)
25    maybe and then there was another investigator

1                    Brian Leeds
2    who I would speak to frequently about
3    essentially if I needed something from the
4    prison system.  Now before this incident with
5    Matt Cornell, in another case that I was
6    prosecuting, we, I think I referenced to
7    Naythen Aubain, the defense attorney had
8    mentioned that Naythen Aubain had filed a
9    complaint against Officer Cornell and was
10   requesting any disclosure that we had as far
11   as that investigation was concerned.  This
12   was probably, maybe a month before the Sean
13   Gaines matter and because the request was
14   made and now it's part of the record, we were
15   kind of obligated to look into whether or not
16   there was going to be any required discovery,
17   required Brady information we were going to
18   have to turn over regarding Matt Cornell in
19   this case so I essentially asked if there was
20   an investigation into Matt Cornell and it
21   turned out there was, I want to say it was
22   based on the complaint that Naythen Aubain
23   made and I had a lot of frequent
24   conversations with them about that first
25   investigation with Matt Cornell.  Ultimately

```
1              Brian Leeds
2   I believe the IG's office found that there
3   was nothing credible to sustain anything
4   involving Officer Cornell and whatever
5   information he gave me, I don't recall
6   specifically what kind of disclosure that we
7   made, maybe that investigation was open and
8   it was unfounded so I made the disclosures in
9   that case and I believe that inmate
10  ultimately plead the day trial, too.
11  Q.      Do you recall whether part of that
12  Aubain investigation included jail phone
13  records where he was admitting that the
14  weapon was his?
15  A.      Mr. Aubain did?
16  Q.      Yes.
17  A.      Yes.  I don't know if that's the
18  specific language that he used exactly, I do
19  want to say we had phone records that we were
20  planning to use in that prosecution, but I
21  don't recall specifically what might have
22  been on those phone calls.
23  Q.      Was this a case that you were
24  prosecuting yourself?
25  A.      Yes.
```

```
 1                      Brian Leeds
 2   Q.      Did he end up pleading guilty to the
 3   weapons charges?
 4   A.      He did.  Well, I don't know if it was
 5   weapons or drugs that he was found in
 6   possession of, I don't recall.
 7   Q.      Was he one of the inmates for whom you
 8   sent out a letter just like you sent out for
 9   Ozzborn and Brown?
10   A.      Yes.
11   Q.      Do you know whether he actually did
12   file a 440 Motion and had his charges
13   dismissed?
14   A.      I do not know.
15   Q.      All right, so specifically with
16   respect to Matt Cornell and the December 9th
17   meeting that you had with him, how many times
18   do you think you talked with OSI about that
19   other than this face-to-face meeting with Tom
20   Knight?
21   A.      After December 9th?
22   Q.      Yeah.
23   A.      Three or four, maybe.
24   Q.      Was that face-to-face or was that on
25   the phone?
```

```
 1                     Brian Leeds
 2   A.      I don't recall any face-to-face
 3   meetings other than the one that occurred
 4   here at the Public Defender's Office.  I
 5   could be wrong, but I don't recall anything
 6   face-to-face.
 7   Q.      I would like to talk about that
 8   session that you would with Matt Cornell and
 9   according to your notes it looks like it
10   happened on December 9th, 2016?
11   A.      Correct.
12   Q.      How long was that prep session, I
13   think you said it was 30 to 45 minutes or
14   something to that effect?
15   A.      That sounds about right, again, if I
16   can refer to the notes I think the notes were
17   a little bit more accurate.
18   Q.      Yeah.
19   A.      If you give me a moment.
20               MR. LEVY:  I think he said 20
21           to 30.
22   A.      I think I said 20 to 30 before he made
23   the disclosure to me.  My notes say the
24   entire preparation conversation lasted about
25   a half hour to 45 minutes, yes.
```

```
 1                   Brian Leeds
 2    Q.    Anybody else there present with you
 3    and Officer Cornell for that prep session?
 4    A.    Inside the room, no.
 5    Q.    Was that prep session recorded in any
 6    way?
 7    A.    I'm going to say no, I don't believe
 8    so, I don't think we had any recording
 9    devices in that room.  There were recording
10    devices in other rooms in the District
11    Attorney's Office, but I do not think that
12    room was one of them.
13    Q.    Would it be typical for you to record
14    a session with an officer during a prep
15    session?
16    A.    Never.
17    Q.    Prior to prep session, how many times
18    had you met with Officer Cornell?
19    A.    About this case?
20    Q.    About anything.
21    A.    Dozen maybe.
22    Q.    Were they all to discuss preparing
23    testimony for trial?
24    A.    Trial or grand jury, yes.
25    Q.    Were you friends with Officer Cornell?
```

```
 1                      Brian Leeds
 2    A.     No.
 3    Q.     Did you ever associate with him
 4    outside of work?
 5    A.     Never.
 6    Q.     During any of these dozen or so
 7    meetings that you had with him prior to
 8    December 9th, had he ever told you that he
 9    had planted weapons on inmates?
10    A.     Never.
11    Q.     Did he ever tell you that any other
12    officers planted weapons on inmates?
13    A.     Never.
14    Q.     Had he ever told you prior to December
15    9th that he or other officers tried to get
16    rid of gang members at Auburn?
17    A.     Never.
18    Q.     Would you say that you had a good
19    rapport with Officer Cornell prior to this
20    meeting?
21    A.     Yes.
22    Q.     How would you describe -- well, prior
23    to this meeting, how would you kind of
24    describe officer Cornell's demeanor typically
25    when you would meet with him?
```

1          Brian Leeds

2    A.     He was very, very laid back.  Young.

3    I think the best way that I can say is, is

4    describe him as casual.  Often times, you

5    know, people will come in to the District

6    Attorney's Office to prep, police officers

7    and, you know, they are very formal, they

8    come in, you know, in uniform, he was a

9    little bit more casual about things.  Smart

10   enough, but, you know, wasn't very prepared,

11   you know, often times I had to kind of give

12   him his notes to look at some, other guys

13   would come in with their own notes.  So,

14   yeah, I mean almost a little bit too relaxed,

15   but that's kind of why we needed to prep him

16   because I wanted to make sure that he was

17   going to present well for the jury.

18   Q.     So obviously I'm his attorney so I've

19   met with him a few times before now and I

20   kind of get a sense of his demeanor as well,

21   would you describe him as a fast talker?

22   A.     Absolutely, yes.

23   Q.     I know I'm a fast talker sometimes,

24   but I see him as a fast talker, would you

25   agree with that?

| 1 | Brian Leeds |
|---|---|
| 2 | A.       I would go even further, I would say |
| 3 | the reason why because I was the prosecutor |
| 4 | involved in the prison cases at some point |
| 5 | maybe a few months before December 9th I had |
| 6 | kind of made a personal decision that I was |
| 7 | going to try to avoid Matt Cornell prison |
| 8 | cases, the sole reason being you couldn't |
| 9 | understand him in the grand jury, he mumbled |
| 10 | too much for the grand jury's liking and they |
| 11 | would constantly have to ask him to slow down |
| 12 | and it was difficult for him to kind of |
| 13 | impart very well with them.  He mumbled and |
| 14 | did talk pretty quick so I would agree with |
| 15 | you. |
| 16 | Q.       I also found that he uses a lot of |
| 17 | prison lingo, prison jargon when he was |
| 18 | speaking with me at least, did you find that |
| 19 | to be true as well? |
| 20 | A.       Yes, absolutely. |
| 21 | Q.       Did you ever have to ask him what he |
| 22 | meant by a particular word or a phrase in any |
| 23 | of your meetings? |
| 24 | A.       Yes, I did. |
| 25 | Q.       You mentioned briefly, you mentioned |

1                    Brian Leeds
2   that -- I'm trying to get to my notes here,
3   that there were a lot of cases in which
4   Officer Cornell was testifying for your
5   office with respect to prison contraband
6   cases, correct?
7   A.    Correct.
8   Q.    And I think you said that it was
9   something to the effect it was an unusual
10  amount or something?
11  A.    He was -- I found that he was coming
12  in or again, I don't know if it was the way
13  it just worked out, but we found that he was
14  a more frequent witness for us than, you
15  know, maybe some other guards over there
16  given there's over a hundred of them there,
17  you know, and again, it wasn't like we were
18  looking for cases involving Matt Cornell, as
19  I said toward the end of my career at Cayuga
20  I was actually trying to avoid them, but it
21  was unusual.
22  Q.    And the cases that he would come
23  testify about, they involved contraband in
24  general, it wasn't just weapons, right, it
25  was also other contraband?

```
1                    Brian Leeds
2    A.    Contraband for us was usually going to
3    be weapons or drugs beyond marijuana.  It
4    would have been usually synthetic marijuana
5    is what we were prosecuting often.
6    Q.    Ever prosecute anyone for having
7    alcohol in prison?
8    A.    I don't think so.
9    Q.    Do you know what Matt Cornell's job
10   title was while you were as prosecutor at
11   Cayuga County?
12   A.    Corrections officer.
13   Q.    Specifically do you know where he was
14   assigned within the prison?
15   A.    No, I don't know.
16   Q.    Do you know whether his specific job
17   assignment would place him in more contact
18   with inmates as opposed to other positions in
19   the prison?
20   A.    No, I don't know.
21   Q.    Do you know whether Officer Cornell
22   had a good rapport in general with the
23   inmates at the prison?
24   A.    I couldn't answer that, I don't know
25   what they thought of him.
```

```
1                        Brian Leeds
2    Q.      Do you know whether Officer Cornell
3    had confidential informants inside the
4    prison?
5    A.      I know that he had one.
6    Q.      Do you know if he had more than that?
7    A.      I don't know.
8    Q.      I'm just going to get back to the
9    December 9th meeting.  He was there to speak
10   to you specifically about Sean Gaines,
11   correct?
12   A.      Correct.
13   Q.      I think you brought up during your
14   meeting with him that there was some letter
15   that had been written by Sean Gaines about a
16   supposed retaliation he was fearful of?
17   A.      Correct.
18   Q.      Did he mention Officer Cornell
19   specifically in that letter?
20   A.      Not that I recall.
21   Q.      Did you have a copy of that letter at
22   the time that you met with Officer Cornell?
23   A.      I believe I did.
24   Q.      Do you still have a copy of that
25   letter?
```

1        Brian Leeds
2    A.    I don't think so.  I didn't see it
3    among the documents that I had.  If it exists
4    it's probably in Sean Gaines' criminal file.
5    Q.    Was Officer Cornell aware of that
6    letter before you had mentioned it to him?
7    A.    Not that I -- I don't recall, I don't
8    think we -- we did discuss the letter, but I
9    don't think I asked him that question
10   directly.
11   Q.    Did you ever see a letter like that
12   before from an inmate where he's expressing
13   concern that someone is going to try to
14   retaliate against him?
15   A.    The only other time -- I could be
16   wrong about this, the only other time I
17   recall was with the previous case involving
18   Naythen Aubain.  Now I don't recall if there
19   was a specific letter that was written there
20   or if it was a handwritten note, I don't
21   recall what the circumstances were involving
22   Mr. Aubain.
23   Q.    Do you remember the circumstances
24   involving Mr. Gaines in a weapon that was
25   found on him?

```
1                        Brian Leeds
2    A.      The facts of that specific case?
3    Q.      Yes.
4    A.      Yes, I do.
5    Q.      Do you know whether there were other
6    witnesses present when that weapon was found?
7    A.      Corrections witnesses?
8    Q.      Yes.
9    A.      I don't believe there were.
10   Q.      Okay.
11           If you go to your notes, that's
12   Exhibit 1 and go to page 2 and the third
13   paragraph down starts with, after receiving
14   this tip, do you see where that paragraph is?
15   A.      Yes, I do.
16   Q.      This text seems to indicate to me that
17   there were witnesses to this particular strip
18   frisk where a weapon was found.
19   A.      According to my notes there would have
20   also been a sergeant involved in the search
21   of Mr. Gaines it looks like, yes.
22   Q.      It looks like you said Cornell,
23   Porten, P-O-R-T-E-N, and Gaines were in the
24   center room, correct?
25   A.      Correct.
```

```
1                      Brian Leeds
2    Q.     And that's when Gaines allegedly, I
3    guess, produced the contraband weapon from
4    his mouth?
5    A.     Correct.
6    Q.     During the course of your meeting with
7    Officer Cornell, did there come a time where
8    you asked him if he had planted a weapon on
9    Sean Gaines specifically?
10   A.     No, I don't believe I did.
11   Q.     I want to direct you to page 3 and
12   it's the first full -- it's the first
13   paragraph there, but it's all the way down it
14   starts with, I then asked if he planted a
15   weapon?
16   A.     Okay.
17   Q.     Do you see that?
18   A.     Yes.
19   Q.     It seems to indicate here in your
20   notes to me that you did specifically ask him
21   if he planted a weapon on Gaines and he said
22   that he did not; do you see where it says
23   that?
24   A.     Yes, I do.
25   Q.     I think the facts of that particular
```

1                    Brian Leeds
2  case were that Matt Cornell says that another
3  inmate came to him as a confidential
4  informant and had told him that Gaines had a
5  weapon on him, right?
6  A.    Correct.
7  Q.    And then subsequently there was a
8  strip frisk and there was a weapon that was
9  found on Mr. Gaines, right?
10 A.    Correct, I don't know if they actually
11 got to the strip frisk.
12 Q.    After you asked if Mr. or Officer
13 Cornell planted a weapon on Gaines, he said
14 he did not and he said that Gaines was a
15 quote, "clean find"; do you see where it says
16 that?
17 A.    Yes, I do.
18 Q.    Is that a specific quote from Officer
19 Cornell?
20 A.    That would have been, yes, yes, it
21 would, it would have been.  If that's what I
22 wrote then that would have been the word that
23 I heard being used.
24 Q.    Did you ask him what he meant by
25 "clean find"?

1                    Brian Leeds
2    A.     That term I did not ask him to define.
3    Q.     I'm sure during your time at the DA's
4    office there were other officers who used
5    confidential informants to get information
6    about other inmates who had weapons?
7    A.     I don't know if we, if we had a case
8    that we either presented to the grand jury or
9    went to trial where that was kind of one of
10   the foundations about why searches occurred,
11   but yeah, I mean yes, I knew and assumed that
12   that was part of kind of the daily course of
13   action inside the prison.
14   Q.     Maybe I'll ask if a different way, I
15   don't know if this makes more sense.
16          Were there occasions where a weapon
17   was found on an inmate that you prosecuted
18   because of a confidential informant's tip?
19   A.     Possibly.
20   Q.     How many occasions would you say that
21   that happened?
22   A.     I couldn't, I couldn't recall.  I mean
23   I could look through each one of the files if
24   I had the ability to do that and kind of tell
25   you what the facts of each case was, but I

1                    Brian Leeds
2   don't recall really a lot of these cases off
3   the top of my head.
4   Q.     It's okay, it was like four or five
5   years ago at this point?
6   A.     Exactly, yes.
7   Q.     We don't expect you to.
8          You mentioned that Officer Cornell
9   told you that there was a gang problem at
10  Auburn?
11  A.     On December 9th during our
12  conversation, I don't know if he defined it
13  as a gang problem so much as he was
14  referencing an incident that occurred back
15  around the time that Mr. Gaines filed his
16  letter.
17  Q.     I think you testified earlier that at
18  that point Officer Cornell casually mentioned
19  that some weapons were put on certain gang
20  members?
21  A.     That's, yes.
22  Q.     Did you ask him what he meant by "put
23  on"?
24  A.     I did.  My recollection and I believe,
25  I'm looking from where in my notes I might

1                    Brian Leeds
2    have kind of articulated that.  Maybe I
3    didn't.  Maybe, I do know that the words that
4    were used were put on, I don't know if I
5    asked him what do you mean by that versus
6    just kind of understanding to my own
7    interpretation what that meant, but I don't
8    think I asked him to clarify what do you mean
9    by put on specifically, do you mean you put a
10   weapon in somebody's pants and then searched
11   them for it, I don't think I asked him to
12   articulate that.
13   Q.     Did you ask him who the specific
14   inmates were?
15   A.     I did ask him, again according to my
16   notes and my recollection I did ask him who
17   he had done this to and he gave me a name.
18   Q.     With respect to the putting weapons on
19   gang members in general, did you ask him who
20   those people were that the weapons were put
21   on?
22   A.     Whether he did this to say the Bloods?
23   No, I didn't ask him that.
24   Q.     What about other officers that he
25   claims were complicit with this, did you ask

```
 1                     Brian Leeds
 2  him to give any other names?
 3  A.      I did not.  I didn't ask him and I
 4  don't think any other officers' names ever
 5  came up at any point.
 6  Q.      It says in your notes, I then asked if
 7  he put a weapon on anyone in the prison and
 8  he said yes.  When you were questioning him
 9  or interviewing him during this prep session,
10  did you specifically say did you put a weapon
11  on someone?
12  A.      No, those would have been Matt's words
13  that he put a weapon on someone.
14  Q.      And again, you didn't ask him
15  specifically what he meant by putting a
16  weapon on someone, right?
17  A.      I don't believe that I did.
18  Q.      Then according to you he said yes, and
19  his name was Johnson, Eddie Johnson?
20  A.      Correct.
21  Q.      Did he tell you that Eddie Johnson had
22  ever accused him of planting a weapon on him?
23  A.      No, no, he didn't say that.
24  Q.      Did he tell you that other inmates had
25  accused him of putting a weapon on Eddie
```

```
 1                     Brian Leeds
 2   Johnson?
 3   A.    He had never told me that.
 4   Q.    Now I know you testified that you
 5   actually looked into this inmate Eddie
 6   Johnson to see if Matt Cornell was involved
 7   in an incident with him, right?
 8   A.    Correct.
 9   Q.    And you were able to find, I think it
10   was an unusual incident report?
11   A.    Correct.
12   Q.    Did you find any evidence that Officer
13   Cornell planted this weapon on Eddie Johnson?
14   A.    So what I did, the answer to that is
15   no.   What I did was -- well, no, let me
16   correct, the sequence of events was after the
17   disclosure was made by Matt and again, I
18   reacted not sure if I heard him correctly and
19   not really in belief that I heard him
20   correctly, I wanted to look into it a little
21   bit myself and by doing that I had a name, I
22   had Eddie Johnson.   I requested the unusual
23   incident report from Mr. Johnson and looked
24   into the according to the incident report for
25   that one, what the facts of that one were and
```

1            Brian Leeds
2    that was I believe going to be a situation
3    where Matt claimed to have recovered a weapon
4    without any other corroborating witnesses
5    from Mr. Johnson. And that to me indicated
6    that, you know, now I had a problem that it
7    wasn't just, you know, maybe a weapon was
8    found, I believe it was Matt and Matt alone
9    saying that he was responsible for this
10   weapon that was recovered from Mr. Johnson
11   that he said he put on him. Later on I
12   believe during the investigation it was
13   relaid to me that Mr. Johnson during his
14   disciplinary hearing had complained right off
15   the bat that he was being set up by Matt
16   Cornell and afterwards investigators from the
17   IG's office actually went to whatever
18   facility Mr. Johnson was currently at and
19   without explaining why they were there or
20   anything asked him about his time in Auburn
21   Prison and I believe what was told to me was
22   Mr. Johnson's answer was things were going
23   fine there until they put a weapon on me.
24   Q.     Who told you this?
25   A.     Until they planted a weapon on me, let

1                        Brian Leeds
2    me be a little bit more clear.
3    Q.    Who told you this?
4    A.    That information, that was one of the
5    investigators that I had met with from the
6    IG's office.  I don't know if it was through
7    the phone or face-to-face.
8    Q.    Do you know whether Eddie Johnson was
9    ever prosecuted for having a weapon?
10   A.    I don't believe he did, I think he was
11   one of the cases that we were, we reviewed,
12   that I reviewed and for whatever reason we
13   declined prosecution.
14   Q.    Are you familiar with these
15   disciplinary hearings that take place at
16   Auburn?
17   A.    I am, I've never been present to one.
18   I have overheard audio of them sometimes.
19   I've seen some of the paperwork that comes
20   out of them, I'm kind of familiar with what
21   they entail.  The person whose job I
22   actually -- I don't want to say I took his
23   job, but I was replacing, Brian Bauerfeld who
24   worked at the Cayuga County District
25   Attorney's Office left that job right before

| 1 | Brian Leeds |
| 2 | I had started and he was, I believe the |
| 3 | disciplinary hearings officer over at Auburn |
| 4 | Prison. So he still interacted, was still |
| 5 | friendly with members of the DA's office |
| 6 | after he had left so we had obviously talked |
| 7 | a little bit about what he does and things |
| 8 | like that over at Auburn. |
| 9 | Q. Mr. Leeds, are you familiar with how |
| 10 | often inmates claim at these hearings that |
| 11 | they were quote, "set up by officers"? |
| 12 | MR. LEVY: Objection. Note my |
| 13 | objection. |
| 14 | A. It happens frequently, you know, what |
| 15 | percentage I just don't know. |
| 16 | Q. Is it possible that Officer Cornell |
| 17 | told you that this Eddie Johnson inmate |
| 18 | accused him of planting a weapon on him and |
| 19 | didn't say he actually did plant a weapon? |
| 20 | A. No. |
| 21 | Q. Now, if Officer Cornell were to admit |
| 22 | to you, a district attorney, assistant |
| 23 | district attorney that he planted a weapon on |
| 24 | an inmate that would admission to a crime I |
| 25 | would assume? |

1                    Brian Leeds
2    A.    Yes, I believed it was.
3    Q.    Did you find it unusual that an
4    officer would be admitting to a crime to an
5    assistant district attorney?
6    A.    Absolutely.
7    Q.    At any point during your conversation
8    with him, did he say something like you
9    misunderstood him or you misheard him or you
10   didn't understand or anything to that effect?
11   A.    Again, I'm looking at my notes, he
12   actually did, in fact, according to my notes
13   after he had said that he put a weapon on him
14   he did mention that he wasn't saying he
15   planted a weapon on him or anything and then
16   backtracked and said he might have just found
17   it in his cell, that's according to my notes.
18   Q.    And looking at page 3, that first
19   paragraph there?
20   A.    Correct.
21   Q.    It seems like he tried to clarify
22   exactly what he was saying about Eddie
23   Johnson specifically and then he told you
24   that he was not saying that he planted a
25   weapon, right?

```
 1                      Brian Leeds
 2   A.     I -- I -- I mean, according to my
 3   notes, yes, but it was also an evasive way
 4   that led me to believe that he had said
 5   something and he wanted to take it back.
 6   Q.     Did it seem like he was upset that you
 7   may have misunderstood what he was telling
 8   you?
 9   A.     Upset that I was misunderstanding it,
10   no.
11   Q.     Did he seem upset at any point during
12   this conversation?
13   A.     No, no.  You know, he had again kind
14   of mentioned that, you know, he had asked
15   like nothing I'm saying is -- I don't want to
16   say this is exactly the words that he used,
17   but, you know, that after he had made it, he
18   mentioned that, you know, he hoped that this
19   was going to be something kept in confidence,
20   you know, and then, you know, again was
21   trying to kind of, I wouldn't say clarify,
22   but more like backtrack what he had said.
23   Q.     So you think he was trying to
24   backtrack rather than clarify?
25   A.     Correct.
```

```
 1                    Brian Leeds
 2    Q.    You can't really be sure what was in
 3    his head at that time, though, right?
 4    A.    I can't be sure what was in his head.
 5    Q.    At any point either before, during or
 6    after this conversation with him did you tell
 7    him there was some sort of attorney-client
 8    privilege or anything like that?
 9    A.    No, I did not.
10    Q.    At any point before, during or after
11    did you tell him that this conversation was
12    confidential?
13    A.    No, I did not.
14    Q.    I think you said after this prep
15    session you actually never spoke to Officer
16    Cornell again?
17    A.    No, I did not.
18    Q.    Did you try contact him after this?
19    A.    I don't believe that I did.
20    Q.    You said that the inmate, Gaines he
21    ended up pleading guilty to the contraband
22    charges after this, right?
23    A.    Yes, he did.
24    Q.    Just looking through my notes here.
25          Mr. Levy, he mentioned a Jaencric
```

1                        Brian Leeds
2    Agee, do you recall that question?
3    A.      I do remember, yes.
4    Q.      I can't remember if you said you can
5    recall that case or not?
6    A.      I can't recall it specifically.  It's
7    jumping out at me as one of my trial cases,
8    but I don't -- I mean, there were several of
9    them, if you kind of give me a little bit of
10   detail it will probably jump right back in my
11   head.
12   Q.      Do you recall whether Officer Cornell
13   was involved in that case at all?
14   A.      Probably not because if he was it
15   would have been under the list of things that
16   were flagged.
17   Q.      Do you know when that case went to
18   trial?
19   A.      I don't recall it specifically, again,
20   if there was, if you can give me some kind of
21   reference to it maybe I can be a little bit
22   better about it.
23             MS. COWAN:   I'm looking through
24        my notes.  Did you have any other
25        questions you were going to ask?

```
1                      Brian Leeds
2                 MR. LEVY:  I'm going to follow
3          up on a couple of things.
4   BY MR. LEVY:
5   Q.    The letters that you have that are
6   similar to the letters that are marked as
7   Plaintiff's Exhibits 2 and 3 dated December
8   23rd, 2016 and signed by Jon Budelmann?
9   A.    Yes.
10  Q.    How many of those letters do you have
11  in your possession there?
12  A.    Ten.
13  Q.    Do you know whether or not the
14  convictions in all ten of those cases that
15  you have a letter there for were overturned
16  and the indictment dismissed?
17  A.    I do not.
18  Q.    Am I correct in saying that there is
19  no confidentiality between a corrections
20  officer who is going to testify as a witness
21  and a district attorney, correct?
22  A.    That is correct.
23  Q.    You said that also contained within
24  some of the documents that you have are those
25  summaries that you gave to Jon Budelmann
```

```
 1                      Brian Leeds
 2   about what each case was about; is that
 3   right?
 4   A.      Correct.
 5   Q.      Do you have the ones relative to the
 6   Thomas Ozzborn and Donnesia Brown cases?
 7   A.      You mean are they listed on my summary
 8   sheet?
 9   Q.      Yes.
10   A.      Yes, they are.
11   Q.      So the sheet that you have, is it,
12   it's one sheet with all the cases on it and
13   it has a little summary next to each one?
14   A.      Yes.
15   Q.      I would ask that the summaries that
16   you have, if it's possible, if you could sort
17   of highlight those two relative to the
18   Ozzborn and Brown case or if they can be
19   extracted, if those can be provided to us?
20   A.      Sure, sure.  Do you want me to take a
21   break and see if I can scan them over right
22   now?  I can scan you everything that I have
23   here or just that sheet.
24   Q.      Well, let me ask you, is it very long?
25   A.      No, one page.
```

1                      Brian Leeds
2    Q.      Each one of those lines that we see,
3    is that relative to a separate case?
4    A.      Each one is a separate inmate, yes.
5    Q.      Could you read to us what you have
6    written for the Thomas Ozzborn case?
7    A.      Sure.  Thomas Ozzborn
8    DIN09A5824CCC242321PG, meaning plead guilty,
9    two to four, Cornell primary, not sure if
10   supervisor who authorized search or Cornell
11   reports to.  Disclose, not opposed 440.
12   Q.      Can you read us what you have in your
13   summary of the Donnesia Brown case?
14   A.      Donnesia Brown DIN11A4897CCC247936,
15   plead/sentenced two to four, Cornell only
16   witness found on him disclose not opposed to
17   440.
18   Q.      Thank you.
19           With regard to the case that Ms. Cowan
20   just brought up, Jaencric Agee, this was
21   another case involving First Degree Promoting
22   of Prison Contraband, there was a jury trial
23   that occurred in November of 2016, he was
24   represented by an attorney named Ryan
25   Muldoon?

```
 1                       Brian Leeds
 2    A.     Okay.
 3    Q.     And the trial took place before Judge
 4    Leone?
 5    A.     Okay.
 6    Q.     Does that refresh your recollection at
 7    all?
 8    A.     A little bit, yes.
 9    Q.     Do you recall Mr. Agee also claimed
10    that a weapon had been planted on him?
11    A.     I do believe that was his defense to
12    that, yes.
13    Q.     Do you recall what ended up happening
14    with that case?
15    A.     He was found guilty.
16    Q.     Did his attorney, Mr. Muldoon, move to
17    have the case dismissed, the conviction
18    overturned and the indictment dismissed?
19    A.     I wouldn't know if he did that or not
20    I wouldn't know the answer to that.  I could
21    tell you at trial he did the appropriate
22    motions, but I don't know what happened
23    afterward.  I don't recall.
24    Q.     I mentioned this earlier, that this is
25    a case that you were quoted in a publication
```

```
1                     Brian Leeds
2     as saying that any assertion that something
3     had been planted on Mr. Agee was pure
4     speculation was how you were quoted, you
5     don't recall that?
6     A.     I don't, I don't recall that, nor do I
7     recall speaking to any members of the press
8     about this.
9     Q.     I'm sorry, I might have missed this,
10    what is your Master's Degree in?
11    A.     English.
12                     MR. LEVY:  I don't have
13           anything else.
14    BY MS. COWAN:
15    Q.     Mr. Leeds, did you ever see a video of
16    an interview that the DA's office made
17    interviewing Officer Cornell?
18    A.     No, I did not.
19    Q.     I think you said you didn't
20    participate in any interview of Officer
21    Cornell?
22    A.     No, I did not.
23    Q.     During your December 9th, 2016
24    meeting, did Officer Cornell ever mention
25    Donnesia Brown or Thomas Ozzborn?
```

```
1                       Brian Leeds
2    A.    On December 9th, no, he did not.
3                  MS. COWAN:  That's all I have.
4                  MR. LEVY:  Follow up to
5            questions, did he ever mention either
6            Thomas Ozzborn or Donnesia Brown at
7            any point in time to you?
8                  THE WITNESS:  Aside from when
9            we were preparing for their hearings,
10           their grand jury hearing, no.
11                 MR. LEVY:  Again, you don't
12           specifically recall any of the
13           preparations for the grand jury
14           testimony with regard to either Thomas
15           Ozzborn or Donnesia Brown, correct?
16                 THE WITNESS:  I don't
17           specifically recall that, no.
18                 MS. COWAN:  But you do know
19           that Mr. Cornell did not claim that he
20           planted any weapons on either of those
21           inmates, correct?
22
23
24
25    (Continued on next page for Jurat.)
```

```
 1
 2                    THE WITNESS:  Correct.
 3                    MS. COWAN:  Okay.
 4                    MR. LEVY:  I don't have
 5          anything further.
 6                    (Time noted:  1:34 p.m.)
 7
 8
                           _____
 9                              BRIAN LEEDS
10
11
12   Subscribed and Sworn to before me
13   this     day of        ,  _____
14
15   _____
16          Notary Public
17
18
19
20
21
22
23
24
25
```

1
2                           INDEX
3   WITNESS              EXAMINATION BY          PAGE
4   BRIAN LEEDS          MR. LEVY                6
5                        MS. COWAN              76
6                        MR. LEVY              130
7                        MS. COWAN             134
8
9                         EXHIBITS
10  PLAINTIFF'S

    FOR IDENTIFICATION   DESCRIPTION            PAGE
11
    1       NOTES                               6
12
    2 AND 3  LETTERS                           62
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2              C E R T I F I C A T E
3         I, ANN MULLIGAN, hereby certify that the
4    Examination Before Trial of BRIAN LEEDS, was held
5    before me on the 16th day of July, 2020; that said
6    witness was duly sworn before the commencement of
7    his testimony; that the testimony was taken
8    stenographically by myself and then transcribed by
9    myself; that the party was represented by counsel as
10   appears herein;
11         That the within transcript is a true record
12   of the Examination Before Trial of said witness;
13         That I am not connected by blood or marriage
14   with any of the parties; that I am not interested
15   directly or indirectly in the outcome of this
16   matter; that I am not in the employ of any of the
17   counsel.
18         IN WITNESS WHEREOF, I have hereunto set my
19   hand this 16th day of July, 2020.
20
21                    _Ann Mulligan_____
                       ANN MULLIGAN
22
23
24
25

**A**
A-G-E-E (1)
65:18
a.m (1)
2:8
aback (1)
38:8
ability (1)
118:24
able (4)
59:16 60:12
84:23 122:9
absolutely (3)
109:22 110:20
126:6
accept (1)
85:13
accepted (1)
85:3
accepting (2)
85:17,17
access (2)
21:19 82:13
accomplish (1)
68:10
account (4)
78:6,7,14,15
accurate (3)
61:16 71:10
106:17
accurately (1)
21:18
accused (5)
18:8 23:21
121:22,25
125:18
acknowledge...
6:20 61:15
action (11)
1:5 33:15
37:22 48:17
55:23 62:9
63:18,23
66:19 87:8
118:13

activity (1)
33:3
actual (4)
23:12 49:8,11
82:15
addition (2)
42:5 69:3
address (1)
6:9
adjust (1)
7:25
administer (1)
4:10
administerin...
4:17
admission (2)
53:8 125:24
admissions (2)
9:25 49:21
admit (2)
52:10 125:21
admitted (4)
9:17,20 40:25
53:9
admitting (2)
104:13 126:4
advising (1)
57:3
afterward (3)
17:25 87:15
133:23
against- (2)
1:6,13
Agee (7)
65:17,23 66:5
129:2 132:20
133:9 134:3
agenda (1)
49:5
agent (2)
50:18,24
ago (1)
119:5
agree (5)
58:4 69:4
98:21 109:25

110:14
**AGREED (4)**
4:4,7,9,13
ahead (1)
44:9
Aimee (3)
3:11 75:14
76:4
AL (1)
1:8
Albany (1)
9:16
alcohol (1)
112:7
Aldo (2)
102:24,24
algorithm (1)
43:13
alleged (1)
79:7
allegedly (1)
116:2
alligation (1)
33:13
allow (3)
32:8 56:18
67:16
allowed (3)
21:22 40:14
53:24
altered (4)
23:21,24 24:2
24:5
amiss (1)
40:5
amount (1)
111:10
amounted (2)
52:17 54:17
ANN (2)
138:3,21
answer (14)
8:4,6 16:10
22:17 24:8
33:4 43:3
59:18 66:11

74:20 112:24
122:14
123:22
133:20
answered (1)
7:18
anticipation ...
29:18
anybody (13)
13:25 16:8
38:11 50:20
54:13,14
71:11 75:24
79:8,11 93:9
100:6 107:2
anymore (2)
52:14 78:5
anyway (2)
80:24 85:25
apologize (2)
28:2 76:8
appear (2)
37:17 44:16
appearance (4)
11:14,23 25:8
73:18
appeared (2)
47:7,10
appears (1)
138:10
apply (1)
67:9
approached (...
32:12
appropriate (...
133:21
approval (1)
15:7
approximate ...
21:13
approximate...
8:24 9:2 13:15
20:18 26:21
27:11,15
45:13
arguably (1)

54:19
articulate (1)
120:12
articulated (1)
120:2
Aside (1)
135:8
asked (25)
32:13 34:19
35:3 36:3
37:5 38:18
39:4 52:15
55:5 75:5
76:22 77:12
77:16 99:15
103:19 114:9
116:8,14
117:12 120:5
120:8,11
121:6 123:20
127:14
asking (7)
7:16 8:3 31:22
34:5 39:4
44:14 78:23
asks (1)
75:23
assault (5)
18:11 24:25
25:2 87:10,14
assaulted (1)
25:2
assaults (2)
18:12,13
assertion (1)
134:2
assigned (6)
13:20 15:24
16:5 68:14
97:5 112:14
assignment (1)
112:17
assistant (9)
8:22 10:5 13:4
13:4,15 71:7
95:21 125:22

126:5
assisted (1)
15:25
associate (1)
108:3
assume (8)
7:19 28:10,11
30:4,10,11
89:9 125:25
assumed (1)
118:11
assuming (2)
83:6 99:8
attorney (42)
3:8 4:23 9:7
10:3,6 12:16
13:2 16:20,25
17:10 33:14
40:11,12 41:9
52:15 55:15
57:25 59:10
59:22 63:14
68:24 70:4,18
71:5,15,23
90:21 93:15
95:9,12,16,22
98:13,16
103:7 109:18
125:22,23
126:5 130:21
132:24
133:16
Attorney's (38)
10:12,23 12:2
12:6,15,21
13:7 15:3,13
16:12 21:12
22:24 38:7
47:15 48:18
49:16,18 51:6
51:11 59:5
60:8 63:19
64:9 65:13
66:8,14,20
67:16 70:11
71:8 72:16

73:13,21 82:8
92:8 107:11
109:6 124:25
attorney-clie...
128:7
attorneys (8)
3:3,9 12:22,25
13:16 60:6,15
71:7
Aubain (8)
46:15 103:7,8
103:22
104:12,15
114:18,22
Auburn (30)
11:2 14:13,24
17:14,16,22
20:9 29:6
33:3,20,23
34:9 35:24
36:9,14 46:2
46:21 47:14
50:5 53:14,15
53:18 87:10
90:3 108:16
119:10
123:20
124:16 125:3
125:8
audio (2)
80:25 124:18
August (2)
27:15 69:6
authorized (2)
4:10 132:10
avoid (3)
45:8 110:7
111:20
aware (3)
17:7 49:12
114:5
ax (1)
48:10

**B**

B (1)

6:2
B-U-D-E-L-...
12:17
back (18)
10:18 31:4
38:15 40:23
45:25 54:16
55:20,21
56:22 62:22
67:19 77:8
80:7 109:2
113:8 119:14
127:5 129:10
backing (1)
38:23
backtrack (3)
46:2 127:22,24
backtracked ...
126:16
backup (1)
16:4
bad (1)
83:19
bag (1)
75:2
ballpark (1)
26:24
based (3)
56:22 80:19
103:22
basic (1)
7:14
basing (2)
74:21,23
basis (3)
67:12 79:6
85:11
bat (1)
123:15
Bauerfeld (1)
124:23
bear (1)
5:2
began (7)
11:8 12:14,24
16:13 34:10

48:16,21
belief (3)
66:12,16
122:19
believe (54)
9:22 17:9,24
18:5,13 20:8
20:12,23 27:5
27:18 29:11
31:23 32:6,14
32:19 33:16
33:22 34:4
35:6,11 36:6
36:7 38:15
41:13 44:15
48:8 52:16
54:17 59:8
65:9 67:8,9
68:9 71:10
74:6 76:16
97:3 104:2,9
107:7 113:23
115:9 116:10
119:24
121:17 123:2
123:8,12,21
124:10 125:2
127:4 128:19
133:11
believed (2)
84:9 126:2
Bender (4)
41:10,11 51:17
52:2
best (17)
19:15 21:24
31:20 33:11
36:15 45:22
48:20 52:8
56:9,14 57:11
58:5 60:2
72:20 73:8
80:12 109:3
better (4)
8:2 72:14
97:24 129:22

beyond (1)
112:3
big (3)
53:13,13 83:18
Binghamton ...
94:3,4,5 95:25
Biology (2)
94:17,19
bit (17)
21:3 31:8
45:23 76:9
85:19 98:4,6
100:22
106:17 109:9
109:14
122:21 124:2
125:7 129:9
129:21 133:8
bits (1)
23:4
biweekly (2)
102:10,14
blanking (1)
51:18
blood (1)
138:13
Bloods (3)
34:11,16
120:22
boated (2)
35:17,21
boil (2)
85:18 86:21
boiled (2)
86:3 87:24
bolts (1)
73:9
bored (2)
98:4,5
boss (2)
16:22 100:23
Boulevard (1)
3:10
Brady (8)
52:17 54:18,20
54:20 56:19

64:18 65:3
103:17
**break (4)**
32:21 36:10
75:25 131:21
**Brian (138)**
1:21 2:4 6:1,8
7:1 8:1 9:1
10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1,21
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1
30:1 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1
60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1

86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1,23
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1
133:1 134:1
135:1 136:9
137:4 138:4
**brief (2)**
62:6,7
**briefed (2)**
50:3 73:4
**briefly (1)**
110:25
**bring (3)**
19:11 25:10
44:11
**broken (1)**
13:8
**Brook (1)**
94:18
**Brooklyn (1)**
3:5
**Broome (8)**
10:6,11,19
12:8 95:15
96:8,12,23

**brought (6)**
15:5 25:24
73:11 99:12
113:13
132:20
**Brown (44)**
1:4 3:4 7:11
22:16,19 24:4
27:9,20,23
28:7 30:2,9
30:23 47:7,20
69:14,16
70:19,20,22
72:5,11 74:17
75:11 76:6,19
78:19 79:4
88:15,24
89:13,22 90:3
90:9,12 92:4
105:9 131:6
131:18
132:13,14
134:25 135:6
135:15
**Brown's (1)**
28:15
**brush (1)**
24:6
**Bud (3)**
51:19,21,22
**Budelmann (...**
12:17,18 15:9
16:19,23,24
17:10 40:24
41:6,12,20
46:8 48:16,24
54:4 57:9,24
58:4,10 59:11
59:15,22 60:5
63:3,13 70:3
71:5 84:8,9
84:13 130:8
130:25
**bulk (1)**
18:8
**bunch (1)**

35:18
**bureau (1)**
97:4
**bureaus (1)**
97:6
**business (1)**
82:17
**bypassing (1)**
58:16

**C**
**C (3)**
3:2 138:2,2
**C-H-U-T-E-...**
18:4
**calendar (1)**
100:17
**call (4)**
51:19 77:8
86:11 91:6
**called (8)**
7:5 41:15 50:4
56:21 68:15
86:6 87:18
94:16
**calls (2)**
102:19 104:22
**Canzano (7)**
68:23 70:19
71:16,21,25
72:5,9
**capacity (5)**
1:17 58:22
63:14 70:3
86:3
**captain (2)**
17:21,22
**car (1)**
50:8
**carbon (1)**
92:20
**care (1)**
91:25
**career (3)**
53:11 54:10
111:19

**case (86)**
13:17 20:7,12
21:16 22:8,10
22:12,20
24:10,25
26:17 29:11
30:17 33:12
38:14 42:5
44:5,22 46:4
46:10,15,19
46:20,21
52:21,24
54:24 55:4
57:15 58:21
63:20,25 64:6
64:13,25
65:16,23
66:10 68:14
68:18,25
69:13,18
72:10,11,25
75:7 76:6
82:23 84:15
85:13,17 86:2
86:15 87:7,8
87:10,17
88:10,24 89:6
89:11 102:18
103:5,19
104:9,23
107:19
114:17 115:2
117:2 118:7
118:25 129:5
129:13,17
131:2,18
132:3,6,13,19
132:21
133:14,17,25
**cases (98)**
13:19,20 14:6
14:20 15:4,18
15:19,22 16:4
16:5 17:13
18:11,14
21:13 22:25

23:17 25:3
30:15 42:8,11
42:13,17,20
42:24 43:10
43:14,15,16
43:20,22
44:24 45:9,16
45:19,24
46:18 47:3,6
47:7,12,14,18
47:21,23
48:17 56:11
56:12 57:13
58:12 60:19
65:11 66:7,13
71:24 72:4
82:17,19 84:9
84:12,17,25
85:3,5,10,16
85:21,25 86:4
86:9,13,21
87:19,21 88:2
88:4 93:8,10
96:2,9,12,14
97:13 99:4,25
102:8,14
110:4,8 111:3
111:6,18,22
119:2 124:11
129:7 130:14
131:6,12
**casual (2)**
109:4,9
**casually (2)**
34:18 119:18
**caution (2)**
58:20 86:20
**Cayuga (58)**
10:12,19,23
11:3,25 12:5
12:14,20 13:7
13:16 14:14
14:25 15:2,12
16:11,18,24
17:2,5 21:11
25:18 38:6

45:6,10 48:18
51:10 59:5,10
59:23 60:7
61:19 63:15
63:19 64:8
66:8,14 68:5
70:4,11,16
71:8 72:15
73:12 82:7,18
91:9 96:21
97:5,11,16,19
99:21 100:7,9
100:13
111:19
112:11
124:24
**cell (4)**
24:18 32:9
77:7 126:17
**center (1)**
115:24
**certain (1)**
119:19
**certainly (2)**
50:12 72:24
**certify (1)**
138:3
**chance (2)**
25:15 63:6
**change (3)**
15:14,15,17
**changed (3)**
15:21 99:7
101:17
**changes (1)**
21:25
**charge (7)**
29:6 30:4 34:3
89:16,20
90:13,22
**charged (4)**
19:6 29:21
30:3 73:15
**charges (10)**
15:5 18:19
19:11 23:23

69:20 72:22
73:11 105:3
105:12
128:22
**Charles (1)**
35:7
**check (1)**
83:14
**chief (1)**
13:4
**choose (2)**
43:14,15
**choosing (1)**
44:21
**Christopher ...**
13:5 15:8
59:23
**Chutey (2)**
17:22 18:4
**circling (1)**
54:16
**circumstance...**
114:21,23
**City (2)**
77:11 95:25
**civil (2)**
1:5 5:4
**civilly (1)**
77:11
**claim (2)**
125:10 135:19
**claimed (3)**
74:15 123:3
133:9
**claims (1)**
120:25
**clarified (1)**
21:2
**clarify (7)**
34:20 49:25
88:10 120:8
126:21
127:21,24
**clean (2)**
117:15,25
**cleanup (1)**

87:15
**clear (4)**
27:7 51:8 54:7
124:2
**close (1)**
52:11
**closed (1)**
53:21
**closed-door (1)**
49:22
**closely (1)**
16:21
**closer (1)**
11:4
**co-workers (1)**
38:10
**collaborate (1)**
93:9
**collaborated ...**
93:12
**colloquial (1)**
36:8
**come (7)**
31:22 53:16
109:5,8,13
111:22 116:7
**comes (1)**
124:19
**comfortable ...**
40:15
**coming (9)**
14:22 18:2
43:23,25
48:21 52:11
77:6 100:24
111:11
**commencem...**
138:6
**common (3)**
23:25 24:9
42:13
**COMMUNI...**
1:15
**compile (1)**
47:3
**compiled (1)**

57:15
**complained (1)**
123:14
**complaining ...**
59:13
**complaint (5)**
33:17,22 34:8
103:9,22
**complicated ...**
43:18
**complicit (1)**
120:25
**component (1)**
72:19
**composed (1)**
69:25
**computer (4)**
82:4,4,6,12
**concealed (1)**
31:24
**concern (1)**
114:13
**concerned (4)**
30:22 50:21
90:7 103:11
**concluded (1)**
38:3
**conduct (3)**
5:2 51:13 93:2
**conducted (2)**
4:15 24:17
29:12 49:17
65:22 82:17
**conducting (2)**
6:19 7:24
**conference (5)**
4:15 5:2 38:5,6
51:5
**confess (1)**
39:24
**confidence (1)**
127:19
**confident (1)**
40:19
**confidential (...**
113:3 117:3

118:5,18
128:12
**confidentialit...**
130:19
**confirming (1)**
4:19
**conflicts (2)**
98:15,18
**confronted (1)**
52:12
**confused (1)**
100:12
**connected (1)**
138:13
**consent (3)**
4:20 66:9
67:17
**consented (2)**
64:23 66:15
**consider (3)**
17:15 45:2
57:5
**considered (3)**
4:21 18:19
30:19
**considering (1)**
47:22
**constantly (1)**
110:11
**contact (3)**
38:16 112:17
128:18
**contacted (1)**
60:15
**contained (2)**
88:18 130:23
**contemporan...**
81:25
**contemporan...**
80:10
**contents (1)**
78:16
**context (2)**
54:22 70:8
**continue (3)**
17:4 64:25

86:12
**continued (5)**
37:24 38:13
39:20 47:2
135:25
**contraband (...**
18:9 20:13
23:8,9,13,17
24:2,11 25:3
29:7,25 30:5
30:8,22 31:12
31:19 35:2
43:16,20,22
46:20 59:4
69:21 74:15
90:13 96:14
97:13 111:5
111:23,25
112:2 116:3
128:21
132:22
**control (2)**
4:17 68:18
**conversation ...**
35:15 37:3,20
37:23 38:4,10
52:6 56:7
57:6 80:20,23
106:24
119:12 126:7
127:12 128:6
128:11
**conversation...**
31:15 49:24
71:15 89:19
90:20,24
100:4 103:24
**conviction (3)**
65:14,24
133:17
**convictions (1)**
130:14
**coordinate (1)**
48:23
**coordination...**
11:13

**copied (2)**
68:20 70:17
**copies (2)**
84:2 92:20
**copy (11)**
4:24 5:3 21:21
25:24 39:8
82:10 84:6,17
94:14 113:21
113:24
**Cornell (147)**
1:17 7:10,12
19:25 20:2,5
20:16 21:8,14
26:13,17 27:5
28:9,12,22
29:2,10 30:7
30:12,16,25
31:5,11,18,21
32:20 34:5,9
36:20 37:21
38:20 39:11
39:17 40:24
41:24 42:9,10
42:14,16,21
42:23 43:18
44:4,12,16,22
45:8,15,16
46:2,8 47:4
47:18,22 48:2
48:11,22
49:15 51:9,14
52:2,16 54:10
57:14 58:21
59:13 60:8,21
64:12 65:4,25
66:5,10 72:23
73:12,24 74:3
74:10,15 76:5
76:22 77:13
78:20,22
80:20,24
82:22 84:25
85:6,22 86:2
86:5,22 87:4
89:20,25 90:6

91:12 92:3
93:6 99:3,13
99:24 100:3
101:5 102:15
103:5,9,18,20
103:25 104:4
105:16 106:8
107:3,18,25
108:19 110:7
111:4,18
112:21 113:2
113:18,22
114:5 115:22
116:7 117:2
117:13,19
119:8,18
122:6,13
123:16
125:16,21
128:16
129:12 132:9
132:10,15
134:17,21,24
135:19
**Cornell's (6)**
50:8 58:11
84:22 86:16
108:24 112:9
**correct (84)**
10:20,21 11:11
11:12,20,21
11:22 16:15
18:20 19:2,8
23:2,3,5
25:11,12
26:20 27:9,10
45:10,12
46:10 47:4
56:5 59:7
67:23,24
69:16,17,21
69:22 70:9,10
70:13,14,24
70:25 74:22
80:4,22 81:12
88:3,7,17

92:17 93:6,7
93:19,25
94:20 95:4,17
96:21,22
97:12,17,18
101:5,16
102:3 106:11
111:6,7
113:11,12,17
115:24,25
116:5 117:6
117:10
121:20 122:8
122:11,16
126:20
127:25
130:18,21,22
131:4 135:15
135:21 136:2
**correction (8)**
7:10,11 19:24
30:7 42:25
73:25 74:5,11
**Correctional ...**
14:15,24,25
17:14,16,23
20:9 29:6
33:4 35:24
36:14
**corrections (...**
1:8,15,16
18:12,16
19:13 21:23
22:3 53:8,17
78:20,21
84:20 112:12
115:7 130:19
**correctly (3)**
40:21 122:18
122:20
**corresponde...**
68:17
**corresponde...**
76:14
**correspondin...**
78:5 88:6

corroboratin...
23:5 45:17
  123:4
corroboratio...
39:15
cost (2)
53:11 54:10
costs (1)
5:2
counsel (9)
4:4,14,15,25
  52:23 58:15
  88:6 138:9,17
county (71)
8:18,21 10:6
  10:12,19,19
  10:23 11:3,25
  12:5,8,15,20
  13:16 14:14
  14:14,25 15:2
  16:11,13,25
  21:11 38:6
  45:6,11 48:18
  51:6,10 59:5
  59:10,24 60:7
  61:12,19
  63:15,19 64:8
  66:8,14 68:5
  68:6 70:4,11
  70:16 71:8
  72:15 73:12
  82:7,18 91:9
  95:15,23 96:9
  96:12,21,23
  97:5,11,16,17
  97:19 98:3
  99:21 100:7,9
  100:11,13,20
  101:21 112:11
  124:24
couple (6)
18:14 76:7
  79:16 96:3
  102:5 130:3
course (10)
48:17 55:23

62:8 63:18,23
  66:19 71:12
  91:20 116:6
  118:12
court (17)
1:2,9 3:5 4:11
  4:15,17,19
  6:23,24 8:9
  9:24 10:14
  58:15 68:6,12
  95:21,25
courts (5)
9:19 15:23
  19:7 60:16
  95:22
Cowan (23)
3:11 43:2,5
  44:8,18 48:12
  52:19 75:16
  75:20,23,24
  76:3,4 83:15
  83:18 129:23
  132:19
  134:14 135:3
  135:18 136:3
  137:5,7
CPL440 (1)
70:13
CPLR (2)
4:14 5:3
create (1)
34:25
created (1)
79:23
credibility (1)
86:11
credible (1)
104:3
creditability ...
65:4
crime (2)
125:24 126:4
crimes (1)
96:7
criminal (9)
19:6 29:7,24

54:22 64:2
  67:4 72:22
  73:11 114:4
criminality (1)
53:10
criminally (2)
73:16 99:12
currently (4)
8:15 9:7,21
  123:18

**D**

D (2)
4:2 6:2
DA's (6)
51:14 89:3
  96:21 118:3
  125:5 134:16
daily (1)
118:12
date (13)
1:20 9:5 25:22
  26:21 27:4
  61:6 62:24
  69:11 80:7,8
  80:9,9 81:20
dated (1)
130:7
dates (2)
12:12 80:5
day (11)
38:14,17 39:7
  40:14 46:10
  78:3 100:16
  104:10
  136:13 138:5
  138:19
days (8)
48:21 53:19,24
  77:8,23 81:4
  81:9,24
deal (1)
53:13
dealing (5)
20:2 22:25
  42:16 53:6

72:14
dealt (2)
17:17 102:23
December (42)
27:5 28:8,13
  28:23 30:13
  31:5 41:25
  45:14 46:7
  47:5,25 48:5
  48:13 55:22
  56:3 61:6,20
  62:25 71:9,13
  80:15,16,21
  81:5,8,14,14
  81:15,16,16
  81:18 105:16
  105:21
  106:10 108:8
  108:14 110:5
  113:9 119:11
  130:7 134:23
  135:2
decide (4)
14:17,20 86:17
  93:16
decided (5)
45:7 58:6
  59:20 64:12
  99:18
decision (5)
49:11 57:25
  98:17 99:13
  110:6
decisions (5)
50:13 54:14
  98:22 99:3,17
decline (1)
85:14
declined (1)
124:13
defendant (1)
92:25
defendants (5)
1:8,18 3:9
  57:22 59:12
defender (3)

8:22 97:17
  100:11
Defender's (8)
8:18,21 16:14
  50:15 51:7
  100:21 101:9
  106:4
defense (13)
33:14 40:11,12
  52:23 58:14
  60:5,15 70:18
  71:15,22 88:6
  103:7 133:11
define (1)
118:2
defined (1)
119:12
definitely (3)
24:19 40:9
  80:15
definition (1)
23:15
degree (7)
29:8,25 69:21
  94:8,13
  132:21
  134:10
degrees (1)
95:5
demeanor (2)
108:24 109:20
department (6)
1:7,15 9:16,22
  84:20 95:19
DEPONENT...
1:21
deposed (1)
5:3
deposition (13)
4:9,14,18 5:2
  6:19 7:24
  11:18 77:17
  77:18 79:9,12
  79:18 82:14
deputy (2)
13:2,5

describe (5)
15:20 108:22
   108:24 109:4
   109:21
described (1)
75:7
DESCRIPTI...
137:10
detail (1)
129:10
details (2)
22:20 23:23
determine (4)
15:4 19:5,10
   86:8
develop (2)
92:2,5
developed (1)
92:9
devices (2)
107:9,10
different (7)
6:21,21 13:8
   41:2 55:6
   56:25 118:14
difficult (1)
110:12
difficulty (1)
7:22
DIN09A5824...
132:8
DIN11A4897...
132:14
direct (5)
16:16,20 92:13
   92:24 116:11
directly (4)
30:20 42:3
   114:10
   138:15
disagreemen...
98:20 99:2
disappointin...
99:10,16
disciplinary (...
34:25 84:17

123:14
124:15 125:3
disciplined (1)
95:11
disclose (2)
132:11,16
disclosed (6)
40:10 41:20
   54:23 55:9,10
   55:11
disclosing (1)
55:14
disclosure (19)
30:12 40:8
   49:7 53:10
   54:2,4 55:2
   55:20 56:19
   61:22 64:15
   64:20 65:3,3
   74:6 103:10
   104:6 106:23
   122:17
disclosures (1)
104:8
discovery (2)
77:15 103:16
discuss (5)
38:11 54:13
   72:4 107:22
   114:8
discussed (2)
11:14 71:24
discussing (1)
56:16
discussion (6)
13:12 41:8
   48:2 58:3,9
   62:17
discussions (5)
11:17,24 60:2
   85:12 102:4
dismiss (13)
28:21 30:23
   56:17 57:23
   58:19,23 59:6
   60:25 62:11

64:4 66:24
67:13,17
dismissal (2)
66:15 86:18
dismissed (5)
30:24 105:13
   130:16
   133:17,18
dismissing (2)
28:13 67:6
district (67)
1:2,3,9,10 7:8
   10:6,12,23
   11:25 12:5,15
   12:16,21 13:2
   13:7,16 15:2
   15:12 16:12
   16:20,25
   17:10 21:12
   22:24 38:6
   41:9 47:14
   48:18 49:16
   49:18 51:6,10
   57:24 59:5,10
   59:22 60:7
   63:14,19 64:9
   65:12 66:8,14
   66:20 67:16
   70:4,11 71:5
   71:7,8 72:15
   73:13,20 82:8
   92:8 93:15
   95:16,22
   98:13,16
   107:10 109:5
   124:24
   125:22,23
   126:5 130:21
division (2)
95:18 97:4
divisions (2)
13:8,22
Doctorate (1)
9:10
document (4)
25:20 37:7

38:25 84:24
documented ...
39:19
documents (7)
19:9,14,19
   89:16 91:2
   114:3 130:24
doing (16)
13:24 18:7,18
   38:21 40:16
   45:2 57:5
   61:2 62:4
   80:10 93:13
   95:22 96:4,6
   98:6 122:21
Donnesia (33)
1:4 3:4 7:11
   22:16 24:4
   27:9,20,23
   28:6 30:2,9
   47:7 69:14,15
   70:20 72:5
   74:17 76:6
   78:19 88:15
   88:24 89:13
   89:22 90:3,9
   90:12 92:4
   131:6 132:13
   132:14
   134:25 135:6
   135:15
door (1)
53:21
dozen (3)
96:19 107:21
   108:6
dozens (2)
45:24,24
drafted (4)
58:6 59:14
   60:4 92:16
drafting (1)
62:5
drafts (1)
61:21
Drive (1)

6:10
drugs (7)
18:10 20:13,15
   24:22 59:2
   105:5 112:3
duly (2)
6:2 138:6
DWI (3)
15:25 16:3
   96:6

**E**

E (8)
3:2,2 4:2,2 6:2
   6:2 138:2,2
earlier (5)
20:23 29:23
   75:5 119:17
   133:24
easiest (3)
10:25 11:5
   33:18
easy (1)
54:7
Eddie (10)
35:6 121:19,21
   121:25 122:5
   122:13,22
   124:8 125:17
   126:22
editor (1)
94:14
effect (5)
4:10 79:25
   106:14 111:9
   126:10
eight (10)
12:25 13:15
   21:19 25:20
   45:23 65:10
   79:15 87:25
   96:25 97:2
eight-page (1)
37:7
either (23)
15:8 17:7 27:8

51:25 52:17
54:18 58:9
60:24 66:6
72:10 74:16
76:18 79:7
80:24 90:24
92:3,10 100:7
118:8 128:5
135:5,14,20
**Elder (1)**
6:10
**elements (1)**
24:16
**eligible (1)**
9:22
**email (9)**
76:18 77:24
78:6,8,9,12
78:13,16 84:8
**Emailed (1)**
4:24
**emails (2)**
79:16 91:8
**embarrassed...**
51:18
**employ (1)**
138:16
**employed (5)**
8:15,17 73:25
100:8,10
**encountering...**
20:4
**ended (5)**
28:13 34:18
44:22 128:21
133:13
**English (3)**
94:9,10 134:11
**entail (1)**
124:21
**entire (3)**
17:5 40:16
106:24
**entirety (3)**
37:9,14 61:10
**Entry (1)**

2:7
**Erie (1)**
3:10
**errata (1)**
22:2
**erred (2)**
58:19 86:20
**especially (1)**
39:5
**ESQ (2)**
3:6,11
**ESQS (1)**
3:3
**essential (1)**
86:15
**essentially (44)**
13:5 14:2
19:20 24:15
26:10 29:8,15
29:17 30:14
31:22 32:3,10
32:13 34:2,25
38:13 39:9,23
41:3,19 43:17
45:25 46:3
49:2 52:9
53:7,18 56:12
56:20 58:15
60:17,24 62:3
62:4 64:14
67:13 68:11
78:23 84:15
85:15 86:23
87:2 103:3,19
**estimate (1)**
96:17
**ET (1)**
1:8
**ethical (2)**
40:11 64:17
**evasive (2)**
35:10 127:3
**events (3)**
37:18 48:19
122:16
**eventually (1)**

86:8
**everybody (2)**
60:17 98:24
**evidence (9)**
23:2,4,10
30:19 92:2,5
92:9,24
122:12
**exact (2)**
9:5 81:20
**exactly (6)**
59:17 76:16
104:18 119:6
126:22
127:16
**Examination...**
2:3 6:5 137:3
138:4,12
**examined (1)**
6:4
**example (3)**
13:22 87:9
102:16
**exchange (1)**
32:6
**exclusively (1)**
96:6
**exhibit (11)**
4:23,24 6:13
25:22 62:25
66:19 67:20
69:11 79:14
79:22 115:12
**exhibits (7)**
4:23 62:21
84:5 88:16
92:13 130:7
137:9
**exists (1)**
114:3
**expand (1)**
14:4
**expect (2)**
38:3 119:7
**explain (5)**
28:11 36:3

39:3 41:20
100:23
**explained (2)**
32:2 40:12
**explaining (3)**
31:21 62:5
123:19
**express (1)**
4:20
**expressing (1)**
114:12
**extracted (1)**
131:19

**F**

**F (2)**
4:2 138:2
**face-to-face (...**
41:7 98:18
101:6,21,23
101:24 102:4
102:11
105:19,24
106:2,6 124:7
**facility (13)**
14:15,24,25
17:14,16,23
20:9 29:6
33:4,24 35:24
36:14 123:18
**fact (13)**
40:22 43:16
45:5 58:4
61:18 63:11
64:5,20 74:9
74:21,23 78:2
126:12
**factor (1)**
11:7
**facts (6)**
23:2 26:11
115:2 116:25
118:25
122:25
**factual (1)**
11:16

**fair (3)**
13:14 22:22
37:18
**falling (2)**
98:12,14
**familiar (4)**
98:10 124:14
124:20 125:9
**family (3)**
11:4 53:15
97:24
**Fandrich (1)**
70:16
**far (8)**
19:3 22:18
30:21 50:20
60:10 67:11
90:6 103:10
**Farmington (...**
6:10
**fast (3)**
109:21,23,24
**father-in-law...**
53:17
**favor (1)**
32:7
**FBI (5)**
50:19,23 73:19
100:6,23
**fearful (1)**
113:16
**fearing (1)**
33:25
**February (9)**
9:4 10:8 12:8,9
20:24 21:7
100:17,20,25
**Federal (1)**
9:24
**feel (2)**
44:6 67:14
**felony (5)**
16:5 30:4 96:4
96:5,12
**felt (3)**
42:7 55:8

57:13
**fifty (1)**
97:15
**figure (1)**
93:9
**file (11)**
57:21,22 82:15
82:18,20,21
82:24 88:20
90:19 105:12
114:4
**filed (10)**
33:16,22 34:8
72:23 79:3
93:10,11 95:8
103:8 119:15
**files (3)**
57:15 58:6
118:23
**filing (2)**
4:5 79:5
**find (8)**
43:18 57:13
110:18
117:15,25
122:9,12
126:3
**finding (2)**
55:6 85:22
**fine (2)**
97:22 123:23
**firm (1)**
7:5
**first (24)**
6:2 10:3,5 13:4
14:8 17:20
20:4,15 21:8
29:7,25 30:5
41:7,14 42:15
69:21 76:17
76:18 100:23
103:24
116:12,12
126:18
132:21
**five (6)**

17:24 94:14,22
94:23,24
119:4
**flag (1)**
84:24
**flagged (6)**
47:21 87:8
88:2,11 93:8
129:16
**flagging (3)**
47:16,18 48:16
**float (1)**
35:23
**floating (1)**
36:10
**follow (3)**
75:22 130:2
135:4
**following (4)**
29:19 30:14
37:20 100:19
**follows (1)**
6:4
**force (1)**
4:10
**forget (1)**
35:12
**form (4)**
4:7 33:16 43:6
48:21
**formal (1)**
109:7
**formally (1)**
100:15
**forms (1)**
85:7
**formula (1)**
43:13
**Forty (1)**
97:15
**forward (1)**
86:12
**forwarding (1)**
77:4
**found (20)**
24:5 29:14

31:19 39:14
43:24 73:5
104:2 105:5
110:16
111:11,13
114:25 115:6
115:18 117:9
118:17 123:8
126:16
132:16
133:15
**foundations (...**
118:10
**four (5)**
20:22 105:23
119:4 132:9
132:15
**frequency (1)**
44:2
**frequent (2)**
103:23 111:14
**frequently (7)**
44:16 45:3
71:23 102:9
102:23 103:2
125:14
**fresh (1)**
46:23
**Friday (2)**
29:2 40:25
**friend (1)**
98:2
**friendly (1)**
125:5
**friends (2)**
53:16 107:25
**frisk (3)**
115:18 117:8
117:11
**front (3)**
21:10 38:5
83:8
**full (5)**
8:4 53:19 54:8
64:24 116:12
**further (8)**

4:7,9,23 48:2
88:9 99:15
110:2 136:5

**G**
**Gaines (30)**
29:5,8 31:17
32:4,10,17
33:2,12,16,21
34:7 40:13,21
53:25 55:14
103:13
113:10,15
114:24
115:21,23
116:2,9,21
117:4,9,13,14
119:15
128:20
**Gaines' (2)**
34:13 114:4
**Gaines's (3)**
29:14 46:19
52:24
**Gains's (1)**
33:14
**game (1)**
41:23
**gang (12)**
32:22 33:3
34:11 35:18
89:23 91:17
91:22 108:16
119:9,13,19
120:19
**gangs (2)**
33:9 36:10
**general (8)**
3:8 26:5 36:17
79:12 102:15
111:24
112:22
120:19
**General's (2)**
33:24 41:15
**generally (4)**

13:19 24:14
26:3 33:3
**gentleman (2)**
40:18 79:7
**getting (2)**
12:12 94:12
**give (12)**
10:25 14:16
19:22 21:5
30:18 32:16
67:12 106:19
109:11 121:2
129:9,20
**given (3)**
29:22 90:12
111:16
**giving (1)**
39:7
**go (21)**
7:13 8:6 9:13
10:10 14:8
17:24 29:16
31:4 42:6
44:8 57:12
62:15 68:16
80:7 84:23
85:16 86:12
94:2 110:2
115:11,12
**go-to (1)**
17:25
**goes (3)**
6:18 8:7 56:24
**going (67)**
6:18 7:18 21:9
22:2 23:14
28:10,17
29:24 30:18
32:8 33:25
39:21 40:2,13
42:22 45:7,8
49:2,3 54:14
55:3,21 56:12
56:17,18,19
58:7,14 62:9
62:10,11

63:20 64:9
65:5 72:21,22
72:24,24
75:17,18,21
76:7 78:4
84:10,16
85:24 86:12
86:18,22 87:3
89:9 93:14
101:18
103:16,17
107:7 109:17
110:7 112:2
113:8 114:13
123:2,22
127:19
129:25 130:2
130:20
**good (9)**
6:15,16 44:6
44:12 75:25
98:2,25
108:18
112:22
**gotten (2)**
78:2 98:3
**graduate (5)**
93:20,21 94:5
94:6,8
**graduated (3)**
9:11 95:2,14
**grand (18)**
20:10,17 22:12
24:11,13
43:25 44:17
75:3 86:6
89:7,13 90:17
107:24 110:9
110:10 118:8
135:10,13
**granted (3)**
64:21,22 86:14
**great (2)**
8:14 83:10
**grew (1)**
11:2

**grievances (1)**
95:8
**grind (1)**
48:10
**ground (2)**
6:17 7:14
**groups (1)**
13:9
**guard (3)**
53:18 55:2,5
**guards (3)**
44:3 87:12
111:15
**guess (13)**
6:17 11:5 16:7
21:9 29:24
33:19 44:10
45:22 46:17
47:12 57:3
97:7 116:3
**guessing (3)**
21:18 65:9,22
**guilty (11)**
40:14,15,18,22
40:23 53:25
90:13 105:2
128:21 132:8
133:15
**guys (1)**
109:12

**H**
**half (1)**
106:25
**hand (3)**
75:2 88:19
138:19
**handle (6)**
13:17 56:9
90:19 96:10
96:13,15
**handled (4)**
18:13 47:15
61:4 68:25
**handling (7)**
15:18,18 24:24

25:6 43:12
90:16 96:2
**handwritten ...**
114:20
**happen (2)**
38:24 85:12
**happened (12)**
33:19 55:19
80:8,9 81:24
89:9 90:4,5
94:24 106:10
118:21
133:22
**happening (3)**
43:8 53:23
133:13
**happens (1)**
125:14
**happy (1)**
7:17
**head (5)**
65:21 119:3
128:3,4
129:11
**hear (2)**
8:2 39:16
**heard (6)**
35:25 40:20
54:8 117:23
122:18,19
**hearing (5)**
7:22 19:2 40:3
123:14
135:10
**hearings (4)**
124:15 125:3
125:10 135:9
**held (5)**
2:5 8:23 13:13
62:18 138:4
**help (1)**
16:6
**helped (1)**
24:15
**helpful (2)**
17:21 23:16

**hereunto (1)**
138:18
**hesitant (1)**
52:12
**hide (1)**
32:5
**highlight (1)**
131:17
**hire (1)**
12:18
**honestly (3)**
38:7 53:4,23
**hope (2)**
23:12 83:8
**hoped (1)**
127:18
**hot (1)**
32:8
**hour (1)**
106:25
**hundred (1)**
111:16
**hundreds (1)**
43:11

**I**
**idea (5)**
17:9 34:3
57:21 73:14
73:17
**ideally (1)**
24:12
**identification...**
6:14 25:23
62:21,25
137:10
**identified (1)**
78:21
**identity (1)**
4:19
**IG (1)**
101:13
**IG's (9)**
48:23 49:24
74:7 101:4
102:6,21

104:2 123:17
124:6
**imagine (1)**
78:11
**immediately ...**
40:22 55:12
80:17
**impart (1)**
110:13
**impeachmen...**
54:25 55:3,8
**important (1)**
8:7
**incident (29)**
14:12 19:16
26:7,16 28:12
31:15 33:20
34:10,11
37:15 38:19
39:8,18 43:11
50:21 72:6
76:21 77:12
78:19 79:25
80:14 84:21
91:3 103:4
119:14 122:7
122:10,23,24
**Incidentally ...**
69:18
**incidents (1)**
19:23
**included (1)**
104:12
**including (2)**
28:14 84:4
**incorporated...**
19:18
**increase (1)**
97:25
**independent ...**
89:15
**independentl...**
57:6 65:20
89:8,14
**INDEX (1)**
137:2

indicate (7)
32:20 42:2,3
46:6 50:22
115:16
116:19
indicated (1)
123:5
indicates (4)
69:5 70:7,22
71:4
indicted (3)
74:19,22,24
indictment (1...
30:24 56:24
58:23 64:4
66:15,24
67:23 69:16
130:16
133:18
indictments (6)
28:14,20 56:17
58:19 59:7
62:11
indirectly (1)
138:15
individual (3)
22:6,16 23:7
INDIVIDUA...
1:17
informant (1)
117:4
informant's (1)
118:18
informants (2)
113:3 118:5
information (...
19:20 32:2
39:2 40:3,18
40:20 50:9
54:20,21,21
54:22 55:15
56:23 64:18
83:23,24
86:11 87:6
103:17 104:5
118:5 124:4

infractions (1)
18:25
initial (1)
78:12
inmate (34)
18:11,11,12
19:12 20:8,8
20:13 29:5,14
30:21,21
31:12,23 32:4
32:7,9,12,21
38:19 39:13
41:2 55:6
56:20 85:23
91:21 104:9
114:12 117:3
118:17 122:5
125:17,24
128:20 132:4
inmates (24)
18:8,15,25
34:24 36:14
55:3 56:18
57:21 60:6
61:22 84:3
87:16 92:11
92:15 105:7
108:9,12
112:18,23
118:6 120:14
121:24
125:10
135:21
inside (3)
107:4 113:3
118:13
Inspector (2)
33:24 41:15
instantly (7)
42:14 46:18,24
54:2,3 55:18
55:19
Institute (1)
56:8
instructions (...
8:12

interacted (1)
125:4
interaction (1)
50:20
interactions (...
101:23
interest (4)
66:24 67:7,18
70:13
interested (2)
14:18 138:14
interpretatio...
120:7
interview (8)
49:18 50:23
51:4,14
100:24 101:6
134:16,20
interviewed (5)
26:17 49:17
50:16 51:9
101:4
interviewing ...
121:9 134:17
interviews (1)
73:19
intimately (1)
50:11
introduced (1)
77:9
introducing (1)
78:17
investigation...
49:3,9,12
50:12 53:13
72:19 73:4,9
103:11,20,25
104:7,12
123:12
investigation...
48:22 49:14
100:4 101:14
investigator (...
41:10 51:20
52:6,8 58:21
64:12 84:21

84:25 100:5
102:23,25
investigators ...
14:11 49:16,23
51:10,17
73:20 85:8
102:6,8,12
123:16 124:5
involve (1)
26:16
involved (46)
21:14 23:16
24:23 29:10
30:17,20 31:2
33:12 42:9,21
43:19,21
44:23 45:4,20
46:5,24 48:25
49:8,11 50:11
58:22 59:3
60:19,20,22
64:13 66:10
73:8 77:15
85:2,6,22
86:3,25 87:7
87:10,13,23
89:10 99:17
110:4 111:23
115:20 122:6
129:13
involving (20)
19:24 20:7
26:13 34:11
47:3,12 48:22
57:9 60:19
66:18 76:22
78:19 84:18
99:12 104:4
111:18
114:17,21,24
132:21
Island (1)
94:18
issue (4)
42:7 60:18,21
64:11

issues (1)
65:4
item (9)
23:19,25 24:20
24:21 25:5,6
29:13,25
31:17
items (6)
18:9 30:22,23
31:3 50:7
59:4

J
J-A-E-N-D-...
65:17
Jaencric (3)
65:17 128:25
132:20
jail (5)
32:9 91:5,9
96:12 104:12
James (2)
41:10 51:17
jargon (1)
110:17
job (20)
8:20 10:3,5,7
14:2,3 15:13
44:6,12 53:11
57:12 74:4,11
94:13 98:23
112:9,16
124:21,23,25
Joe (1)
18:3
John (1)
56:7
Johnson (17)
35:7,7 121:19
121:19,21
122:2,6,13,22
122:23 123:5
123:10,13,18
124:8 125:17
126:23
Johnson's (1)

123:22
**join (1)**
66:23
**Jon (11)**
12:17 15:8
16:19 59:10
59:22 63:2,13
70:3 71:4
130:8,25
**journal (1)**
94:16
**judge (9)**
68:6,7,9,13,16
68:17 70:16
88:5 133:3
**judges (4)**
59:23 60:2
61:12,18
**July (3)**
2:8 138:5,19
**jump (2)**
83:12 129:10
**jumped (1)**
76:25
**jumping (2)**
76:8 129:7
**Jurat (1)**
135:25
**Juris (1)**
9:9
**jurisdiction (1)**
68:13
**jury (24)**
20:10,17 22:12
24:12,13
28:25 29:3
40:6 43:25
44:17 65:21
75:4 86:7
87:6 89:7,13
90:17 107:24
109:17 110:9
118:8 132:22
135:10,13
**jury's (1)**
110:10

**justice (6)**
56:14 66:25
67:7,18 70:13
95:22

**K**
**keep (4)**
72:18 82:3
99:20,23
**kept (3)**
57:15 82:16
127:19
**key (1)**
72:25
**kind (51)**
11:3 14:15
16:3 17:25
32:7,19,25
34:8,17 35:10
35:11,13 36:8
38:11,23
39:20 41:19
41:22 48:25
49:5 50:3,13
52:11 54:15
58:8 67:15
73:7 85:18
86:19 87:22
97:10 98:4,7
103:15 104:6
108:23
109:11,15,20
110:6,12
118:9,12,24
120:2,6
124:20
127:13,21
129:9,20
**King (1)**
41:16
**knew (10)**
19:3 34:5,12
40:16 42:14
42:19,19
53:10 64:19
118:11

**Knight (7)**
41:17,18,18
50:18 101:7
101:22
105:20
**know (178)**
7:14,20,24 9:2
13:3 14:9
19:16 24:25
27:11,17,20
28:2,6,11,15
29:16 30:2
31:25 32:13
32:14,15
33:10,23 34:2
34:6,12,14,21
35:3,7,11,12
35:22 36:17
36:18,19
37:25 38:2,24
39:4,9,15,23
41:19,21 43:7
44:20 49:5,7
49:10,15,19
49:21 50:2,10
50:16 51:13
52:9,15 53:5
53:23 54:12
55:12,17
56:10,11,23
57:4 58:16,25
59:25 60:10
64:5,7,16
65:15 66:11
72:9,12,21
73:2,5,7,15
73:24 74:2,3
74:10,13
75:10 77:2,9
77:14,22,25
78:11,14,17
78:21,22 79:6
81:23 82:2,10
84:18 85:11
86:25 87:9
88:7 89:22,24

90:11,12,17
91:16,18 92:8
92:12 95:10
98:7,9,24
99:9,11 102:4
102:9,9,11
104:17 105:4
105:11,14
109:5,7,8,10
109:11,23
111:12,15,17
112:9,13,15
112:16,20,21
112:24 113:2
113:5,6,7
115:5 117:10
118:7,15
119:12 120:3
120:4 122:4
123:6,7 124:6
124:8 125:14
125:15
127:13,14,17
127:18,20,20
129:17
130:13
133:19,20,22
135:18
**knowing (6)**
26:7 53:19
54:8 64:24
79:23 86:10
**known (1)**
32:4

**L**
**L (3)**
4:2,2 6:2
**lack (1)**
72:13
**laid (1)**
109:2
**language (6)**
60:23 66:17
67:5,11,15
104:18

**large (1)**
12:20
**Larossi (1)**
102:24
**lasted (1)**
106:24
**late (1)**
19:24
**law (14)**
4:21 7:5 9:11
9:13,14 10:4
64:2 67:4
93:18,24
94:25 95:2,3
95:14
**lawsuits (3)**
7:7 79:3,5
**learned (1)**
41:22
**learning (1)**
64:11
**leave (5)**
10:7 93:15
97:19 98:17
100:13
**led (1)**
127:4
**Leeds (142)**
1:21 2:4 6:1,8
6:15 7:1 8:1
8:15 9:1 10:1
11:1 12:1
13:1 14:1
15:1 16:1
17:1 18:1
19:1 20:1
21:1 22:1
23:1 24:1
25:1 26:1
27:1 28:1
29:1 30:1
31:1 32:1
33:1 34:1
35:1 36:1
37:1 38:1
39:1 40:1

| | | | | |
|---|---|---|---|---|
| 41:1 42:1 | 133:1 134:1 | 130:15 | 132:2 | 8:23 25:21 |
| 43:1 44:1 | 134:15 135:1 | **letterhead (1)** | **lingo (1)** | 94:18,21 |
| 45:1 46:1 | 136:9 137:4 | 71:3 | 110:17 | 96:23 97:20 |
| 47:1 48:1 | 138:4 | **letters (23)** | **Link (1)** | 106:12 |
| 49:1 50:1 | **left (18)** | 58:14 61:22,25 | 2:7 | 131:24 |
| 51:1 52:1 | 10:11 12:7 | 62:2,5,7,13 | **list (8)** | **look (37)** |
| 53:1 54:1 | 16:7,11 17:6 | 62:19 65:7 | 47:3,8,11,12 | 12:10 14:17,19 |
| 55:1 56:1 | 17:24 21:4 | 71:3 84:2 | 47:13 57:15 | 21:18 23:13 |
| 57:1 58:1 | 38:4,7 41:24 | 87:20 88:5,13 | 85:10 129:15 | 26:23 35:4,5 |
| 59:1 60:1 | 45:10 82:7,11 | 88:15,18 | **listed (3)** | 35:14,19 |
| 61:1 62:1,23 | 82:20 99:20 | 92:14,16,20 | 26:13 93:8 | 37:11 42:22 |
| 63:1 64:1 | 100:15 | 130:5,6,10 | 131:7 | 46:11 56:11 |
| 65:1 66:1 | 124:25 125:6 | 137:12 | **litigation (2)** | 59:16 61:5,8 |
| 67:1 68:1 | **left-hand (1)** | **level (1)** | 4:22 5:4 | 61:11 62:2,12 |
| 69:1 70:1 | 71:4 | 40:7 | **little (24)** | 62:24 63:6 |
| 71:1 72:1 | **legally (1)** | **Levy (25)** | 21:3 31:8 | 69:9 78:11 |
| 73:1 74:1 | 54:16 | 3:6 6:6 7:4 | 34:23 38:8 | 82:24,25 83:5 |
| 75:1 76:1,4 | **LegalView/Z...** | 10:13 13:11 | 44:2 45:23 | 83:7,11 88:13 |
| 77:1 78:1 | 4:16 | 51:23 62:15 | 76:9 85:19 | 91:20 92:18 |
| 79:1 80:1 | **Leone (4)** | 75:14,18,21 | 96:25 98:4,6 | 100:16 |
| 81:1 82:1 | 68:3,8,9 133:4 | 76:13,17 | 99:16 100:12 | 103:15 |
| 83:1 84:1 | **let's (12)** | 83:12,20 | 100:22 | 109:12 |
| 85:1 86:1 | 12:7 20:20 | 106:20 | 106:17 109:9 | 118:23 |
| 87:1 88:1 | 21:6 31:4 | 125:12 | 109:14 | 122:20 |
| 89:1 90:1 | 35:12,13 | 128:25 130:2 | 122:20 124:2 | **looked (8)** |
| 91:1 92:1 | 44:21 62:15 | 130:4 134:12 | 125:7 129:9 | 39:8 44:24 |
| 93:1 94:1 | 81:13 87:11 | 135:4,11 | 129:21 | 83:6 85:21,25 |
| 95:1 96:1 | 98:4 102:18 | 136:4 137:4,6 | 131:13 133:8 | 86:7 122:5,23 |
| 97:1 98:1 | **letter (48)** | **Levy's (1)** | **local (2)** | **looking (16)** |
| 99:1 100:1 | 59:11,15,16 | 79:9 | 15:23 95:21 | 11:4 23:10 |
| 101:1 102:1 | 60:4,11,13,16 | **Lewis (1)** | **located (3)** | 25:17 26:4 |
| 103:1 104:1 | 60:23 62:3 | 50:24 | 10:20 11:3 | 46:9 55:22 |
| 105:1 106:1 | 63:2,11 65:11 | **Lexitas (1)** | 94:17 | 69:24 85:10 |
| 107:1 108:1 | 66:13,16,22 | 4:17 | **locations (1)** | 88:8 102:19 |
| 109:1 110:1 | 67:19,20,22 | **LEXITAS-L...** | 4:16 | 111:18 |
| 111:1 112:1 | 67:25 68:2,7 | 2:6,6 | **locked (2)** | 119:25 |
| 113:1 114:1 | 68:20,23 69:4 | **liaison (1)** | 53:20,21 | 126:11,18 |
| 115:1 116:1 | 69:8,10,13,19 | 17:16 | **locker (1)** | 128:24 |
| 117:1 118:1 | 69:23,24 70:7 | **lieutenant (3)** | 50:8 | 129:23 |
| 119:1 120:1 | 70:8,15,21 | 18:3 38:16 | **lockers (1)** | **looks (6)** |
| 121:1 122:1 | 71:13 88:12 | 39:3 | 50:6 | 84:6,22 88:8 |
| 123:1 124:1 | 90:12 105:8 | **liked (1)** | **logistically (1)** | 106:9 115:21 |
| 125:1,9 126:1 | 113:14,19,21 | 48:14 | 61:3 | 115:22 |
| 127:1 128:1 | 113:25 114:6 | **liking (1)** | **logistics (1)** | **lot (9)** |
| 129:1 130:1 | 114:8,11,19 | 110:10 | 11:19 | 31:9 53:12 |
| 131:1 132:1 | 119:16 | **lines (1)** | **long (8)** | 73:4,5 77:15 |

103:23
110:16 111:3
119:2

**M**

**MAD/ATB (1)**
1:13
**main (3)**
45:17 47:19
60:9
**making (5)**
11:23 39:15,18
49:11 53:25
**manner (2)**
4:20 39:24
**March (4)**
10:9 50:25
101:12,22
**marijuana (2)**
112:3,4
**Mark (1)**
70:16
**marked (11)**
4:23 6:13
25:21 37:8,17
62:20,24
67:20 69:10
88:16 130:6
**marriage (1)**
138:13
**Master's (2)**
94:12 134:10
**material (11)**
30:19 31:2
47:23 52:18
54:18,23 60:9
64:13 86:19
86:23,24
**materially (1)**
87:7
**Matt (74)**
27:4 29:9,15
31:25 32:8,10
32:11 39:11
39:17 42:16
42:20,23

43:18 44:4,12
44:16,22 45:4
45:7 46:2,24
47:3,18,22
48:2,4,14
51:9,14 58:11
59:13 60:8,21
65:4 73:12,24
74:3,10 76:22
78:20,22
80:20,23
82:22 85:5,21
86:2,5,15
87:4,11 89:20
90:6 99:3,24
100:3 101:4
102:15 103:5
103:18,20,25
105:16 106:8
110:7 111:18
112:9 117:2
122:6,17
123:3,8,8,15
**Matt's (1)**
121:12
**matter (4)**
72:21 91:20
103:13
138:16
**matters (8)**
5:4 11:15,16
61:13 67:7
71:16 72:15
73:22
**Matthew (9)**
1:16 7:10,12
19:25 21:14
28:8,22 30:6
76:5
**mean (14)**
14:4 18:22
35:22 36:12
57:11 109:14
118:11,22
120:5,8,9
127:2 129:8

131:7
**meaning (2)**
30:19 132:8
**means (2)**
56:22 61:24
**meant (7)**
34:20 36:4
110:22
117:24
119:22 120:7
121:15
**meet (5)**
14:10 23:14
61:18 85:8
108:25
**meeting (25)**
4:16 27:7 28:8
28:22,24
29:15 31:4,6
41:25 45:15
49:22 59:21
61:12,14 81:6
81:11 102:8
105:17,19
108:20,23
113:9,14
116:6 134:24
**meetings (3)**
106:3 108:7
110:23
**Melissa (1)**
50:24
**member (2)**
89:23 91:17
**members (9)**
11:25 35:18
53:14 91:22
108:16
119:20
120:19 125:5
134:7
**memorandu...**
85:7
**memorandu...**
85:15
**memory (1)**

80:20
**mention (6)**
38:9 90:6
113:18
126:14
134:24 135:5
**mentioned (17)**
34:18 36:25
38:20 76:20
77:10,14
101:3 103:8
110:25,25
114:6 119:8
119:18
127:14,18
128:25
133:24
**mentioning (2)**
33:8 34:14
**message (1)**
77:8
**messing (1)**
57:20
**met (12)**
20:16 21:8
27:4 29:2
52:21 101:21
102:11,13
107:18
109:19
113:22 124:5
**method (1)**
7:23
**middle (1)**
80:14
**mind (1)**
46:23
**minutes (2)**
106:13,25
**mirror (2)**
67:10,10
**misbehavior ...**
18:24 19:12,17
**misdemeano...**
96:2,11
**misheard (1)**

126:9
**missed (1)**
134:9
**missing (1)**
71:11
**mistaken (1)**
9:6
**misundersta...**
127:9
**misundersto...**
126:9 127:7
**moment (4)**
21:5 52:13
55:17 106:19
**Monday (6)**
29:4 40:4,6
46:7 47:25
100:19
**month (1)**
103:12
**months (4)**
14:10 20:22
33:19 110:5
**morning (8)**
6:15,16 29:4
35:6 40:4,6
78:10 79:20
**motion (13)**
56:21 60:25,25
63:25 64:4,10
64:21 65:13
66:9,23 68:15
70:12 105:12
**motions (5)**
57:22 62:10
67:17 72:10
133:22
**motivating (1)**
11:7
**mouth (6)**
29:14 31:25
32:6,18 54:9
116:4
**move (6)**
35:13 58:23
59:6 62:11

| | | | | |
|---|---|---|---|---|
| 97:24 133:16 | **never (20)** | 46:6,11 47:2 | 4:2 | 16:14 21:12 |
| **moved (2)** | 15:21 39:23 | 55:22 56:6,10 | **O'Mara (5)** | 22:24 33:24 |
| 28:20 30:22 | 48:4 53:4 | 57:2 61:6,15 | 56:7,15 57:3,7 | 38:7 40:23 |
| **moving (2)** | 87:18 90:4,5 | 61:17 79:15 | 57:7 | 41:9,15 47:15 |
| 58:18 67:12 | 90:8,10 91:15 | 79:20,22 80:2 | **oath (2)** | 47:24 48:19 |
| **Muldoon (2)** | 99:14,14 | 80:6,6,15,18 | 4:10,17 | 48:21,23 |
| 132:25 133:16 | 107:16 108:5 | 80:19 81:10 | **objecting (1)** | 49:10,17,19 |
| **Mulligan (3)** | 108:10,13,17 | 81:15,18,25 | 43:5 | 49:25 50:15 |
| 6:25 138:3,21 | 122:3 124:17 | 82:9,19 83:23 | **objection (7)** | 51:6,7,11,15 |
| **mumbled (2)** | 128:15 | 84:12 88:9 | 43:2 44:8,18 | 51:20 52:7 |
| 110:9,13 | **new (26)** | 106:9,16,16 | 48:12 52:19 | 57:16 59:6 |
| | 1:3,7,10,14 | 106:23 | 125:12,13 | 60:8 63:19 |
| **N** | 1:14,16 2:9 | 109:12,13 | **objections (1)** | 64:9 65:13 |
| **N (3)** | 3:5,8,9,10 6:3 | 111:2 115:11 | 4:7 | 66:9,14,21 |
| 3:2 4:2 6:2 | 6:10,21 7:8 | 115:19 | **obligated (1)** | 67:17 70:12 |
| **nail (1)** | 9:18,19 10:6 | 116:20 | 103:15 | 71:9 72:16 |
| 100:14 | 10:20 14:8 | 119:25 | **obligation (2)** | 73:6,13,21 |
| **name (17)** | 19:7 56:7,23 | 120:16 121:6 | 5:3 64:17 | 74:7 76:15 |
| 6:7 7:4 22:18 | 77:11 98:8 | 126:11,12,17 | **obligations (2)** | 79:9 82:8 |
| 35:6 36:25 | **newspaper (1)** | 127:3 128:24 | 40:8,12 | 89:4,6 92:9 |
| 37:6 39:17 | 66:4 | 129:24 | **obviously (3)** | 94:17 96:21 |
| 41:16 51:18 | **nine (1)** | 137:11 | 82:8 109:18 | 97:7 98:9 |
| 65:19 76:4 | 21:20 | **notified (1)** | 125:6 | 100:21 101:4 |
| 77:15 84:22 | **non-party (1)** | 60:15 | **occasions (2)** | 101:9,14 |
| 86:16 120:17 | 2:3 | **notify (1)** | 118:16,20 | 102:6,21 |
| 121:19 | **normally (1)** | 60:17 | **occurred (11)** | 104:2 106:4 |
| 122:21 | 98:19 | **November (1)** | 19:24 26:16 | 107:11 109:6 |
| **named (3)** | **Northern (3)** | 132:23 | 38:5 45:11 | 111:5 118:4 |
| 22:6,16 132:24 | 1:3,10 7:8 | **noxious (1)** | 52:7 80:14 | 123:17 124:6 |
| **names (3)** | **Notary (3)** | 18:14 | 101:8 106:3 | 124:25 125:5 |
| 101:17 121:2,4 | 2:8 6:3 136:16 | **number (17)** | 118:10 | 134:16 |
| **nature (2)** | **note (5)** | 18:24 21:13 | 119:14 | **officer (70)** |
| 66:17 79:3 | 61:9,20 84:6 | 28:13 42:11 | 132:23 | 1:16 4:10,17 |
| **Naythen (5)** | 114:20 | 42:12,20 | **occurrence (3)** | 7:10,11 19:13 |
| 46:14 103:7,8 | 125:12 | 43:15,19,20 | 26:12 102:10 | 19:25 24:19 |
| 103:22 | **noted (1)** | 43:22 44:24 | 102:14 | 24:20,23 |
| 114:18 | 136:6 | 56:25 64:16 | **October (2)** | 29:10 30:7 |
| **need (4)** | **notes (72)** | 71:6 77:3,25 | 27:24 70:23 | 31:5,11 32:20 |
| 4:18 21:25 | 6:12 21:10,19 | 96:11 | **offenses (1)** | 36:13,20 |
| 40:10 75:25 | 25:10,13,17 | **numbers (1)** | 96:6 | 37:21 41:24 |
| **needed (9)** | 25:24 26:4,6 | 12:22 | **office (82)** | 42:9,10 44:23 |
| 15:25 16:6 | 26:8,11,13,15 | **nuts (1)** | 8:19,21 10:12 | 45:15,16 46:8 |
| 18:2 38:2 | 26:24 27:3 | 73:9 | 10:24 12:2,6 | 48:11 52:16 |
| 42:18 55:8 | 32:24 35:5,14 | | 12:15,21 13:8 | 53:8 57:14 |
| 102:17 103:3 | 35:19,21 37:8 | **O** | 13:25 14:18 | 73:25 74:5,11 |
| 109:15 | 37:9,15,16 | **O (1)** | 15:3,13 16:12 | 74:15 78:20 |

| | | | | |
|---|---|---|---|---|
| 78:22 84:25 | once (4) | 108:4 | 131:25 | 97:25 |
| 86:22 89:25 | 14:9 58:18 | overcome (1) | 135:25 137:3 | pending (1) |
| 93:5 103:9 | 64:2,20 | 65:2 | 137:10 | 7:8 |
| 104:4 107:3 | One-Click (1) | overheard (1) | pages (2) | people (21) |
| 107:14,18,25 | 2:6 | 124:18 | 25:21 79:15 | 8:8 17:18,21 |
| 108:19,24 | ones (10) | overriding (1) | pants (1) | 26:9 29:4 |
| 111:4 112:12 | 44:25 46:4 | 22:23 | 120:10 | 35:3,23 36:9 |
| 112:21 113:2 | 47:17 57:13 | overturned (3) | paperwork (1) | 49:24 50:9 |
| 113:18,22 | 58:7 66:18 | 65:24 130:15 | 124:19 | 60:20 63:3,21 |
| 114:5 116:7 | 84:4,10 100:5 | 133:18 | paragraph (7) | 65:16 67:21 |
| 117:12,18 | 131:5 | Ozzborn (47) | 92:18,19,22 | 69:15 90:7 |
| 119:8,18 | Ontario (9) | 1:11 3:4 7:9 | 115:13,14 | 98:10,20 |
| 122:12 125:3 | 8:18,20 16:13 | 22:6,13 23:20 | 116:13 | 109:5 120:20 |
| 125:16,21 | 51:6 97:17 | 27:9,12 28:6 | 126:19 | people's (1) |
| 126:4 128:15 | 98:3 100:11 | 29:20 30:8 | part (15) | 49:13 |
| 129:12 | 100:20 101:9 | 47:6,20 63:4 | 14:2 23:17 | percentage (2) |
| 130:20 | open (1) | 63:21 66:18 | 25:9 33:11 | 43:22 125:15 |
| 134:17,20,24 | 104:7 | 67:21 69:2,3 | 40:2,11 59:25 | period (2) |
| officers (14) | opening (1) | 69:5,19 70:9 | 73:3 87:15,15 | 15:11 74:4 |
| 18:13,16 24:15 | 54:9 | 72:4,10 74:16 | 98:17,23 | person (10) |
| 24:17 36:19 | opportunity ... | 75:12 76:6,19 | 103:14 | 8:10 17:15 |
| 42:25 44:17 | 98:8 | 78:18 79:4 | 104:11 | 18:2 24:18 |
| 60:22 108:12 | oppose (8) | 88:14 90:16 | 118:12 | 31:3 32:5 |
| 108:15 109:6 | 60:24 62:10 | 90:21 91:3,6 | participate (1) | 39:12 53:22 |
| 118:4 120:24 | 63:25 64:3,10 | 91:8,14,16 | 134:20 | 90:5 124:21 |
| 125:11 | 65:13 70:12 | 92:4 105:9 | participating... | person's (1) |
| officers' (1) | 86:18 | 131:6,18 | 4:16 | 36:25 |
| 121:4 | opposed (3) | 132:6,7 | particular (12) | personal (8) |
| offices (1) | 112:18 132:11 | 134:25 135:6 | 17:15 31:23 | 77:2,5 78:6,8 |
| 98:19 | 132:16 | 135:15 | 39:13 50:21 | 78:15 82:4 |
| official (2) | options (1) | Ozzborn's (3) | 89:16 91:3 | 83:23 110:6 |
| 1:17 6:23 | 56:25 | 22:10 28:14 | 92:25 95:18 | personally (1) |
| okay (29) | order (1) | 30:24 | 97:4 110:22 | 99:10 |
| 22:4 27:4 43:4 | 68:10 | | 115:17 | perspective (2) |
| 46:14,17 56:6 | originally (1) | **P** | 116:25 | 53:6 57:4 |
| 61:7,10 69:12 | 68:14 | P (3) | particularly (... | pertaining (1) |
| 75:18,20,24 | OSI (5) | 3:2,2 4:2 | 44:20 | 82:21 |
| 76:2,10,11 | 101:18,22,23 | P-O-R-T-E-... | parties (7) | phone (11) |
| 78:25 79:21 | 102:21 | 115:23 | 2:5 4:5,14,20 | 49:24 76:18 |
| 80:8 83:2,19 | 105:18 | p.m (1) | 5:2 68:19 | 77:7 91:5 |
| 83:22 85:18 | outcome (1) | 136:6 | 138:14 | 102:2,19 |
| 94:8 115:10 | 138:15 | packet (2) | parts (1) | 104:12,19,22 |
| 116:16 119:4 | outset (1) | 19:19,19 | 6:21 | 105:25 124:7 |
| 133:2,5 136:3 | 57:19 | page (7) | party (3) | phones (2) |
| old (1) | outside (3) | 115:12 116:11 | 5:3,4 138:9 | 77:5,5 |
| 82:18 | 18:19 19:6 | 126:18 | pay-wise (1) | phonetic (1) |

| | | | | |
|---|---|---|---|---|
| 102:24 | 125:18 | 10:17 | **preparing (7)** | 13:24 14:5,7 |
| **phrase (7)** | **plants (1)** | **posed (1)** | 28:25 29:3 | 14:13,14 15:4 |
| 18:21 35:17,25 | 55:2 | 42:7 | 40:6 46:22 | 15:18,22 16:9 |
| 66:22 67:2,9 | **plate (1)** | **position (4)** | 52:22 107:22 | 17:25 18:3,19 |
| 110:22 | 32:9 | 8:23 15:17 | 135:9 | 19:2,6,10 |
| **place (9)** | **platform (1)** | 53:5 57:19 | **present (16)** | 23:8,9,17 |
| 4:18 26:22 | 6:20 | **positions (1)** | 4:14 23:18 | 24:11 30:15 |
| 50:24 51:4 | **plea (3)** | 112:18 | 25:19 27:18 | 32:3 33:9,15 |
| 77:19 87:14 | 40:23 55:14 | **possessing (1)** | 28:3 41:11,11 | 33:17,21,23 |
| 112:17 | 56:22 | 23:21 | 41:12,13 51:8 | 34:4,16 36:10 |
| 124:15 133:3 | **plead (8)** | **possession (8)** | 55:4 75:3 | 38:17 43:10 |
| **placed (7)** | 40:13,14,18,22 | 4:25 23:8 24:5 | 107:2 109:17 | 43:23 44:3 |
| 34:24 36:13,21 | 53:25 90:13 | 29:7,24 30:5 | 115:6 124:17 | 46:3,4,21 |
| 38:21 90:8 | 104:10 132:8 | 105:6 130:11 | **presentation ...** | 47:14 50:5,6 |
| 91:13 92:10 | **plead/senten...** | **possible (3)** | 74:25 90:18 | 53:14,15,18 |
| **placing (1)** | 132:15 | 81:3 125:16 | **presented (2)** | 57:13 69:7,20 |
| 90:7 | **pleading (2)** | 131:16 | 4:24 118:8 | 70:24 86:2 |
| **Plaintiff (2)** | 105:2 128:21 | **possibly (3)** | **presenting (4)** | 87:10 89:3 |
| 1:4,12 | **please (5)** | 53:9 54:24 | 4:23 20:10 | 90:3 96:14 |
| **plaintiff's (7)** | 7:14,19,24 8:3 | 118:19 | 22:12 24:10 | 97:10,13 |
| 6:13 25:21 | 37:13 | **post-it (1)** | **presently (1)** | 102:7,17 |
| 62:20 69:10 | **point (33)** | 84:6 | 7:7 | 103:4 110:4,7 |
| 82:22 130:7 | 17:23 28:17 | **potential (1)** | **press (1)** | 110:17,17 |
| 137:10 | 32:18 34:9,17 | 15:3 | 134:7 | 111:5 112:7 |
| **Plaintiffs (1)** | 38:12,24 | **potentially (1)** | **pretty (5)** | 112:14,19,23 |
| 3:3 | 39:22 40:8 | 30:16 | 16:21 24:9 | 113:4 118:13 |
| **plan (1)** | 45:5 50:14 | **practice (3)** | 41:21 98:25 | 121:7 123:21 |
| 41:23 | 52:13 53:7 | 9:17,20,23 | 110:14 | 125:4 132:22 |
| **planning (1)** | 72:13,20 74:8 | **practicing (2)** | **previous (2)** | **prisoner (1)** |
| 104:20 | 75:3 81:24 | 9:21 71:22 | 70:8 114:17 | 96:9 |
| **plant (1)** | 82:2 83:5 | **prep (9)** | **primarily (1)** | **prisoners (1)** |
| 125:19 | 91:12 94:11 | 106:12 107:3,5 | 13:23 | 36:22 |
| **planted (17)** | 96:8 101:18 | 107:14,17 | **primary (3)** | **prisons (2)** |
| 41:2 66:5 92:3 | 110:4 119:5 | 109:6,15 | 16:3 29:10 | 14:22 18:7 |
| 108:9,12 | 119:18 121:5 | 121:9 128:14 | 132:9 | **privilege (1)** |
| 116:8,14,21 | 126:7 127:11 | **preparation (...** | **principals (1)** | 128:8 |
| 117:13 | 128:5,10 | 29:17 40:3 | 22:23 | **probably (16)** |
| 122:13 | 135:7 | 106:24 | **printed (1)** | 24:22 45:5 |
| 123:25 | **Points (1)** | **preparations...** | 82:19 | 55:13,16 |
| 125:23 | 17:24 | 135:13 | **prior (10)** | 56:13 65:5 |
| 126:15,24 | **police (6)** | **prepare (2)** | 4:25 11:23 | 72:2,25 80:13 |
| 133:10 134:3 | 14:9,12 85:7,9 | 38:13 85:9 | 25:8 28:7 | 84:7 90:23 |
| 135:20 | 85:15 109:6 | **prepared (5)** | 56:15 107:17 | 96:10 103:12 |
| **planting (4)** | **Porten (1)** | 26:6 39:25 | 108:7,14,19 | 114:4 129:10 |
| 35:2 93:6 | 115:23 | 61:21,25 | 108:22 | 129:14 |
| 121:22 | **portion (1)** | 109:10 | **prison (71)** | **problem (8)** |

39:6 41:3
42:2,4 84:14
119:9,13
123:6
**problematic ...**
42:9
**problems (3)**
34:15,25 53:12
**procedurally...**
68:10
**procedure (2)**
64:2 67:4
**proceed (1)**
50:14
**proceeding (1)**
89:13
**proceedings (...**
71:12
**process (3)**
38:12 49:9
58:16
**produced (1)**
116:3
**Promoting (4)**
23:9 24:11
69:20 132:21
**prosecute (3)**
31:13 96:9
112:6
**prosecuted (7)**
59:12 60:7
86:5 88:24
97:14 118:17
124:9
**prosecuting (...**
14:18 17:13
22:5,15,24
23:7 26:19
86:13 91:21
102:18 103:6
104:24 112:5
**prosecution (6)**
14:21 27:8
85:14 90:16
104:20
124:13

**prosecutions ...**
13:24 14:5
15:25 16:9
18:6 85:4
96:4,5 98:7
**prosecutor (1...**
15:24 16:2,3
22:9,11,21
89:3,10 91:24
95:24 97:10
110:3 112:10
**Prosecutors (1)**
56:8
**provide (3)**
7:6 8:4 77:17
**provided (5)**
2:7 21:21
52:23 73:21
131:19
**providing (1)**
8:5
**pry (1)**
73:8
**public (14)**
2:8 6:3 8:18,21
8:22 16:13
50:15 51:7
97:17 100:11
100:20 101:9
106:4 136:16
**publication (1)**
133:25
**pull (1)**
38:18
**pulled (2)**
32:18 58:6
**pure (1)**
134:3
**purpose (5)**
4:21 28:23
60:11,13,16
**purposes (3)**
54:25 55:4
82:13
**pursuant (3)**
2:5 4:14 11:9

**pursuing (1)**
77:10
**put (21)**
11:5 32:21
33:18 34:21
35:22 37:2,4
53:4 89:6
119:19,22
120:4,9,9,20
121:7,10,13
123:11,23
126:13
**putting (5)**
34:18,20
120:18
121:15,25

**Q**

**Quarterly (2)**
94:16,19
**question (15)**
4:7 7:15,18,21
8:4,6 16:8
31:19 33:5
43:9 44:13
59:18 80:5
114:9 129:2
**questioning (2)**
4:25 121:8
**questions (6)**
35:9 75:15,23
76:7 129:25
135:5
**quick (3)**
75:17 84:14
110:14
**quickly (2)**
35:5 37:12
**quite (2)**
21:3 39:22
**quote (3)**
117:15,18
125:11
**quoted (3)**
66:3 133:25
134:4

**R**

**R (4)**
3:2 4:2 6:2
138:2
**racked (1)**
54:5
**raid (1)**
50:5
**randomly (1)**
44:23
**rapport (2)**
108:19 112:22
**razor (1)**
32:19
**re-prosecutio...**
65:6
**reach (1)**
102:21
**reached (2)**
32:18 77:24
**reaching (1)**
76:17
**reacted (1)**
122:18
**read (6)**
10:17 25:19
61:8,10 132:5
132:12
**reading (1)**
39:10
**real (3)**
11:6 73:9
84:14
**realized (1)**
30:18
**really (23)**
12:10 18:17
23:18 24:24
25:3 27:17
35:5,10 37:12
50:19 55:16
73:7 77:20
87:5,14 91:24
97:3 98:2,21
98:23 119:2

122:19 128:2
**reason (15)**
10:22,25 11:6
38:21 44:5,7
44:15 55:7
64:8 67:3,11
68:16 110:3,8
124:12
**reasonable (1)**
83:21
**rec (1)**
32:13
**recall (93)**
19:25 20:4,18
22:5,8,10,13
22:15,17,19
28:18 29:20
33:6 41:12
46:23 49:23
57:6,9,16,23
58:2,20,24
59:19 60:14
61:2,12,14
65:16,19,19
65:23 66:2,3
66:6,7 71:14
71:18,20 72:8
74:14,18 75:8
75:9,10 76:24
78:13 81:20
82:5 84:19
87:21 88:23
89:2,8,25
90:4,20,25
91:2,5,7,9,11
91:12 100:21
101:24
102:16 104:5
104:11,21
105:6 106:2,5
113:20 114:7
114:17,18,21
118:22 119:2
129:2,5,6,12
129:19 133:9
133:13,23

| | | | | |
|---|---|---|---|---|
| 134:5,6,7 | **records (7)** | 55:24 63:20 | **remote (2)** | 26:8 65:2 |
| 135:12,17 | 50:22 83:6 | 76:21 82:16 | 2:7 4:16 | 79:24 103:16 |
| **recalled (3)** | 84:17 91:6,10 | 132:19 | **remotely (1)** | 103:17 |
| 50:2 75:6 | 104:13,19 | 135:14 | 4:18 | **reserve (1)** |
| 77:12 | **recovered (13)** | **regarding (14)** | **reopen (2)** | 75:22 |
| **receive (2)** | 20:13 23:13,19 | 12:2 37:8,10 | 58:18 63:25 | **reserved (1)** |
| 9:9 76:13 | 24:20 25:4 | 57:8 61:13 | **reopened (1)** | 4:8 |
| **received (4)** | 29:9 30:7 | 63:3 67:21 | 58:18 | **respect (5)** |
| 6:12 33:13 | 31:3,12 50:7 | 69:13,19 70:9 | **rephrase (4)** | 81:13 99:3 |
| 62:20 76:13 | 74:16 123:3 | 73:16,22 | 7:15 15:16 | 105:16 111:5 |
| **receiving (1)** | 123:10 | 100:3 103:18 | 44:11 76:10 | 120:18 |
| 115:13 | **recovering (2)** | **regards (1)** | **replacing (1)** | **respective (2)** |
| **recognize (2)** | 31:16 87:13 | 48:19 | 124:23 | 2:4 4:4 |
| 25:23 63:9 | **recovery (5)** | **regret (1)** | **report (9)** | **respond (1)** |
| **recollection (...** | 29:12 30:21 | 55:16 | 19:12,17 38:19 | 31:18 |
| 19:15 21:24 | 39:13 59:3 | **regretted (2)** | 39:8 41:4 | **responded (1)** |
| 23:22 24:6 | 87:2 | 54:3 55:19 | 84:21 122:10 | 87:12 |
| 29:13 30:6 | **refer (9)** | **relaid (2)** | 122:23,24 | **response (3)** |
| 31:20 33:11 | 27:3 32:23 | 52:5 123:13 | **reporter (7)** | 25:16 34:4 |
| 35:15 36:7,16 | 37:11 46:11 | **related (2)** | 4:15,19 6:24 | 36:24 |
| 45:22 48:20 | 55:21 67:19 | 34:11 78:7 | 8:9 10:14,18 | **responsibiliti...** |
| 52:8 57:12 | 71:2 101:18 | **relationship ...** | 51:24 | 15:14,22 |
| 60:3 63:18 | 106:16 | 98:24 | **Reporting (1)** | **responsible (4)** |
| 80:12 81:5 | **reference (2)** | **relative (4)** | 4:17 | 20:14 22:11 |
| 89:12,15 | 85:5 129:21 | 19:23 131:5,17 | **reports (6)** | 25:5 123:9 |
| 119:24 | **referenced (4)** | 132:3 | 14:13 19:16 | **restate (1)** |
| 120:16 133:6 | 26:8 84:4,11 | **relaxed (1)** | 39:6 43:12 | 7:20 |
| **recommenda...** | 103:6 | 109:14 | 77:16 132:11 | **result (2)** |
| 84:16 | **references (1)** | **relaying (1)** | **represent (2)** | 64:16 85:12 |
| **recommende...** | 67:22 | 50:9 | 24:12 76:5 | **retaliate (1)** |
| 14:7 56:10 | **referencing (1)** | **relevant (8)** | **representatio...** | 114:14 |
| **recommendi...** | 119:14 | 7:7 25:10 | 61:16 | **retaliated (1)** |
| 84:13 | **referring (10)** | 26:17 27:8 | **represented (...** | 33:25 |
| **record (10)** | 36:18 46:14 | 37:22 55:4 | 60:20 132:24 | **retaliation (1)** |
| 13:11,13 62:16 | 47:13,17 56:3 | 83:7,24 | 138:9 | 113:16 |
| 62:18 68:24 | 61:20 69:4 | **remain (1)** | **represents (2)** | **retaliatory (1)** |
| 70:18,21 | 81:23 93:5 | 16:24 | 76:19 78:18 | 33:15 |
| 103:14 | 101:13 | **remember (12)** | **request (2)** | **returned (1)** |
| 107:13 | **reflect (1)** | 42:16 57:18 | 78:4 103:13 | 74:11 |
| 138:11 | 61:17 | 60:22 62:8 | **requested (5)** | **returning (1)** |
| **recorded (4)** | **refresh (4)** | 76:16,20 | 10:16 48:24 | 47:24 |
| 4:20 6:22 | 23:22 24:6 | 78:12 89:19 | 84:18,19 | **reveal (1)** |
| 80:24 107:5 | 63:17 133:6 | 90:15 114:23 | 122:22 | 64:18 |
| **recording (4)** | **regard (10)** | 129:3,4 | **requesting (1)** | **revealed (2)** |
| 4:20 80:17 | 21:15 26:12 | **remembranc...** | 103:10 | 31:7 46:7 |
| 107:8,9 | 37:15 48:15 | 12:11 | **required (5)** | **revealing (1)** |

| | | | | |
|---|---|---|---|---|
| 49:14 | riot (2) | 130:18 134:2 | 115:14 | served (3) |
| revelations (2) | 33:18,20 | says (9) | 116:17,22 | 11:10 55:7 |
| 55:24 65:25 | role (7) | 62:4 66:23 | 117:15 122:6 | 59:2 |
| review (9) | 20:12 33:18,21 | 80:7 92:24 | 131:21 132:2 | Service (1) |
| 15:3 19:14.21 | 34:13 58:11 | 93:3 116:22 | 134:15 | 4:17 |
| 21:23 25:15 | 86:9 87:17 | 117:2,15 | seeing (2) | session (9) |
| 45:16 63:7 | Rome (6) | 121:6 | 74:14 87:13 | 106:8,12 107:3 |
| 94:17,19 | 68:23 70:19 | scan (2) | seeking (2) | 107:5,14,15 |
| reviewed (7) | 71:16,21 72:5 | 131:21,22 | 65:24 68:11 | 107:17 121:9 |
| 19:10 25:14 | 72:9 | school (6) | seen (1) | 128:15 |
| 45:24 46:3 | room (9) | 9:11,13,14 | 124:19 | set (5) |
| 79:18 124:11 | 38:5,6 51:5 | 10:4 94:25 | select (1) | 32:8 34:3 |
| 124:12 | 53:20 54:8 | 95:2 | 14:20 | 123:15 |
| reviewing (7) | 107:4,9,12 | sealing (1) | selecting (1) | 125:11 |
| 19:4 42:22 | 115:24 | 4:5 | 43:21 | 138:18 |
| 43:10 63:17 | rooms (2) | Sean (6) | senior (2) | setting (3) |
| 79:19 91:5,10 | 6:21 107:10 | 29:5 103:12 | 98:13,16 | 11:17,19 48:7 |
| Richard (2) | Rosario (3) | 113:10,15 | sense (8) | settings (1) |
| 3:6 7:4 | 52:18 54:18,19 | 114:4 116:9 | 13:22 15:15 | 7:25 |
| rid (2) | rough (1) | search (9) | 26:5 36:18 | seven (5) |
| 90:2 108:16 | 12:11 | 24:17 25:4 | 76:10 101:19 | 12:25 13:15 |
| right (41) | roughly (1) | 29:12 30:20 | 109:20 | 45:23 65:9 |
| 7:2 26:14 | 54:21 | 32:17 39:12 | 118:15 | 87:25 |
| 27:16,25 | Rubenstein (2) | 50:5 115:20 | sent (17) | share (2) |
| 31:10 32:16 | 3:3 7:5 | 132:10 | 59:11 60:5 | 54:12 87:6 |
| 39:16,17 | rules (2) | searched (1) | 65:8,12 66:13 | sheet (5) |
| 50:25 51:3,19 | 6:17 7:14 | 120:10 | 67:25 68:2,7 | 22:2 131:8,11 |
| 54:5 67:5 | Ryan (1) | searches (1) | 70:15 71:13 | 131:12,23 |
| 82:9 83:15,17 | 132:24 | 118:10 | 84:3 88:4,11 | shielded (2) |
| 88:16,19,25 | Rynecki (2) | second (4) | 88:14 92:14 | 72:14,17 |
| 91:23 92:16 | 3:3 7:5 | 62:16 92:18,19 | 105:8,8 | short (4) |
| 97:8 98:5 | | 92:21 | sentenced (10) | 77:7 97:20,22 |
| 100:9 101:11 | **S** | section (1) | 27:12,14,21,24 | 97:23 |
| 101:15 | S (4) | 4:14 | 28:4,7,16 | shortly (1) |
| 105:15 | 3:2 4:2,2 6:2 | securing (1) | 69:2,5 70:22 | 74:8 |
| 106:15 | safe (1) | 87:16 | sentencing (2) | showed (1) |
| 111:24 117:5 | 74:19 | see (27) | 27:19 28:16 | 66:18 |
| 117:9 121:16 | Saturday (1) | 12:7 20:20 | separate (4) | side (4) |
| 122:7 123:14 | 38:14 | 21:6 25:17 | 4:16 67:6 | 58:20 71:4,6 |
| 124:25 | saying (15) | 38:18,22 46:4 | 132:3,4 | 86:20 |
| 126:25 128:3 | 6:18 8:7 35:11 | 56:23 59:16 | sequence (1) | signed (8) |
| 128:22 | 45:10 58:16 | 60:12 71:10 | 122:16 | 4:9,10 59:15 |
| 129:10 131:3 | 78:18 91:13 | 74:20 81:13 | sergeant (1) | 60:5 63:2,13 |
| 131:21 | 102:13 123:9 | 85:16 92:21 | 115:20 | 70:4 130:8 |
| right-hand (1) | 126:14,22,24 | 93:3 109:24 | serve (2) | significant (3) |
| 71:6 | 127:15 | 114:2,11 | 54:24 56:14 | 43:19 60:18 |

97:25
similar (4)
66:17,17 88:12
130:6
single (3)
30:15 39:10
46:3
sit (1)
14:10
situation (4)
39:11,11 42:15
123:2
slow (1)
110:11
small (3)
49:10 73:6
97:7
Smart (1)
109:9
sole (1)
110:8
somebody (3)
39:23 49:7
89:5
somebody's (1)
120:10
sorry (4)
41:18 43:4
51:7 134:9
sort (2)
128:7 131:16
sorts (2)
18:6 23:9
sound (3)
27:16,25 50:25
sounded (1)
50:4
sounds (2)
51:3 106:15
source (1)
32:3
speak (10)
47:16 48:6
51:25 78:24
79:8,11 87:21
102:22 103:2

113:9
speaking (8)
24:14 26:3
33:2,2 54:16
54:22 110:18
134:7
special (2)
50:24 101:14
specific (26)
10:22,25 11:6
13:19,21 16:8
22:19 24:21
26:7 31:8,15
42:17 43:14
43:15 48:10
60:23 68:16
71:14,18,20
104:18
112:16
114:19 115:2
117:18
120:13
specifically (...
12:4 18:10
19:22 20:6
21:6 22:14
26:15 28:19
32:24 33:6
35:14 36:21
48:24 56:3
59:18 60:13
60:14 61:3,23
62:8 72:3
75:9,11 76:21
76:24 78:11
81:20 84:19
85:20,22
88:23 89:2
102:5,15
104:6,21
105:15
112:13
113:10,19
116:9,20
120:9 121:10
121:15

126:23 129:6
129:19
135:12,17
specifics (3)
22:18 50:2
58:2
speculation (2)
66:4 134:4
spelling (1)
102:24
spoke (4)
57:17 74:7
100:6 128:15
spring (1)
21:9
stack (1)
14:12
staff (5)
34:8 98:13,16
99:21,23
standard (1)
87:23
started (20)
9:3 12:9,23
13:23 17:20
20:20,24 21:7
35:8 46:2
50:15 53:22
80:13,16
81:21 95:21
96:4 100:18
101:12 125:2
starting (2)
20:22 81:22
startled (1)
34:23
starts (2)
115:13 116:14
state (22)
1:7,7,14,15,16
2:9 3:8,9 6:3
6:22 7:16
9:18,19 14:8
14:11 56:8
61:23 69:6
70:23 85:7,9

85:15
statement (1)
50:17
states (4)
1:2,9 61:21
69:18
Statue (1)
67:8
status (1)
28:19
statute (2)
67:6,16
statutory (3)
23:15 64:19
67:11
stenographer...
6:24
stenographic...
138:8
step (2)
39:21 41:14
steps (2)
31:16 57:8
STIPULATE...
4:4,7,9,13,23
Stony (1)
94:18
stood (2)
46:18 59:4
stop (2)
75:19 76:9
stored (1)
82:11
straight (1)
26:11
strange (1)
100:22
Street (1)
3:5
strip (3)
115:17 117:8
117:11
strong (1)
55:3
subject (1)
58:17

subjected (1)
92:25
submit (1)
58:14
submitted (1)
64:3
subpoena (8)
2:5 24:14,16
25:9,16 76:12
77:22 78:2
subpoenaed (...
20:7,11,16
99:14
subpoenas (3)
11:9 77:21,23
Subscribed (1)
136:12
subsequently...
117:7
substance (2)
11:20 18:14
successful (1)
65:6
Suite (2)
3:5,10
summaries (5)
58:8,9 84:14
130:25
131:15
summarized...
93:14
summary (4)
84:12 131:7,13
132:13
summer (1)
21:9
SUNY (1)
94:3
SUPERVISI...
1:16
supervisor (3)
16:17,21
132:10
supply (1)
5:3
supposed (1)

| | | | | |
|---|---|---|---|---|
| 113:16 | 75:25 80:15 | 6:4 20:23 44:4 | 45:25 50:10 | 131:6 132:6,7 |
| **Supreme (1)** | 83:5,10 87:16 | 80:3 119:17 | 56:14,14 58:3 | 134:25 135:6 |
| 68:6 | 124:15 127:5 | 122:4 | 58:3,8,12,21 | 135:14 |
| **sure (31)** | 131:20 | **testify (6)** | 67:14 72:18 | **thought (4)** |
| 9:5 10:14 | **taken (5)** | 26:9 38:3 55:5 | 74:8 76:24 | 44:12 52:10 |
| 17:11 18:22 | 2:4 38:8 55:24 | 79:24 111:23 | 77:23 78:3 | 58:7 112:25 |
| 18:23 21:3 | 87:3 138:7 | 130:20 | 79:16,22 | **three (7)** |
| 23:14 26:10 | **talk (11)** | **testifying (1)** | 80:13 81:3 | 14:10 20:21 |
| 26:25 34:12 | 8:8 26:9 34:10 | 111:4 | 83:9 84:11 | 53:19,24 81:4 |
| 38:12 39:16 | 37:24 52:14 | **testimony (14)** | 86:7,14 87:24 | 81:9 105:23 |
| 39:22 46:13 | 71:23 76:23 | 7:6 11:10,21 | 88:10,22 89:7 | **throwing (1)** |
| 47:13 54:6,11 | 100:2 102:14 | 12:2 19:23 | 90:15 92:15 | 18:15 |
| 59:19 77:18 | 106:7 110:14 | 25:11 29:16 | 92:19 93:17 | **thumbs (2)** |
| 83:14,15 | **talked (9)** | 29:18 73:22 | 95:15 96:20 | 58:12,13 |
| 85:19 109:16 | 41:16 48:4 | 87:3 107:23 | 97:9 98:24 | **time (40)** |
| 118:3 122:18 | 71:21 79:14 | 135:14 138:7 | 100:6,12 | 4:8 8:8,10 |
| 128:2,4 | 80:2 99:4,25 | 138:7 | 101:3,7,12,17 | 10:10 15:11 |
| 131:20,20 | 105:18 125:6 | **testing (2)** | 103:6 105:18 | 16:17,25 17:5 |
| 132:7,9 | **talker (3)** | 20:14 24:24 | 106:13,16,20 | 20:15 21:11 |
| **suspended (3)** | 109:21,23,24 | **text (1)** | 106:22 107:8 | 23:6 25:18 |
| 74:4,9,12 | **talking (4)** | 115:16 | 107:11 109:3 | 28:20 29:5 |
| **sustain (2)** | 8:10 35:9 | **thank (3)** | 111:8 112:8 | 34:16 40:16 |
| 64:25 104:3 | 56:15 79:20 | 51:22 75:16 | 113:13 114:2 | 41:5 42:15 |
| **sworn (8)** | **tasked (1)** | 132:18 | 114:8,9 | 45:6 68:25 |
| 4:9,11,18 6:2 | 93:13 | **thing (3)** | 116:25 | 74:4 75:13 |
| 9:11,15 | **teacher (1)** | 19:17 58:5 | 119:17 120:8 | 77:19,19 |
| 136:12 138:6 | 94:10 | 76:24 | 120:11 121:4 | 81:17 94:4 |
| **synthetic (1)** | **tell (13)** | **things (23)** | 122:9 124:10 | 96:8 99:5,6,6 |
| 112:4 | 20:6 26:23 | 23:25 24:24 | 127:23 | 113:22 |
| **Syracuse (1)** | 43:24,24 77:6 | 31:9 35:12 | 128:14 | 114:15,16 |
| 3:10 | 79:2 108:11 | 37:25 39:5,6 | 134:19 | 116:7 118:3 |
| **system (5)** | 118:24 | 49:13 57:22 | **thinking (1)** | 119:15 |
| 33:17 53:14,15 | 121:21,24 | 71:21 73:5,6 | 40:7 | 123:20 128:3 |
| 102:17 103:4 | 128:6,11 | 81:23 82:15 | **third (1)** | 135:7 136:6 |
| | 133:21 | 86:14,20 | 115:12 | **timeline (2)** |
| **T** | **telling (2)** | 93:16 99:7 | **Thomas (30)** | 37:18 100:13 |
| **T (4)** | 90:2 127:7 | 109:9 123:22 | 1:11 3:4 7:9 | **times (7)** |
| 4:2,2 138:2,2 | **ten (2)** | 125:7 129:15 | 22:6,9 23:20 | 42:12 89:4 |
| **tainted (1)** | 130:12,14 | 130:3 | 27:8,11 28:6 | 105:17 |
| 64:14 | **term (2)** | **think (81)** | 29:20 30:8 | 107:17 109:4 |
| **take (20)** | 36:8 118:2 | 12:10 18:16 | 47:6 63:3,21 | 109:11,19 |
| 8:9 14:17 | **terms (1)** | 21:2,5 28:3 | 67:21 68:2 | **timing (1)** |
| 26:18,21 | 12:21 | 32:7,17 34:17 | 69:19 72:4 | 55:12 |
| 36:12 51:4 | **tester (1)** | 36:3 38:17 | 74:16 76:6 | **timing-wise (1)** |
| 61:5,8 62:23 | 59:2 | 39:20 42:7,18 | 78:18 88:14 | 55:10 |
| 63:6,20 69:9 | **testified (6)** | 42:19 44:19 | 90:16 91:3 | **tip (2)** |

115:14
118:18
**tired (1)**
98:6
**title (2)**
13:3 112:10
**today (15)**
6:25 7:6 11:9
11:11,14,24
12:3 19:22
21:24 25:8,11
25:25 37:17
67:14 73:18
**today's (3)**
25:22 62:24
69:11
**told (28)**
23:20 24:4
27:14,23
29:22 32:10
38:9 40:24
41:6 46:9
48:3,15 52:2
52:9,17 54:17
77:21 90:8
108:8,14
117:4 119:9
122:3 123:21
123:24 124:3
125:17
126:23
**Tom (8)**
41:16,17,18,18
50:18 101:7
101:21
105:19
**tooth (1)**
24:5
**top (2)**
65:20 119:3
**total (1)**
71:6
**touch (2)**
99:20,23
**tough (1)**
102:7

**tracked (1)**
77:3
**Training (1)**
56:8
**transcribed (1)**
138:8
**transcript (4)**
5:3 10:17
21:22 138:11
**transitions (1)**
32:25
**transpired (7)**
32:25 35:16
49:22 54:15
59:17 61:17
62:6
**trial (28)**
2:3 4:8 26:18
28:18,25 29:3
29:4,15,18
37:25 40:2,6
42:6,12 46:22
65:2,22
104:10
107:23,24
118:9 129:7
129:18
132:22 133:3
133:21 138:4
138:12
**tried (6)**
45:25 72:18
73:7 86:8
108:15
126:21
**trigger (1)**
53:12
**triggers (1)**
30:25
**trouble (1)**
33:8
**true (4)**
59:9 99:11
110:19
138:11
**try (7)**

7:25 45:8
75:17 98:8
110:7 114:13
128:18
**trying (9)**
34:2 41:22
48:22 49:25
90:2 111:2,20
127:21,23
**turn (3)**
45:3,4 103:18
**turned (1)**
103:21
**tweezers (3)**
23:21,25 29:23
**two (17)**
7:7 8:8 11:9
14:9 21:4
51:16 61:12
61:18 71:3,19
82:22 88:13
92:10 95:23
131:17 132:9
132:15
**two-and-a-h...**
8:24
**two-months (...**
45:11
**type (2)**
13:17 33:20
**types (4)**
13:19 15:19
16:4 65:7
**typical (1)**
107:13
**typically (2)**
91:19 108:24

**U**

**U (1)**
4:2
**ultimately (6)**
57:24 86:17
93:15 99:19
103:25
104:10

**unauthorize...**
4:21
**unavailable (1)**
89:5
**undergrad (1)**
94:2
**Undergradu...**
94:6
**understand (4)**
8:11 85:20
110:9 126:10
**understandi...**
34:7 49:20
120:6
**understood (2)**
7:2,19
**unfounded (1)**
104:8
**uniform (1)**
109:8
**UNITED (2)**
1:2,9
**University (2)**
94:4,18
**unsure (1)**
40:4
**unusual (11)**
19:15 38:18
39:8 43:11,20
84:21 111:9
111:21
122:10,22
126:3
**upset (3)**
127:6,9,11
**Upstate (1)**
10:20
**urine (1)**
18:15
**use (4)**
35:17 45:7
87:5 104:20
**uses (1)**
110:16
**usually (5)**
23:11 85:24

86:18 112:2,4

**V**

**V-A-L-D-I-N...**
13:6
**V-A-S-I-L-E ...**
18:4
**vacate (3)**
65:14 68:12
70:12
**Valdina (10)**
13:5 15:8
16:22 17:4,11
41:13 57:10
57:17 58:10
59:23
**Vasile (2)**
18:3 38:16
**VC (3)**
2:5,6,7
**vehicles (1)**
50:6
**vehicular (1)**
96:7
**verify (1)**
38:25
**Vermont (5)**
9:14 93:17,24
95:3,14
**verse (1)**
65:17
**version (4)**
97:20,21,22,23
**versus (6)**
29:4 63:3,21
67:21 69:15
120:5
**video (3)**
4:15 5:2
134:15
**videoconfere...**
2:7 3:2 4:16,19
**videotape (1)**
80:25
**violation (1)**
4:21

77:20
**voicemail (1)**
76:25

**W**
W-H-I-T-S-...
51:24
**wait (2)**
8:3,5
**waited (3)**
40:4 77:23
81:4
**waiting (3)**
28:16 77:21,22
**waived (1)**
4:5
**walked (2)**
40:7,23
**want (43)**
10:8,13 12:7
21:17 24:19
24:23 27:2
32:12,15 33:9
38:14 41:8,14
44:25 49:4
50:17 51:16
52:14 57:4,16
65:21 67:19
71:2 73:2
76:10 77:22
78:15 81:24
82:5 83:3,5
85:18 92:13
97:20 100:14
100:15
102:22
103:21
104:19
116:11
124:22
127:15
131:20
**wanted (10)**
14:20 26:10
38:22 54:7
67:10,10

102:20
109:16
122:20 127:5
**wasn't (18)**
38:11 39:18
44:20 45:7
49:10 54:4,6
54:11,19
58:22 87:12
97:4 99:13
109:10
111:17,24
123:7 126:14
**way (23)**
7:17 11:5
13:18 28:5,11
31:2 33:18
35:23 37:3
38:25 59:3
64:24 86:6,16
95:11 99:9,17
107:6 109:3
111:12
116:13
118:14 127:3
**we'll (1)**
7:25
**we're (7)**
26:4 42:21
67:12 69:23
75:25 83:13
101:13
**we've (6)**
25:21 37:17
62:24 69:10
79:14 99:25
**weapon (55)**
29:9 31:24
32:5,11,15,21
37:3,4 38:21
39:14 41:2
55:6 66:5
75:2 85:23
87:2,11 90:9
91:13 92:3,10
93:6 104:14

114:24 115:6
115:18 116:3
116:8,15,21
117:5,8,13
118:16
120:10 121:7
121:10,13,16
121:22,25
122:13 123:5
123:7,10,23
123:25 124:9
125:18,19,23
126:13,15,25
133:10
**weapons (27)**
18:10 24:3
34:19,20,22
34:24 35:3,23
36:13,21 55:2
75:6,11 85:25
87:13 90:6
105:3,5 108:9
108:12
111:24 112:3
118:6 119:19
120:18,20
135:20
**wedding (1)**
53:17
**week (4)**
12:9 29:18
100:18,23
**weeks (1)**
30:13
**went (15)**
10:11,23 30:14
37:3 38:15
45:25 93:17
94:25 95:15
96:4,20 97:16
118:9 123:17
129:17
**weren't (4)**
43:17 85:17
86:17 90:23
**West (1)**

3:10
**whatsoever (1)**
87:17
**WHEREOF ...**
138:18
**Whitsett (5)**
51:21,22,25
52:7,9
**wife (1)**
11:2
**wife's (1)**
53:14
**willing (3)**
76:23 77:17
78:23
**wish (1)**
21:23
**withstanding...**
5:3
**witness (40)**
2:4 4:15,18,18
4:24,24 21:16
23:5,18 39:10
42:11,24 43:4
43:7 45:17
47:19,23 49:3
49:6 54:25
59:13 60:9
64:14 72:25
73:3 83:17
86:5,19,23
87:18 111:14
130:20
132:16 135:8
135:16 136:2
137:3 138:6
138:12,18
**witness's (1)**
4:19
**witnessed (1)**
25:2
**witnesses (10)**
20:11 23:11,15
25:7 75:3
86:24 115:6,7
115:17 123:4

**word (5)**
36:16 72:14
98:5 110:22
117:22
**words (3)**
120:3 121:12
127:16
**work (15)**
7:4 10:10
16:21 17:4,8
29:17 38:15
77:4,4 78:6
82:3,6 93:13
98:20 108:4
**worked (9)**
13:18 16:17
17:2 51:20
71:7 95:19
98:25 111:13
124:24
**working (10)**
12:5,14,22,24
15:12 16:13
22:23 38:17
98:3,11
**works (1)**
77:11
**wouldn't (11)**
28:2 59:9,25
60:24 72:17
81:19 87:4
99:9 127:21
133:19,20
**write (5)**
63:11 80:6
81:4,8,15
**written (7)**
4:20 50:17
67:5 87:20
113:15
114:19 132:6
**wrong (5)**
12:12 40:17
79:6 106:5
114:16
**wrongdoing ...**

53:9
**wrote (5)**
35:20 81:10,17
84:7 117:22

**X**

**x (4)**
1:3,9,11,19
**xxxx (1)**
4:12

**Y**

**yard (1)**
32:13
**yeah (4)**
105:22 106:18
109:14
118:11
**year (3)**
9:9 96:5
100:25
**years (13)**
8:25 21:4 69:6
70:23 94:14
94:22,23,24
95:23 96:3,25
97:2 119:5
**York (24)**
1:3,7,7,10,14
1:15,16 2:9
3:5,8,9,10 6:3
6:10,22 7:8
9:18,19 10:6
10:20 14:8
19:7 56:7
77:11
**young (2)**
53:8 109:2

**Z**

**Zoom (1)**
6:19

**0**

**1**

**1 (6)**

6:13 25:22
79:14,22
115:12
137:11
**1:34 (1)**
136:6
**10:12 (1)**
2:8
**102 (1)**
3:10
**10th (2)**
81:14,16
**11 (1)**
27:15
**112541 (1)**
3:5
**11th (4)**
27:24 69:6
81:14,16
**12 (3)**
46:7 47:5,25
**12th (4)**
74:8 80:16
81:15,22
**130 (1)**
137:6
**13204 (1)**
3:10
**134 (1)**
137:7
**14425 (1)**
6:11
**16 (2)**
2:8 3:5
**16th (4)**
55:22 56:4
138:5,19
**1717 (1)**
3:5
**17th (1)**
100:17
**18th (1)**
70:23
**191 (1)**
6:10
**1995 (1)**

94:6

**2**

**2 (11)**
62:21,25 66:19
67:20 69:6
70:23 88:16
92:13 115:12
130:7 137:12
**20 (4)**
31:14 87:11
106:20,22
**2007 (3)**
9:11 93:23
95:3
**2008 (1)**
9:12
**2014 (5)**
10:8,9 12:8,10
20:25
**2015 (4)**
12:13 20:21
21:7,10
**2015-191 (1)**
67:23
**2016 (23)**
19:24 27:6,15
27:24 28:8,23
31:5 41:25
45:14 46:7
47:25 55:22
61:6,21 63:2
69:6 70:23
71:9,14
106:10 130:8
132:23
134:23
**2016-095 (1)**
69:16
**2017 (6)**
9:4 50:25
100:25 101:2
101:12,22
**2020 (3)**
2:8 138:5,19
**20th (1)**

61:6
**22nd (1)**
61:21
**23-page (1)**
84:24
**23rd (3)**
63:2 71:9
130:8
**28th (1)**
9:6
**29th (1)**
50:25

**3**

**3 (8)**
62:21 69:11
88:16 92:14
116:11
126:18 130:7
137:12
**30 (3)**
106:13,21,22
**30-minute (1)**
31:14
**3113(d) (1)**
4:14
**3rd (2)**
9:16,23

**4**

**4 (2)**
69:6 70:23
**440 (15)**
56:21 57:22
58:16,17
60:25 64:2,10
64:21 66:9
67:8 68:15
72:10 105:12
132:11,17
**440s (1)**
86:13
**45 (2)**
106:13,25
**4th (1)**
9:21

**5**

**6**

**6 (2)**
137:4,11
**615 (1)**
3:10
**62 (1)**
137:12

**7**

**7/16/2020 (1)**
1:20
**76 (1)**
137:5

**8**

**9**

**9:17-CV-010... (1)**
1:5
**9:17-CV-103... (1)**
1:13
**97 (1)**
94:7
**98 (1)**
94:7
**9th (24)**
27:6 28:8,13
28:23 30:13
31:5 41:25
48:5,13 80:16
80:21 81:5,8
81:18 105:16
105:21
106:10 108:8
108:15 110:5
113:9 119:11
134:23 135:2

# CORRECTION / ERRATA SHEET ▶LEXITAS™

The Letter of the Law. The Spirit of Service.

_____, being duly sworn, deposes and says: I have reviewed the transcript of my deposition / hearing taken on _____. The following changes are necessary to correct my testimony.

## CASE CAPTION:

| Page: | Line: | Should read / Corrected Testimony: | Reason for Change |
|-------|-------|-------------------------------------|-------------------|
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |
|       |       |                                     |                   |

Sworn to before me this _____

Day of _____

_____
NOTARY PUBLIC

Testimony Deposition / Hearing Witness:

X _____

Print: _____

## Lexitas ● Court Reporting ● 800-788-0166

**Administrative Offices** ● 100 Merrick Road – Suite 320W ● Rockville Centre, NY 11570