# EXHIBIT 3

EX 1
7/16/20

## Matt Cornell Investigation Notes

### December 9, 2016

At approximately 2:30 PM, I met with Corrections Officer Matt Cornell at the Office of the District Attorney to prepare for trial in the matter of People v. Sean Gaines. The matter was scheduled for trial on Monday, December 12, 2016. I had made arrangements with Cornell to meet at the DA's Office earlier in the day, during a telephone conversation. Throughout the week I had called Cornell's cell phone to schedule a meeting but was unable to reach him. The phone call would ring through to voicemail, with the voicemail stating that he was unable to accept messages because the mailbox was full. I had also tried to reach Cornell at the prison on determine when he was working, but was informed by the charge sergeant that he was off for several days, having swapped shifts, and it was unclear as to when he would be returning. I also texted Cornell from my personal cell phone on Thursday, December 8, but received no response. On the morning of December 9, 2016, I sent an email to Lt. Joseph Vasile at Auburn Prison, requesting some documents related to the Gaines case and also asking if he knew of a way to contact Cornell. Cornell then immediately called me at the DA's Office, as he was working that morning and was responding to Vasile's prompt.

Cornell arrived at the reception area of the DA's Office, and I was notified by secretary Tina Smith that he was here, that he seemed "hyper," and that he immediately asked to use our restroom. I waited several minutes and then greeted Cornell in the reception area. He was alone and in uniform. I immediately noted that he seemed somewhat disheveled and had red blotches on his forehead and nostrils. At some point when we were speaking, he apologized for how he looked and not responding to my calls, stating that he had spent the last few days at his camp hunting and left at 5 AM that morning, going straight to work. I sat with my back to the conference window with Cornell across from me. I had with me my trial binder for Gaines and a folder containing Cornell's To/From report for Gaines, his misbehavior report, and his grand jury testimony. The conference room door was closed when Cornell and I spoke.

The conversation began with Cornell stating something to the effect of "he's fighting this, huh?" Cornell then asked me if I knew that he was caught with another weapon in Elmira. I knew this information, having received Gaines' current disciplinary report from Lt. Vasile as part of my trial preparation. I told Cornell that I knew this and then asked how he knew it. Cornell mentioned (I think) that he had a buddy in Elmira and that he could also track this stuff on his computer, which seemed odd to me because I know of no public website that allows you access to disciplinary history in DOCCS. I was concerned about this because part of my trial preparation is to flesh out any potential bias or prejudice he may have against this defendant, so the idea that he was tracking him was a concern. I asked Cornell why he was following up on this particular inmate and Cornell said he usually likes to track his guys and that

Gaines was a particular "trophy" to him. He elaborated that Gaines was a ranking member of the Bloods and that it was very rare to catch someone like him with a weapon on them. He knew Gaines from the prison by the name of Moneybags and that he had no prior disagreements or problems with him otherwise.

We then went through the details of the incident with Gaines. Of issue during my trial preparation was an inconsistency in the To/From statement and Cornell's grand jury testimony as to how they first suspected that Gaines had a weapon. Cornell explained that he received a tip from a confidential informant at the prison, who he only identified as a sex offender no longer at the prison, who provided the information in exchange for Cornell allowing him to have a "kitchen" in his cell. He explained that "kitchen" meant a hot plate. Cornell explained that when they use informants at the prison, they try to be vague about the source of the information in their reports, in order to avoid any potential retaliation against the informants. When I asked why this particular informant would know that Gaines had possession of a weapon, Cornell explained that the informant was a "plate" for Gaines before. Cornell explained that "plate" meant an inmate in the prison used by another inmate to hold contraband items (drugs or weapons). The Bloods are known to threaten other inmates (plates) to get them to carry contraband.

After receiving this tip from the informant, Cornell notified his supervisor, Sergeant Jeff Porten, who authorized Cornell to conduct a pat frisk of Gaines in the main recreation yard. Cornell performed the pat frisk on Gaines, with Porten observing. No item was found, which Cornell expected because he knew inmates (particularly the Bloods) to "cheek" weapons. He explained that "cheeking" meant to hide items in the mouth. Gaines was clearly hiding something in his mouth, and they cannot search an inmate's mouth during a pat frisk. Sergeant Porten authorized a strip frisk and they escorted Gaines to the nearest "center room" in the prison. Cornell, Porten, and Gaines were all in the center room. Cornell said something to the effect of, "Moneybags, just give it up." Gaines produced the contraband weapon from his mouth and handed it to Cornell. He secured the weapon in his pocket, the did the strip frisk with nothing else found, and brought Gaines to the Special Housing Unit. Gaines was cooperative throughout the search and escort.

I then explained to Cornell that, at issue in this case, was an alleged complaint made by Gaines months before this incident where he claimed that he feared retaliation as a result of being a witness to an incident involving corrections guards and inmates on March 10, 2015. I asked Cornell if he remembered the incident, which he affirmed. He was in the recreation yard at the time, as was most staff because it was a Code 2 at the prison. I asked him if he remembered what Gaines was doing during the incident or if he remembered having any interaction with him during the incident. Cornell did not recall anything specific by Gaines. I asked Cornell if he knew inmate ▓▓▓▓▓▓▓ who was involved in the March 10 incident and was referenced in the letter that Gaines supposedly wrote to the superintendent after the

incident. Cornell stated that Davis was Gaines' "boy" and that they all ran with the Bloods, specifically he through the Redstone Riders. Cornell stated that it was mostly Bloods involved in the March 10 incident. I asked him if he knew of any threats or made any threats to Gaines after this incident. Cornell said that he did not and that he personally had a decent relationship with Gaines after the incident but that he figured that Gaines was mad because they had "boated" a lot of the Bloods out the prison after the March 10 incident. I asked him what he meant by that. Cornell explained that they got rid of them by putting weapons on them. I tried to clarify as to whether he meant that staff was actually placing weapons on these guys and he said yes. He then said that he was telling me this in confidence and that I did not have to worry because he would not say this in court. I then asked if he put a weapon on anyone in the prison and he said yes. I asked him who. He said his name was ▮▮▮▮. I asked for the first name and he said ▮▮▮▮. I tried to clarify as to whether he meant that he planted evidence. He then said again that he was telling me this in confidence and that he was not saying he planted a weapon or anything like that, mentioning that he might have just found it in his cell. He became somewhat inarticulate and nervous while stating this, using the phrase "you know what I mean" several times. I then asked if he planted a weapon on Gaines and he said that he did not and that Gaines was a "clean" find. I did not question this further but later asked if there was anything I needed to know because Gaines might know and it would probably come out at trial. Cornell stated that the only thing that he and Gaines talked about after this was that Gaines asked him, after the weapon was found, if it was the sex offender that gave him up. Cornell said that he did not say anything in response but that he (Cornell) probably did not do a great job in concealing this.

We returned again to the topic of the Bloods and the letter that Gaines allegedly wrote to the superintendent. Cornell said that he sort of remembered Gaines showing him some letter he had written around the time that the Bloods were getting moved out. I showed him the letter from my binder (casefile) but Cornell said that he never actually saw the letter but that Gaines (Moneybags) was bragging that he wrote it. I clarified that Cornell did not think he could identify it in court and he said no. I finished our preparation by clarifying his work schedule for the next week and explaining that I did not need him for trial until Tuesday at 1:00 PM, but that I might call him again in the next few weeks if I need to clarify anything else before trial. He told me not to worry and that he was going to clean up his voicemail. He then said again that some of the stuff he said about the Bloods was in confidence and that he hoped I did not get the wrong impression. The entire preparation/conversation lasted about a half-hour to 45 minutes.

Later that day, at the DA's Office, I met with Lt. Vasile. We met relatively briefly, maybe 15 minutes, in the conference room. I did not discuss anything about my meeting earlier with Matt Cornell. Our trial preparation concerned policy and procedure at the prison in regard to contraband, Lt. Vasile's knowledge and involvement of the March 10 incident, and the note that Gaines may have written. Lt. Vasile was going to check with the superintendent and existing records to see if the letter was received and if anything was done in response. I also briefly spoke to DA Budelmann at the close of my day about

the progress of the trial preparation. I did not mention to him anything about the disclosure by Officer Cornell. I did discuss existing difficulties with Officer Cornell and trying to get him more polished for trial presentation, as well as mentioning that I had to constructively find a way to explain the inconsistencies with how they learned that Gaines had possession of a weapon.

### December 10, 2016

I called Lt. Vasile seeking information about any Unusual Incident report for an inmate named ▇▇▇▇ ▇▇▇▇ at Auburn Prison. I followed this request with an email. I also searched the DOCCS website for an inmate ▇▇▇▇▇▇▇▇▇▇, still actively in custody with DOCCS. I also checked saved UI reports and State Police memos for prison referrals to see if we had a copy of any UI. (We did have an inmate ▇▇▇▇ listed on a police memo, which turned out to be this inmate, with a UI that we declined to prosecute.) Lt. Vasile confirmed that they had a recent UI for an inmate named ▇▇▇▇▇▇▇ and would drop the paperwork off to me on Sunday, December 11.

### December 11, 2016

I met with Lt. Vasile at the Office of the District Attorney, who dropped off paperwork on the UI involving ▇▇▇▇▇▇. Per the paperwork, the incident occurred in April 2015, involving a personal search and weapon found by Officer Cornell. I did not provide Lt. Vasile the reason for the need of this paperwork, stating only that it was necessary for the upcoming trial.

### December 12, 2016

Inmate Gaines pled guilty on the morning of trial to Attempted Promoting Prison Contraband in the First Degree, with an agreed sentence of 1½ to 3 years in state prison. I did not disclose any information about Officer Cornell at this time, other than noting some inconsistencies in his statement vs. grand jury testimony, both of which were previously provided to defense counsel. Upon returning to work, I disclosed to DA Budelmann that Officer Cornell admitted to me that he planted a weapon on inmate Johnson. We immediately contacted the IG's office, where I spoke with Shawn Mouseau and Tom Knight. I followed our conversation up with an email to both, outlining the conversation I had with Officer Cornell on Friday. I followed this up with a second email, describing Officer Cornell's demeanor and physical appearance during our meeting. I also spoke with Investigators Graziano and Cacciotti at the IG's office, as I had past dealings with both in regard to a complaint made by another inmate, ▇▇▇▇▇▇▇▇ who claimed that Officer Cornell placed a weapon on him while he was in Auburn. ▇▇▇▇ pled on the day of trial, received a sentence of 2-4 years in state prison from the court. I also began to compile a list of prison cases handled by me, to see which ones involved Matt Cornell in the direct evidence.

**December 13, 2016**

I continued to compile the list of cases involving Matt Cornell, as well as UI reports from declined cases in the 2015 and 2016. Officer Cornell called me on the office phone at approximately 11 AM. The conversation lasted 15 seconds. The nature of the conversation was to confirm that he did not have to report to court this afternoon, as the Gaines case was resolved. I also corresponded (via email) with Tom Knight, exchanging a list of our known cases directly involving Cornell and a list by DOCCS of misbehavior reports written by Cornell. I additionally spoke with Tom Knight, who informed me that Investigator Graziano spoke with inmate█████ and that █████ unprompted, alleged that Cornell planted a weapon on him. I also spoke with Investigators Bud Whitsett and James Bender of the Cayuga DA's office, who planned to interview Cornell the next day. I explained to them what transpired between myself and Cornell on December 9.

**December 14, 2016**

I continued to explore and discuss our legal/ethical obligations as a result of the investigation involving Cornell. As I was leaving for a court appearance in the Town of Victory, I became aware that Cornell was interviewing with Investigators Whitsett and Bender. I did not see Cornell or have any interaction with Cornell at this time.

**December 16, 2016**

Contacted the New York State Prosecutor's Institute and spoke with staff attorney, John O'Mara. Explained our situation to O'Mara, he advised me to write a disclosure letter with the essential facts of the disclosure to our county courts, with copies sent to the attorney of record, the inmate, and the assigned counsel office. He recommended that, in affected cases where the defendant has been sentenced, our best legal action in cases where we feel justice is best served by a dismissal is to disclose the facts and not oppose any 440 motion brought by the defendant.

**December 19, 2016**

Met with DA Jon Budelmann and Chief Assistant Chris Valdina to discuss our proposals moving forward and the affected cases. Compiled a list/summary of cases where Cornell served as a primary or assisting witness, according to our files.

**December 20, 2016**

Participated in conference call with Chief Assistant Christopher Valdina. Also on the conference call (to my knowledge) were OSI Investigator Tom Knight, DOCCS counsel Darren Miller, a representative from the US Attorney's Office, and possibly one other individual. Discussed the present status of the investigation, the list of Cayuga County cases affected by the disclosure, and which agency may ultimately handle any criminal charges stemming from the incident. The conference call lasted approximately one hour. Later in the afternoon, I met with the two judges for the county, Thomas Leone and Mark Fandrich. Also present were their respective law clerks, DA Budelmann, and Chief Assistant Valdina. We relayed the disclosure as well as our intended course of action for the cases affected.

**December 22, 2016**

Prepared drafts of disclosure letters for affected inmates.

**Brian Leeds**

**From:** Brian Leeds
**Sent:** Monday, December 12, 2016 11:59 AM
**To:** 'shawn.mouseau@doccs.ny.gov'
**Cc:** Jon Budelmann; 'tom.knight@doccs.ny.gov'
**Subject:** Matt Cornell

Dear Investigator Mouseau,

I am writing this email to you at your request, with information contained herein to the best of my recollection. On Friday, December 9, 2016, at about 2:30 PM, I met with Corrections Officer Matthew Cornell in our conference room at the Office of the District Attorney to prepare for trial in the matter of People v. Sean Gaines, Indictment ▊▊▊▊ ▊▊▊▊▊ Sean Gaines was charged with one count of Promoting Prison Contraband in the First Degree, with Officer Cornell being the primary witness. Gaines' potential defense to this was that he was being set up by guards at Auburn prison for weapons or drugs, as retaliation for his testifying at a tier hearing for another inmate, ▊▊▊▊▊ The incident involving ▊▊▊▊ was an incident at Auburn prison ▊▊▊▊ 3) on March 10, 2015. When we were discussing how the March incident related to the present charge against inmate Gaines, Officer Cornell told me that the March incident involved members of the Bloods and that, after the March incident, many of the Bloods were "boated" out of the prison. When I confronted him about what he meant by this, Cornell said something to the effect of that they had gotten rid of them. When I further asked about how, he suggested that they got weapons put on them. When I asked if he "put" a weapon on someone, he said yes and then gave me the name of ▊▊▊▊▊. I then directly confronted him about whether he placed a weapon on this inmate and that this presents a real problem if he is saying that, and he immediately backtracked and said that wasn't what he was saying. He then said that he was telling me this information in confidence. I did not press him further on this and we continued to talk about the Gaines case. I asked him if he put a weapon on Gaines in this case and he said no and that this was a "clean" find. Our meeting together lasted approximately a half-hour and no one else was present.

After meeting with him, I checked our list of prison cases to see if we prosecuted or reviewed any cases with inmate ▊▊▊▊▊ We did have one UI involving an inmate named ▊▊▊▊ at we declined to prosecute in 2015, with no reason noted. I contacted Lt. Joseph Vasile at Auburn to see if he could locate any UIs involving a ▊▊▊▊ on at Auburn. I did not tell Lt. Vasile the reason for this, and later would tell him that it was because his name came up during our investigation/preparation with the Gaines case. Lt. Vasile provided me the Unusual Incident Report on Sunday, December 11, at the District Attorney's Office. The UI ▊▊▊▊ was from April 20, 2015, where Matt Cornell found a contraband weapon on inmate ▊▊▊▊▊▊.

I brought this information to District Attorney Jon Budelmann on the morning of Monday, December 12, 2016. We then contacted the IG's Office with this information and I provided the information listed in this email.

**Brian Leeds**
Assistant District Attorney
Cayuga County District Attorney's Office
95 Genesee Street, First Floor
Auburn, NY 13021
(315) 253-4243

1

# Brian Leeds

**From:** Brian Leeds
**Sent:** Monday, December 12, 2016 4:54 PM
**To:** Jon Budelmann
**Subject:** RE: DOCCS Issue

As Chris suggests, we should probably contact Kevin Bruen to discuss the timing and extent of what we want to disclose. I found five cases that Cornell was involved with as the primary corrections officer when he found contraband (weapon) on an inmate. Sean Gaines was today's case. ▮▮▮▮▮▮▮▮ pled a month ago with an agreed 2-4 sentence, just sentenced last week. ▮▮▮▮▮▮▮▮ has been indicted and awaiting arraignment. Donnesia Brown and Thomas Ozzborn both pled with 2-4 year sentences. Let me know tomorrow what you think the next step for us should be.

**From:** Jon Budelmann
**Sent:** Monday, December 12, 2016 3:49 PM
**To:** Chris Valdina; 'cayugada@cayugacounty.us'; Brian Leeds
**Subject:** DOCCS Issue

(c) When a prosecutor knows of new, credible and material evidence creating a reasonable likelihood that a convicted defendant did not commit an offense of which the defendant was convicted,

Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.

1